**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

BANDSPEED, INC.,

               Plaintiff,

               v.

PARROT INC., ET AL.,

               Defendants.

Case No. A-11-CV-771-LY

**JURY TRIAL DEMANDED**

**DEFENDANTS TOM TOM INTERNATIONAL B.V. AND TOMTOM, INC.'S
MOTION TO DISMISS ON THE PLEADINGS OR FOR SUMMARY
JUDGMENT ON BANDSPEED'S ANTITRUST CLAIMS**

Defendants TomTom International B.V. and TomTom, Inc. (collectively, "TomTom") respectfully submit this motion pursuant to FED R. CIV. P. 12(c) to dismiss on the pleadings Bandspeed's antitrust claims that TomTom "combined and conspired to fix the price they pay for licenses of Bandspeed's patented technology at zero," because Bandspeed's conclusory and unspecific allegations are inadequate under *Twombley* and *Iqbal*, or in the alternative, for summary judgment because these claims are wholly unsupported by any evidence.

I.      **Undisputed Facts**

TomTom submits the following undisputed facts:

1.      The Bluetooth SIG is and was, at all relevant times, a standards development organization established to plan, develop, establish, and coordinate Bluetooth, a voluntary consensus standard. Exhibit 1 (https://www.bluetooth.org/en-us/members/about-sig-overview).

2.      Bandspeed joined the Bluetooth SIG in September 2001 as an Associate Member. Response to Certain Defendants Motion to Dismiss Claims 3 – 5 and 8 – 11 pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. # 827) at p. 6, ¶ 1.

3.      Bandspeed asserts that it "withdrew from the Bluetooth SIG and terminated its contractual obligations to the Bluetooth SIG on or about December 12, 2002." Plaintiff's Answer to Defendant TomTom International B.V.'s Counterclaims (Dkt. # 808) at p. 9, ¶ 1.

4.      Bandspeed asserts that "[n]o claims in the '418 patent or the '614 patent are 'necessary' to practice Bluetooth Core Specification Version 1.1 as that term is defined by the Bluetooth Patent/Copyright License Agreement." Plaintiff's Answer to Defendant TomTom International B.V.'s Counterclaims (Dkt. # 808) at p. 9, ¶ 3.

5.      Bandspeed asserts that its patents are not subject to the Bluetooth SIG License Agreement. Plaintiff's Answer to Defendant TomTom International B.V.'s Counterclaims (Dkt. # 808) at p. 9, ¶¶ 1-3.

6.      Bandspeed admits that all of its antitrust conspiracy claims arise from defendants' entry into the Bluetooth SIG License Agreement. Response to Certain Defendants Motion to Dismiss Claims 3 – 5 and 8 – 11 Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. # 827) at p. 5, ¶ 2.

7.      TomTom joined the Bluetooth SIG on January 17, 2003, and remains an associate member in good standing. Exhibit 2, excerpt in relevant part from Bluetooth SIG's Responses to Bandspeed, Inc.'s Interrogatories (filed under seal).

8.      TomTom derives commercial benefits from its associate membership of the Bluetooth SIG including testing and certification of its products as compliant with the Bluetooth standards, the right to use the Bluetooth logos and trademarks on its products and a royalty free

and undisputed license to numerous patents *other* than those of Bandspeed. Exhibit 7 (https://www.bluetooth.org/en-us/members/membership-benefits); Exhibit 3, Declaration of Victor Shcherbatyuk at ¶¶ 5-6; Exhibit 4, Declaration of Peter Spours at ¶ 11.

9.     That no evidence exists of any sort showing that any employee, representative or officer of TomTom communicated with any third party including, but not limited to the Bluetooth SIG or the other defendants agreeing or attempting to agree what royalty rate should be paid to Bandspeed for a license to its patents or agree whether or not to take a license. Exhibit 3, Declaration of Victor Shcherbatyuk at ¶ 8; Exhibit 4, Declaration of Peter Spours at ¶ 8.

10.     TomTom does not participate and has never participated in the licensing policies of the Bluetooth SIG. Exhibit 3, Declaration, of Victor Shcherbatyuk at ¶ 8; Exhibit 4, Declaration of Peter Spours at ¶¶ 5-6.

11.     Since October 2012, TomTom was and is willing to take a license from Bandspeed at the same royalty rate and on the same terms as the license Bandspeed granted via-CSR to the TomTom products previously accused in this case, but does not hold such a license. Exhibit 5, Letter from Peter Spours.

## II.     History

TomTom was not an original defendant to Bandspeed's antitrust claims – but rather was initially accused by Bandspeed only of patent infringement.[1] The operative complaint was filed

---

[1] *Bandspeed v. Acer, et al*, Case No. 2:10-cv-00215-TJW (E.D. Tex.) Complaint (Dkt. # 1) (June 30, 2010); Amended Complaint (Dkt. # 313) (January 21, 2011). On October 22, 2012 Bandspeed entered into a license and settlement agreement with Cambridge Silicon Radio ("CSR"). As a result of that settlement, the vast majority of TomTom products previously accused, which used Bluetooth chips supplied by CSR, were licensed and dismissed from the case. Only 2,780 TomTom products remain accused in this case with a license value of approximately $20 at the royalty rate agreed by Bandspeed that applied to the TomTom CSR based products. The remaining un-accused products of TomTom sold in the United States use processors supplied by Broadcom, but otherwise are personal navigation devices.

by Bandspeed on December 23, 2011, months after receiving over 1 million pages of documents from TomTom, including all locatable documents relating to TomTom's involvement and dealings with the Bluetooth SIG.[2] Notwithstanding this discovery, the only allegation that Bandspeed has ever made to support its present claim against TomTom is:

> Further, defendants TomTom and Toshiba, along with other defendants, are liable for all acts of their co-conspirator defendants done in furtherance of such conspiracy.[3]

Bandspeed offered no explanation or even suggestion of how, when, or through what actors TomTom suddenly achieved this status of co-conspirator.  There is no allegation of fact beyond the parallel conduct (if it can be called that), of TomTom becoming a member of the Bluetooth SIG.

> Bandspeed has asserted that its

> antitrust conspiracy claims arise from Moving Defendants' entry into the Bluetooth SIG License Agreement. (SAC ¶¶ 84, 87 – 98, 95 – 96.).[4]

In short, Bandspeed's entire antitrust claim is predicated on TomTom's mere membership in the Bluetooth SIG, and thus its "entry into the Bluetooth SIG License Agreement," (the very agreement Bandspeed contends does not apply to its patents), an accusation that could be applied to some 18,313 other companies, who, in parallel with TomTom, are members of the Bluetooth SIG.

On this thin allegation of TomTom's alleged activities, Bandspeed has asserted a lurid list of antitrust abuses against TomTom:

- Price-fixing under Sherman Act § 1;

---

[2] *See NOTICE by TomTom International B.V., TomTom, Inc., re 414 Order of Compliance with Document Production Pursuant to Paragraph 3(b) of the Discovery Order,* (Dkt. # 531) (E.D. Tex.) dated July 22, 2011.

[3] Second Amended Complain dated December 23, 2011 (Dkt. # 731) at ¶ 97.

[4] Response to Certain Defendants Motion to Dismiss Claims 3 – 5 and 8 – 11 Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. # 827) at p. 5.

- Concerted Refusal to Deal/Group Boycott under Sherman Act § 1; and

- Conspiracy to Monopsonize under Sherman Act § 2.

At no point in these proceedings has Bandspeed elaborated on or described in any way: (1) TomTom's knowledge of or specific role in the alleged conspiracy; (2) any occasion on which TomTom in fact offered Bandspeed "zero" for a license to its patents; (3) identify any occasion prior to filing suit when Bandspeed even attempted to license TomTom and was rebuffed; (4) alleged that TomTom ever met with, discussed or remotely suggested to any other company what royalty Bandspeed should be paid; or (5) suggested that TomTom discussed with any other company or business entity that it should not take a license from Bandspeed.

Bandspeed openly admits that in September of 2001 it joined the Bluetooth SIG and it is apparent that it was then aware that as a member of the Bluetooth SIG it had entered into certain obligations with respect to intellectual property and that users of the Bluetooth standard could be expected to raise such obligations. Exhibit 6 (filed under seal).  Membership in the Bluetooth SIG confers a wide array of important commercial benefits, it: (a) allows TomTom to have its products tested and certified as Bluetooth® compliant; (b) allows TomTom to use Bluetooth's trademarks and logo on packaging and advertising; and (c) provides TomTom with an uncontested royalty free license to essential patents held by numerous companies *other than Bandspeed.* Exhibit 3 at ¶ 6; Exhibit 4 at ¶ 11. The latter is a very substantial benefit, since 23,234 U.S. Patents alone refer to Bluetooth in their description and claims, including 1,406 held by Microsoft, 1,218 by Nokia, 1,147 by Sony, 731 by Intel, 720 by Ericsson and 401 by Toshiba. Exhibit 4 at ¶ 10.  It is well established that membership in a standard-setting group and adherence to its intellectual property policies is not in itself a basis for an antitrust claim,[5] but

---

[5] *See, most recently, TruePosition, Inc. v. LM Ericsson Telephone Co.*, --- F.Supp.2d ----, 2012 WL 4718786, *7 (E.D. Pa. 2012) ("It is well-settled that "mere membership, even when coupled with knowledge of wrongful conduct of the

rather, to the contrary, failure of a participant to honor and follow the intellectual property policies of the group can support an antitrust claim.[6]

TomTom's sole activity as an associate member of the Bluetooth SIG has been to submit its products to be certified as compliant with the Bluetooth standard. <u>Exhibit 3</u> at ¶ 5. TomTom has never participated in any licensing policy discussions and indeed joined the Bluetooth SIG *after* the license policy Bandspeed complains of was adopted. <u>Exhibit 2</u>, <u>Exhibit 3</u> at ¶ 8, <u>Exhibit 4</u> at ¶ 8.

## III.   Argument

The common element in all three of Bandspeed's antitrust counts against TomTom is the allegation that TomTom "combined and conspired" with the other defendants to pay "zero" royalties for Bandspeed's patents. *See* Second Amended Complaint (Dkt. # 731), Third Claim at ¶ 117, Fourth Claim at ¶ 123, Fifth Claim at ¶ 128.  Bandspeed's entire case against TomTom is predicated on the fact that TomTom, like 18,313 other companies, joined the Bluetooth SIG.

While "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently,"[7] Bandspeed has offered nothing to overcome the strong reasons, independent of any license of Bandspeed's patents at any royalty rate, that TomTom would have for joining the Bluetooth SIG and signing the Bluetooth SIG License Agreement.  It is undisputed that membership of the Bluetooth SIG conveys substantial commercial benefits on TomTom including compliance testing, the right to

---

association, is insufficient to establish knowing participation.") (citing *Carpet Grp. Int'l. v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp.2d 249, 273 (D. N.J. 2003); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp.2d 709, 733 (E.D. Pa. 2011)).

[6] *See, Broadcom Corp. v. Qualcomm, Inc.*, 510 F.3d 197, 314 (3rd Cir. 2007); *In the Matter of Negotiated Data Solutions LLC*, File No. 0510094, (FTC Jan 23, 2008) – complaint, decision and order available at http://ftc.gov/os/caselist/0510094/index.shtm; *In the Matter of Robert Bosch GmbH*, Docket No. C-4377 (FTC Nov. 26 2012) – complaint, decision and order available at http://www.ftc.gov/os/caselist/1210081/) .

[7] *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 553-54 (2007).

use the Bluetooth® logo, discounts on Bluetooth SIG services and an undisputed license to numerous patents from parties other than Bandspeed. Exhibit 3 at ¶¶ 5-6; Exhibit 4 at ¶ 11.  Thus there are identifiable and sound commercial reasons for TomTom to have independently decided (as some 18,000+ other companies did) to join the Bluetooth SIG.[8]   Indeed the 23,234 U.S. Patents alone that refer to Bluetooth in their description and claims, the vast majority held by companies other than Bandspeed, many of which are licensed under the Bluetooth SIG License Agreement, constitute a sound commercial and competitive reason for TomTom to have independently chosen to sign the Bluetooth SIG License Agreement.  Exhibit 4 at ¶ 11.

Bandspeed has offered no evidence of concerted action on TomTom's part. Bandspeed merely offers the circumstantial evidence that *some* of the accused defendants declined to take a license from Bandspeed without the additional inferences required in order to support a claim of conspiracy.[9]  That accusation with respect to defendants other than TomTom (and Toshiba) would not in itself be enough to survive a motion to dismiss.[10]   However, Bandspeed does not even allege that TomTom is one of the companies who was offered a license and rejected it.

Bandspeed's claim cannot, *inter alia*, be based on TomTom's signing of the Bluetooth SIG License Agreement when joining the Bluetooth SIG on January 17, 2003 – because such a

---

[8]  "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Golden Bridge Tech., v. Motorola, Inc.* 547 F.3d 266, 272-73 (5th Cir. 2008).

[9] *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002). It is undisputed that Bandspeed was a member of the Bluetooth SIG, that it filed the patent applications at issue while it was a member of the Bluetooth SIG and that the Bluetooth SIG License Agreement exists.  In light of these facts, and the existence of prevailing and well known case law such as *Wang Laboratories, Inc. v. Mitsubishi Elec. America. Inc*., 103 F.3d 1571, 1582 (Fed. Cir. 1997) and *Qualcomm, Inc. v. Broadcom Corp,* 548 F.3d 1004 (Fed. Cir. 2008) any competent counsel would advise their client to raise the defenses of license, estoppel, misuse and unenforceability to Bandspeed's claim.  That several companies would hire competent counsel does not require conspiracy or collusion; it is a decision all should reach independently.  As each defendant could reasonably have refused to take a license based on an "independent evaluation of its best interests," the common action of such defendants is not sufficient to support a claim of conspiracy.

[10]  *See, e.g.* Exhibit 8, *Cascades Computer Innovation LLC v. Defendants RPX Corporation, et al*, Case No. 12-cv-01143-YGR (N.D. Cal. Jan. 24, 2013) (Dkt. # 93).

claim would be time-barred.[11]   The only remaining overt act that Bandspeed could allude to on

TomTom's part is TomTom's defenses raised in this proceeding – but those defenses are

protected by the *Noerr-Pennington* doctrine.[12]

Bandspeed's antitrust claim against TomTom is nothing more than an allegation that

TomTom is a member of the Bluetooth SIG.  It is also long and well settled law that mere

membership in a trade association, including attendance at meetings, is insufficient, without

more, to give rise to an inference of conspiracy.[13]  As one court noted:

> Indeed, far from being anticompetitive or merely benign, [standards setting
> organizations] generally have beneficial effects on competition.  Product
> uniformity through standardization, especially in technological markets, facilitates
> the comparison of competing products, which benefits consumers in the short run
> and provided incentives for engineers to develop the next generation of
> compatible products, thereby providing longer-term consumer benefits.  Likewise,
> new producers have easier entry into a market when standards exist, thus also
> increasing competition.  In addition, a future product will have the additional
> benefit of a longer product life if it revolves around an existing standard; a
> standardized technology core also lowers a company's cost of developing a next
> generation product.  Finally, producers have lower marketing costs in bringing
> products to a predefined, standardized market.[14]

Congress too has recognized the benefits of standard setting organizations. The Standards

Development Organization Advancement Act of 2004 was specifically enacted to protect

---

[11] 15 U.S.C. § 15(b).  Bandspeed sought to make a virtue of its inadequate pleadings, arguing that as it had not alleged a date, the statute of limitations could not be asserted. Response to Certain Defendants Motion to Dismiss Claims 3 – 5 and 8 – 11 Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. # 827) at p. 5-6, 9.  However, the statute of limitations does apply "where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir. 2003).

[12] *Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)

[13] *See, e.g.  Kendal v. Visa USA, Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

[14] *Rambus, Inc. v. Infineon Technologies, A.G.,* 330 F. Supp.2d 679, 969 (E.D. Va. 2004) (internal citations omitted). The Fifth Circuit has underscored the benefit of product information from a mark like Bluetooth: "Product information is crucial to a competitive market. . . . This information saves buyers the trouble of investigating products themselves and the risk of trying untested products. . . .  Even if user reliance give API significant influence over the market, that influence may enhance, not reduce, competition and consumer welfare. . . .  Because product information reduces uncertainty, it both increases consumer demand for the product and encourages producers to improve their products. . . . Competition can force sellers to provide accurate quality information to consumers. These are benefits that the antitrust laws should not discourage. . . ." *Consol Metal Prods. v. Am. Petroleum Inst.,* 846 F.2d 284, 296 and n. 46 (5th Cir. 1988).

standard setting as an activity from improper antitrust claims. 15 U.S.C. § 4301-5, Pub. L. 108-237, Title I, § 102, June 22, 2004, 118 Stat. 661 (noting congressional finding of "the importance of technical standards developed by voluntary consensus standards bodies to our national economy").[15]

In the context of a standards setting group, it has also recently been held that "mere membership, even when coupled with knowledge of wrongful conduct of the association, is insufficient to establish knowing participation" to establish a conspiracy claim.[16] Bandspeed has shown nothing more, and alleged nothing more, than TomTom is a member of the Bluetooth SIG.

Failure to show the conspiracy required under Sherman § 1 necessarily means that the Sherman § 2 claim fails. Indeed showing conspiracy under Sherman § 1 is not enough to prevail on a Sherman § 2 claim without showing intent to monopolize and at least one overt act in furtherance of the conspiracy.[17] In sum, Bandspeed's mere allegation that TomTom was a member of the Bluetooth SIG is insufficient to establish an antitrust conspiracy and TomTom is entitled to summary judgment, or in the alternative, judgment on the pleadings.

---

[15] A major protection being the mandatory award of attorney's fees to a prevailing defendant set fort in § 4304 of the act, a remedy TomTom has already indicated it expects to pursue.

[16] *TruePosition Inc.*, n. 5, *supra.*

[17] *American Tobacco v. United States*, 328 U.S. 781, 809 (1946). *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 118 (3rd Cir. 1980). *See generally*, L. Sullivan, W. Grimes, THE LAW OF ANTITRUST: AN INTEGRATED HANDBOOK (2ED. 2006) §3.7: "To establish a conspiracy to monopolize in violation of Section 2 of the Sherman Act, a plaintiff must show, in addition to the conspiracy itself, an intent and purpose to exercise monopoly power . . . at least one overt act in furtherance of the conspiracy is required."

Dated: April 26, 2013

                         Respectfully submitted,

                         Colm MacKernan
ORIGIN LTD.
Twisden Works
Twisden Road
London NW5 1DN, United Kingdom
Telephone: +44 (0)20 7424 1950
Facsimile: +44 (0)20 7209 0643
Email: colm.mackernan@origin.co.uk

James H. Wallace, Jr.
Kevin P. Anderson
Brian H. Pandya
Joseph Shin
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
Emails: jwallace@wileyrein.com,
bpandya@wileyrein.com, jshin@wileyrein.com

Larry F. York
State Bar No. 22164000
Nicholas P. Laurent
State Bar No. 24065591
McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
600 Congress Avenue, Suite 2100
Austin, Texas 78701
Phone: (512) 495-6075
Fax:    (512) 505-6375
Email:  lyork@mcginnislaw.com
Email:  nlaurent@mcginnislaw.com

By: */s/ Nicholas P. Laurent*
     Nicholas P. Laurent

COUNSEL FOR DEFENDANTS
TOMTOM, INC. AND TOMTOM
INTERNATIONAL BV

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this April 26, 2013.

*/s/ Nicholas P. Laurent*
Nicholas P. Laurent
