# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BANDSPEED, INC., | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | |
| | § | |
| GARMIN INTERNATIONAL, INC.; | § | CAUSE NO. A-11-CV-771-LY |
| GARMIN USA, INC.; LG | § | |
| ELECTRONICS, INC.; LG | § | |
| ELECTRONICS U.S.A., INC.; LG | § | JURY TRIAL DEMANDED |
| ELECTRONICS MOBILECOMM U.S.A., | § | |
| INC.; MOTOROLA SOLUTIONS INC., | § | |
| FNA MOTOROLA, INC.; MOTOROLA | § | |
| MOBILITY INC.; RESEARCH IN MOTION | § | |
| LIMITED; RESEARCH IN MOTION | § | |
| CORPORATION; TOSHIBA | § | |
| CORPORATION; TOSHIBA AMERICA | § | |
| INFORMATION SYSTEMS, INC.; | § | |
| TOSHIBA AMERICA, INC.; AND | § | |
| BLUETOOTH SIG, INC., | § | |
| | § | |
| DEFENDANTS. | § | |

## DEFENDANT BLUETOOTH SIG, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  SUMMARY OF THE ARGUMENT ................................................................. 1

II.  STATEMENT OF FACTS ........................................................................... 3

    A.  Bandspeed's Patent Claims ................................................................ 3

    B.  Bandspeed's Antitrust Claims ............................................................ 4

        1.  Bandspeed's Membership in and Withdrawal from the Bluetooth SIG ................. 4

        2.  The Disputed Terms of the BPLA ........................................... 5

        3.  Bandspeed's Antitrust Allegations ......................................... 6

    C.  Bandspeed's Evidence of an Alleged "Retroactive Reinterpretation" Agreement .......... 7

III.  ARGUMENT ......................................................................................... 9

    A.  Bandspeed's Antitrust Claims are Barred as a Matter of Law by the *Noerr-Pennington* Doctrine ................................................................ 10

        1.  The *Noerr-Pennington* doctrine applies to joint litigation efforts ......................... 10

        2.  Defendants' alleged anticompetitive conduct is immunized by the *Noerr-Pennington* doctrine ................................................ 13

        3.  Bandspeed cannot meet its very high burden of showing that the "sham" litigation exception to the *Noerr-Pennington* doctrine applies ................................ 16

        4.  The *Noerr Pennington* Doctrine applies to all of Bandspeed's antitrust-related claims. ................................................ 19

    B.  Bandspeed's Antitrust Claims Fail for Lack of Evidence as to the Existence of an Illegal Agreement ................................................ 20

        1.  Bandspeed has no direct evidence of an agreement .................................. 21

        2.  Bandspeed's purported "circumstantial" evidence is insufficient to survive summary judgment ................................................ 22

    C.  The Governing Legal Standard Requires Summary Judgment as to Bandspeed's Antitrust Claims ................................................ 26

        1.  The rule of reason governs Sherman Act § 1 antitrust claims against an SSO ........ 27

        2.  Bandspeed cannot meet its burden of establishing that the presumptive rule of reason test does not apply ................................................ 28

        3.  Bandspeed's Sherman Act § 1 "price fixing" claim must be dismissed on summary judgment because it alleges only a *per se* violation ................................ 31

IV.  CONCLUSION ....................................................................................... 32

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Addamax Corp. v. Open Software Found.*,
    152 F.3d 48 (1st Cir. 1998) ................................................................. 28

*Am. Needle, Inc. v. Nat'l Football League*,
    130 S. Ct. 2201 (2010) ................................................................. 28, 31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................. 9

*Barton's Disposal Service, Inc. v. Tiger Corp.*,
    886 F.2d 1430 (5th Cir. 1989) ................................................................. 16

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979) ................................................................. 28, 29

*Broadcom Corp. v. Qualcomm, Inc.*,
    501 F.3d 297 (3d Cir. 2007) ................................................................. 30

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984) ................................................................. 12

*California Motor Transp. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ................................................................. 10

*Cascades Computer Innovation, LLC v. RPX Corp.*,
    2013 WL 316023 (N.D. Cal. 2013) ................................................................. 10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................. 9, 19

*Coastal States Marketing, Inc. v. Hunt*,
    694 F.2d 1358 (5th Cir. 1983) ................................................................. 11

*Columbia v. Omni Outdoor Adver., Inc.*,
    499 U.S. 365 (1991) ................................................................. 17

*Destec Energy, Inc. v. Southern Calif. Gas Co.*,
    5 F. Supp. 2d 433 (S.D. Tex. 1997) ................................................................. 16

*Eastern R.R. Presidents Conference v. Noerr Motor Freight*,
    365 U.S. 127 (1961) ................................................................. 1, 17

*F.T.C. v. Actavis, Inc.*,
    133 S.Ct. 2223 (2013) ................................................................. 27

*Feminist Women's Health Clinic, Inc. v. Mohammad*,
    586 F.2d 530 (5th Cir. 1978) ................................................................. 11, 12, 14

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ................................................................. passim

*IGEN Int'l, Inc. v. Roche Diagnostics GMBH*,
    335 F.3d 303 (4th Cir. 2003) ................................................................. 17

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ................................................................. 21

*In re Burlington Northern, Inc.*,
    822 F.2d 518 (5th Cir. 1987)............................................................................ 11

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999).......................................................................... 23

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)............................................................................. 32

*In re Morrison*,
    2009 WL 1856064 (Bankr. S.D. Tex. June 26, 2009)....................................... 15

*In re Terazosin Hydrochloride Antitrust Litig.*,
    335 F. Supp. 2d 1336 (S.D. Fla. 2004)............................................................. 17

*Jones Knitting Corp. v. Morgan*,
    361 F.2d 451 (3d Cir. 1966)............................................................................. 15

*Kaiser Found. Health Plan, Inc. v. Abbot Labs., Inc.*,
    552 F.3d 1033 (9th Cir. 2009).......................................................................... 18

*Lamar Cnty Elec. Coop. Ass'n v. Rayburn Cnty. Elec. Coop., Inc.*, 330 F. Supp. 2d
    763 (E.D. La. 2002)......................................................................................... 17

*Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007).......................... 27

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................... 9, 20, 23

*Mir v. Little Co. of Mary Hosp.*,
    844 F.2d 646 (9th Cir. 1988)............................................................................ 12

*Mondis Tech., Ltd. v. LG Elec., Inc.*,
    2009 WL 901480 (E.D. Tex. Mar. 31, 2009)..................................................... 15

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)................................... 20

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma*,
    468 U.S. 85 (1984)........................................................................................... 28

*Nova Designs v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000).......................................................................... 23

*NW Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*,
    472 U.S. 284 (1985)......................................................................................... 29

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010)........................................................................ 27

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)....................................................................... 11, 16, 17, 18

*Rambus, Inc. v. Infineon Techs. AG*,
    330 F. Supp. 2d 679 (E.D. Va. 2004)................................................................ 31

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
    971 F.2d 37 (7th Cir. 1992)............................................................................. 23

*Royal Drug Co., Inc. v. Group Life and Health Ins. Co.*,
    737 F.2d 1433 (5th Cir. 1984).......................................................................... 25

*Shapiro v. Gen. Motors Corp.*,
  472 F. Supp. 636 (D. Maryland 1979) ................................................................... 24

*Sony Electronics, Inc. v. Soundview Technologies, Inc.*,
  157 F. Supp. 2d 180 (D. Conn. 2001) ............................................................. 14, 15

*Southway Theatres, Inc. v. Georgia Theatre Co.*,
  672 F.2d 485 (5th Cir. 1982)................................................................................. 26

*Stearns Airport Equip. Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999)................................................................................. 23

*Texaco, Inc. v. Dagher*,
  547 U.S. 1 (2006) ................................................................................... 27, 29, 32

*Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*,
  496 F.3d 403 (5th Cir. 2007).................................................................... 20, 21, 23

*United Mine Workers v. Pennington*,
  381 U.S. 657 (1965) ......................................................................................... 1, 11

*W. Penn Allegheny Health Sys. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010)..................................................................................... 23

## STATE CASES

*DeSantis v. Wackenhut Corp.*,
  793 S.W.2d 670 (Tex. 1990) .................................................................................. 19

*Tilton v. Marshall*,
  925 S.W.2d 672 (Tex. 1996) .................................................................................. 19

## FEDERAL STATUTES

15 U.S.C. § 1...................................................................................... 1, 27, 31

15 U.S.C. § 2........................................................................................... 1, 23

Texas Business & Commerce Code § 15.01 ............................................................ 1

## STATE STATUTES

Federal Rule of Civil Procedure 56(a) ...................................................................... 9

## FEDERAL RULES

Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and
  Competition,", Ch. 3, Sec. II.c, April 2007, U.S. Dept. of Justice and Fed. Trade
  Comm'n.................................................................................................................. 28

Antitrust Guidelines for the Licensing of Intellectual Property § 3.4,
  U.S. Dept. of Justice............................................................................................. 28

Standards Development Organization Act of 2004, Pub. L. No. 108-237 § 104, 118
  Stat. 661, 663....................................................................................................... 27

Defendant Bluetooth SIG, Inc. ("Bluetooth") respectfully submits this Motion for summary judgment as to Plaintiff Bandspeed, Inc.'s ("Bandspeed") antitrust claims against Bluetooth.

## I.      SUMMARY OF THE ARGUMENT

In 2011, Bandspeed expanded an 18-month-old patent dispute by asserting a baseless antitrust theory and dragging Bluetooth into this litigation as a result.  The antitrust-related claims[1] were then and are now legally and factually meritless in their entirety.  Yet, for over 18 months Bluetooth and the other Defendants have been forced to endure extremely expensive discovery and other litigation activities, to search for and review hundreds of thousands of pages of documents, and to sit through days of depositions.  Despite this massive discovery effort, Bandspeed's antitrust-related claims lack any evidence and remain barred as a matter of law on at least three independent grounds.[2]

First, Bluetooth and its co-defendants are wholly immune from Bandspeed's antitrust claims under the *Noerr-Pennington* doctrine ("*Noerr-Pennington*").[3]  All of the allegations and facts on which Bandspeed grounds its antitrust claims occurred **after** Bandspeed filed its patent infringement claims in 2009.  Every action that Bandspeed argues is part of an antitrust violation—most of which are in fact court filings in this case—was taken in defense of

---

[1] This includes five claims under the Sherman Act, 15 U.S.C. §§ 1-2 (which are all based on an alleged conspiracy to either restrain trade or monopolize), an undefined claim (*i.e.*, citing no applicable statute) for "Unfair Competition Under Texas Law" that appears to arise under the Texas state antitrust law, Tex. Bus. & Comm. Code § 15.01, *et seq.*, and a claim for Civil Conspiracy.

[2] Bluetooth reserves the right to submit additional summary judgment motions.

[3] The *Noerr-Pennington* doctrine was first established in two Supreme Court cases: *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

Bandspeed's patent infringement claims.   Over 50 years of law under *Noerr-Pennington* establishes that such actions taken in pursuit of redress from the courts are immune from the antitrust laws and are protected by the First Amendment.   Moreover, Bandspeed has not met and cannot meet its burden of establishing that Defendants' litigation activities fall within the extremely narrow "sham" exception to the *Noerr-Pennington* doctrine.   Accordingly, Bandspeed's antitrust claims are subject to summary judgment for this reason alone.

Second, even if *Noerr-Pennington* did not foreclose Bandspeed's claims against Bluetooth, those claims separately fail because Bandspeed has **no evidence** that Bluetooth participated in a "conspiracy" or "agreement" that is the alleged predicate to all of Bandpeed's antitrust-related claims.   Bluetooth is a standard setting organization ("SSO").   The only evidence Bandspeed has ever identified constitutes nothing more than a very few instances in which members of the SSO (certain End Product Defendants) asked that SSO (Bluetooth) how Bluetooth's patent/copyright cross-licensing agreement might apply to the facts of the then-pending patent infringement lawsuit Bandspeed filed against them related to certain Bluetooth technology.   All of this conduct occurred after and in response to Bandspeed's assertion of patent infringement claims.   Such evidence cannot constitute the type of concerted action prohibited by the antitrust laws.

Third, the purported anticompetitive conduct alleged by Bandspeed is not a "*per se*" violation of the Sherman Act even if an agreement existed, which it does not.   Bluetooth is a non-profit Special Interest Group formed to create a wireless technological standard.   This standard enables convenient and secure short range connections between a variety of devices. The Bluetooth patent/copyright cross-licensing agreement was created by Bluetooth to facilitate and implement a successful standard and is integral to its existence; without such an agreement,

the Bluetooth standard could not exist.  The heart of Bandspeed's antitrust-related claims is that Defendants are improperly interpreting the Bluetooth cross-licensing agreement.  But courts have long held that actions by such organizations and their members are subject to the antitrust "rule of reason,"[4] not the "*per se*" test alleged by Bandspeed.  Bandspeed cannot meet its burden to establish that its antitrust claims are subject to the *per se* test.  The rule of reason applies here and, to the extent Bandspeed has failed to plead such violations under the rule of reason, its claims should be dismissed on summary judgment for this reason as well.

Fully aware of the numerous defects in its antitrust claims, Bandspeed has resorted to (and will no doubt do so again here) repeating the phrase "retroactive reinterpretation" *ad nauseum*, as if those words had some legal import or meaning in the antitrust laws.  They do not. Bandspeed's theory that Bluetooth and its co-Defendants "retroactively reinterpreted" the 2001 patent/copyright cross-licensing agreement is legally irrelevant.  Bandspeed's spurious antitrust-related claims and the burden and expense of defending against those claims by Bluetooth have gone on far too long.[5]  It is time that those claims are dismissed on summary judgment.

## II.    STATEMENT OF FACTS

### A.  Bandspeed's Patent Claims

On August 7, 2009, Bandspeed filed the first patent lawsuit related to this case naming three defendants, and on August 13, 2009 filed an amended complaint.  *See* Case No. 1:09-cv-00593-LY (W.D. Tex.), dkt. nos. 1 and 13.  Bandspeed subsequently filed a Second Amended Complaint on October 9, 2009, naming additional defendants.  *Id.*, dkt. no. 53 (adding Lego

---

[4] See Part III.C, *infra*, defining the rule of reason and explaining why it virtually always applied to the activities of a SSO.

[5] During the August 23, 2013, status conference, this Court correctly expressed skepticism regarding Bandspeed's antitrust-related claims and indicated a willingness to consider summary judgment motions on legal issues such as those presented in this motion.

Systems, Parrot and Scosche Industries).[6]  These filing dates are critical because, as described below, all of Bandspeed's alleged "anticompetitive conduct" evidence is based on conduct that occurred post-filing.

## B. Bandspeed's Antitrust Claims

On January 21, 2011, Bandspeed filed an Amended Complaint alleging both patent claims and, relevant to this motion, antitrust-related claims against Bluetooth and the other Defendants.  Case No. A-11-CV-771-LY, dkt. no. 313.  On December 23, 2011, Bandspeed filed a Second Amended Complaint (the "SAC"), which remains the operative complaint in this case. *Id.*, dkt. no. 731.

In the SAC, Bandspeed alleges that Bluetooth is a trade association that was formed and maintained by certain defendants and others.  *Id.* at ¶¶ 79-81.  The crux of Bandspeed's antitrust allegations relate to what is known as the Bluetooth Patent/Copyright License Agreement (the "BPLA").  To understand these allegations—and why they are ultimately barred by the *Noerr-Pennington* doctrine and insufficient to survive summary judgment—some brief background information is necessary.

### 1. Bandspeed's Membership in and Withdrawal from the Bluetooth SIG

Bandspeed applied for and joined the membership of Bluetooth on September 17, 2001. SAC ¶ 91.  In becoming a Bluetooth member, Bandspeed accepted the BPLA's terms. Declaration of Mark Powell In Support of Bluetooth Mot. for Partial Summ. J. ("Powell Decl."), Ex. 1 (BPLA).  Bandspeed alleges that it withdrew from Bluetooth on December 16, 2002.  SAC ¶ 92.

---

[6] On June 30, 2010, Bandspeed filed a separate patent lawsuit in the Eastern District of Texas. Case No. 2:10-cv-00215-TJW (E.D. Tex.).  The Eastern District case was subsequently transferred and consolidated with the 2009 patent case under Case No. A-11-CV-771-LY.

### 2. The Disputed Terms of the BPLA

There is a substantial dispute concerning the interpretation of the BPLA and whether its terms resulted in Bandspeed providing a royalty-free license of its patents to Defendants.[7] Defendants contend that Section 4(b) of the BPLA requires Bandspeed to grant a royalty-free license to its patents because Bandspeed made Contributions to the relevant Bluetooth Specification. Section 4(b) states as follows:

> **All Contributions** by a contributing Associate or Adopter Member that have been **submitted for inclusion** in any Bluetooth Specification or Draft Bluetooth Specification **shall be licensed by the contributing Associate** or Adopter Member to all Licensees (as defined in Section 5(b) hereof) under the grant specified in Section 5(b) hereof for all Bluetooth Specifications in which the Contributions become included, **even if such Associate** or Adopter Member **has withdrawn** or been terminated **as a Member of Bluetooth SIG**.

Powell Decl., Ex. 1 (BPLA ¶ 4(b)) (emphasis added).

The scope of the license grant is defined in Section 5(b) of the BPLA, which relates to patent licenses and states in relevant part as follows:

> Effective upon the adoption by Bluetooth SIG of each Bluetooth Specification, **each Associate** and Adopter Member Members and their Affiliates **hereby grant** to each Promoter member and Associate and Adopter Member and all of their respective Affiliates . . . **a nonexclusive, royalty-free, perpetual, irrevocable, nontransferable, nonsublicenseable, worldwide license** under its Necessary Claims solely to make, have made, use, import, offer to sell, sell and otherwise distribute and dispose of Compliant Portions . . . .

*Id.* (BPLA ¶ 5(b) (emphasis added).

Defendants have argued in this litigation that the terms of BPLA Sections 4(b) and 5(b) require Bandspeed to grant a royalty-free license in the Bandspeed patents as a result of Bandspeed's membership and participation in the Bluetooth SIG "working group" that created the Bluetooth specification. Case No. 09-593, Joint Status Report, dkt. no. 176 at p. 4 (stating

---

[7] The resolution of this disputed contract provision is not at issue in this motion. For purposes of this motion, the only salient fact is that <u>there is a dispute</u>.

that the "patent license agreement that Bandspeed had to agree to as part of its membership in the Bluetooth SIG provides that contributions to a specification that is adopted must be licensed, royalty free, to other members, regardless of whether the contributing member later withdraws from the Bluetooth SIG.").   In other words, Defendants' position is that once a member of Bluetooth SIG has tried to influence the content of the specification by contributing to it, that member is required to license the intellectual property necessary to implement that contribution regardless of its later withdrawal.   In contrast, Bandspeed argues that its withdrawal from the Bluetooth SIG before the Bluetooth specification was adopted means no such license was granted under the BPLA.  SAC ¶¶ 89-94.  This is a contractual-interpretation dispute.  It must be resolved either by the Court on summary judgment or by the jury at trial.[8]  Bandspeed, however, alleges that Defendants' mere assertion (in defense of Bandspeed's own patent infringement claims) of an argument that the BPLA requires Bandspeed to grant a license is an antitrust violation because it is a pretext for a group boycott or price fix.[9]  *Id.*

### 3. Bandspeed's Antitrust Allegations

As the basis for its antitrust-related claims, Bandspeed's alleges:  "Beginning in 2010, [after Bandspeed filed its patent lawsuit], contrary to the express language of the [BPLA], defendants, including Bluetooth SIG, maintained that a Bluetooth SIG License Member grants a

---

[8] The legal dispute regarding the BPLA's interpretation is also relevant because of Bandspeed's self-declared 2002 "IP Strategy" regarding its withdrawal from Bluetooth immediately before its technology was incorporated into Bluetooth's specification, and the timing of its subsequent attempt to demand royalties.   Declaration of Ramona M. Emerson ("Emerson Decl."), Ex. 1 (Beale Dep. at 162-63); Ex. 2 (BSPD0074878); Ex. 3 (BSPD0075062).

[9] To the extent Bandspeed were to attempt to now rely on its previously-abandoned theory that the BPLA itself is an actionable, anti-competitive agreement, such a claim would be barred by the statute of limitations because the BPLA was formed well over a decade ago.

royalty-free license of claims in its issued patents and pending patent applications that are 'necessary' to practice a Bluetooth Specification even if that member withdraws from Bluetooth SIG before the adoption of the Bluetooth Specification."  *Id.* at ¶ 95.  Stated more plainly, Bandspeed alleges that after it filed the patent suit, defendants "affirmatively contended that Bandspeed previously licensed the patents-in-suit to such defendants at a royalty rate of zero." *Id.* ¶ 96.[10]

### C.  Bandspeed's Evidence of an Alleged "Retroactive Reinterpretation" Agreement

On April 26, 2013, Defendant TomTom International B.V. filed a motion for summary judgment challenging the lack of probative evidence as to the alleged anticompetitive conduct. Dkt. no. 1195.  Although Bandspeed settled with TomTom before the motion for summary judgment could be heard by the Court, TomTom's motion forced Bandspeed to fully reveal the evidence (or lack thereof) underlying its antitrust allegations.  *See* Bandspeed, Inc.'s Resp. to Def. TomTom Int'l B.V.'s Mot., dkt. no. 1243, at pp. 12-21.  The sum total of the anticompetitive conduct "evidence" submitted by Bandspeed is as follows:

- In the summer and fall of 2009—in the period <u>after</u> Bandspeed filed its patent lawsuit— certain defendants believed that Bandspeed was still a member of the Bluetooth SIG and, therefore, necessarily bound by the BPLA.  *Id.* at 14-5, (citing Bandspeed Ex. 9). Bandspeed gave those defendants a copy of a letter purporting to evidence Bandspeed's withdrawal from the Bluetooth SIG.  *Id.*

- In December 2009—over four months <u>after</u> Bandspeed filed suit—Bluetooth and Nintendo had a "discussion" about Bandspeed and "how as part of the membership agreements [Bluetooth] members agree to cross-license royalty-free to other members of the Bluetooth SIG for qualified products, and how members not only agree to allow that licensing but they allow Bluetooth SIG to do that on their behalf."  *Id.* at 15 (citing

---

[10] Defendants moved to dismiss these allegations.  Because of Bandspeed's Second Amended Complaint, the Court denied the motions without prejudice.

Bandspeed Ex. 4 (Foley Dep. At 13-16 and 167-69)).  Bluetooth and Nintendo therefore discussed Bluetooth's "opinion or analysis" as to how the BLBA operates.  *Id.*[11]

- On December 8 and December 11, 2009, respectively, Defendants Sony and Parrot filed answers to Bandspeed's complaint in which they asserted nearly-identical <u>affirmative defenses</u> stating that Bandspeed granted Defendants a royalty-free license under the BPLA.  Case No. 09-cv-00593, dkt. nos. 76 and 91.

- In June 2010, at a deposition noticed by Bandspeed, Bluetooth's Executive Director <u>testified</u> in response to Bandspeed's questions and, Bandspeed claims, he purportedly "advocated its position asserting the same retroactive reinterpretation of the terms of the BPLA previously discussed with and agreed to by other defendants."  Bandspeed' Resp. to TomTom Mot. at 17 (citing Bandspeed Ex. 4).

- In September 2010, certain Defendants <u>filed a "Joint Status Report"</u> with the Court "incorporating and adopting Bluetooth SIG's earlier advocacy of the agreed retroactive reinterpretation on behalf of all Bluetooth SIG members."  *Id.* (citing Case No. 09-cv-00593, dkt. nos. 176).

- In September 2010, and in response to a question posed by Defendant Huawei, a Bluetooth employee and Huawei employee exchanged an email in which Bluetooth explained its understanding of the BPLA.  *Id.* at 18 (citing Bandspeed Ex. 3).

- In October 2010, and in response to Huawei's request, Bluetooth sent a letter to Huawei in which Bluetooth again explained its interpretation of the BPLA's licensing provisions and history of Bandspeed's participation in the Bluetooth SIG.  *Id.* (citing Bandspeed Ex. 2).

- Also in October 2010, other defendants (Belkin, Motoroloa, Kyocera, and Garmin) <u>asserted as affirmative defenses</u> that Bandspeed had granted a royalty-free license to Bluetooth SIG members under the BPLA.  *Id.* (citing dkt. Nos. 168, 177, 212, and 214).

- Also in October 2010, certain Defendants asserted what Bandspeed continues to describe as the so-called "retroactive reinterpretation" of the BPLA by <u>jointly filing a motion to transfer</u> the Eastern District case to the Western District.  *Id.* at 18-19 (citing dkt. no. 158).[12]

---

[11] Bandspeed characterizes this discussion as resulting in Bluetooth and Nintendo having "agreed to a retroactive reinterpretation of the terms of the BPLA that fixed the price of licenses of Bandspeed technology and boycotted Bandspeed's licenses altogether."  *Id.* at 15.  While the testimony cited by Bandspeed speaks for itself, it is safe to say that Bandspeed's description is highly imaginative, at best.

[12] Along with its response to the TomTom motion, Bandspeed submitted additional documents purportedly in support of its "conspiracy" allegations.  But Bandspeed offered no argument as to how those documents evidenced a conspiracy, and a review of those documents confirms that they show no evidence of any conspiracy.

The relevant issue in this motion is not whether any of these facts are true. The reason for this motion is that, even if these facts were true, Bandspeed's antitrust-related claims nonetheless fail as a matter of law.

### III.   ARGUMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the non-moving party bears the burden of proof, the moving party need only show that the non-moving party lacks evidence sufficient to create an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Thus, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" to defeat summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence [is] insufficient; there must be evidence on which the jury could reasonably find for [Bandspeed]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Bluetooth now moves for summary judgment as to (i) Defendants' immunity from Bandspeed's antitrust claims based on the *Noerr-Pennington* defense,[13] (ii) the absence of evidence sufficient for Bandspeed to meet its burden on summary judgment as to "concerted action" by Defendants, and (iii) the absence of evidence sufficient for Bandspeed to meet its

---

[13] In response to Bandspeed's antitrust claims, Bluetooth asserted the *Noerr-Pennington* doctrine as an affirmative defense. *See* Dkt. no. 771 at 28-29 (Aff. Def. No. 3). Specifically, Bluetooth asserted: "[Bandspeed's] claims are barred by the *Noerr-Pennington* doctrine and/or immunity. Under the *Noerr-Pennington* doctrine, the First Amendment, among other things, prohibits imposing liability under the antitrust laws for conduct undertaken in an effort to petition a government body." *Id.*

burden of establishing the alleged conduct could be a *per se* antitrust violation and, as a result of Bandspeed's failure to plead otherwise as to its price fixing claim, for dismissal of that claim.

## A. Bandspeed's Antitrust Claims are Barred as a Matter of Law by the *Noerr-Pennington* Doctrine

Bandspeed's antitrust claims against Bluetooth are barred as a matter of law by the *Noerr-Pennington* doctrine.   Even accepting all of Bandspeed's purported "anticompetitive conduct" evidence as true for purposes of this argument,[14] the undisputed facts establish that (i) <u>all</u> such conduct occurred <u>after</u> Bandspeed filed its complaint alleging patent infringement, and (ii) <u>all</u> such conduct was <u>entirely related</u> to defending against Bandspeed's patent claims and Bandspeed's legal contention that the BPLA did not grant all signatories to the BPLA a license to practice Bandspeed's patents without regard to whether Bandspeed withdrew from Bluetooth. Under *Noerr-Pennington*, Bluetooth has complete antitrust immunity for such conduct. Bandspeed's antitrust claims against Bluetooth must therefore be dismissed on summary judgment.

### 1.   The *Noerr-Pennington* doctrine applies to joint litigation efforts

The *Noerr-Pennington* doctrine provides **<u>immunity</u>** to any antitrust defendant facing allegations that actions taken in commencing, prosecuting or defending a lawsuit violate the antitrust laws.   *See California Motor Transp. v. Trucking Unlimited*, 404 U.S. 508 (1972) (extending the doctrine to adjudicative activities); *Cascades Computer Innovation, LLC v. RPX Corp.*, 2013 WL 316023, at *14 (N.D. Cal. 2013) ("The *Noerr-Pennington* doctrine provides immunity from antitrust liability for litigation related conduct—filing a complaint, an answer, negotiating a settlement—that is not otherwise a 'sham.'") (citing *Prof'l Real Estate Investors,*

---

[14] Bluetooth disputes entirely Bandspeed's contention that there is <u>any evidence</u> of an antitrust conspiracy as alleged in the SAC.  *See* Part III.B, *infra*.  The Court need not, however, reach that issue because Bandspeed's claims fail under *Noerr-Pennington*.

*Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56-58 (1993)).  The doctrine is constitutional in nature; it protects a party's First Amendment right to petition the government.  *In re Burlington Northern, Inc.*, 822 F.2d 518, 523-24 (5th Cir. 1987).  It also applies to all antitrust claims—whether based on multi-firm conduct, single-firm conduct, or both, as in this case.  *See Noerr Motor Freight*, 365 U.S. at 136 (doctrine applies to activity that would "produce a restraint or a monopoly").

The *Noerr-Pennington* doctrine is expansively interpreted.  As the Supreme Court has repeatedly made clear, "'*Noerr* shields from the Sherman Act a concerted effort to influence public officials *regardless of intent or purpose*.'"  *Prof'l Real Estate Investors*, 508 U.S. at 58 (emphasis added).  The doctrine provides immunity even if the intent of litigation-related conduct is to eliminate competition: "Joint efforts to influence public officials do not violate the antitrust laws <u>even though intended to eliminate competition</u>.  Such conduct is not illegal, either <u>standing alone or as part of a broader scheme itself violative of the Sherman act</u>."  *Pennington*, 381 U.S. at 670 (emphasis added).  This principle extends even to instances where, as Bandspeed alleges here, the petitioning activity is purportedly a group boycott.  *See Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1364 (5th Cir. 1983) ("The mere fact that a boycott forms a part of the petitioning conduct does not vitiate the [*Noerr-Pennington*] immunity of such conduct.").

Courts have held that the *Noerr-Pennington* doctrine immunizes joint efforts to defend against lawsuits.  *See*, *e.g. Feminist Women's Health Clinic, Inc. v. Mohammad*, 586 F.2d 530, 542-43 (5th Cir. 1978). *Cf. Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 272 (7th Cir. 1984) (noting in the context of a patent suit that there is no authority stating that "simply defending oneself in a proceeding brought by another has been held to be actionable" and that a

11

plaintiff "cannot start a suit . . . and then sue the defendant for refusing to default."); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 650 (9th Cir. 1988) ("Assertion of a defense to court action, without more, is not a sufficient act to constitute a continuing violation of the federal antitrust laws.").

In *Feminist Women's Health Clinic, Inc.*, the plaintiff alleged that another hospital had conspired to monopolize and restrain trade as to certain medical services. 586 F.2d at 538. Following the initiation of the suit, the defendant hospital passed a resolution to "support the defendants in the prosecution of this litigation." *Id.* The antitrust plaintiff argued throughout the case that the litigation-support resolution was the "'consummation' of the alleged conspiracy." *Id.* The trial court ruled on summary judgment that conduct occurring after litigation began was immune under *Noerr-Pennington*, and the Fifth Circuit affirmed:

> We agree with the district court, however, that the [plaintiff] cannot base a right to recovery on the actions of [defendants] in adopting a resolution to provide moral and financial support to the doctors' defense of this lawsuit.
> . . .
> In *California Motor Transport Co. v. Trucking Unlimited*, 1972, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642, the Supreme Court held that joint efforts of competitors to seek adjudicative action are protected. The first amendment right of competitors to join in petitioning courts and administrative bodies <u>entails the right to band together for purposes of supporting litigation</u>, as the physicians in the Capitol Medical Society have done here. Whether the action of the medical society can be linked to the alleged conspiracy that spawned the Center's original complaint is irrelevant, for petitioning activity according to *Pennington* "is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.

586 F.2d at 543 (emphasis added).

## 2. Defendants' alleged anticompetitive conduct is immunized by the *Noerr-Pennington* doctrine

### i. All conduct occurred after Bandspeed initiated patent litigation and related to defending against that litigation

Even accepting Bandspeed's purported "anticompetitive conduct" evidence as true, Bandspeed's antitrust claims are barred by the *Noerr-Pennington* doctrine. At its core, and in the light most favorable to Bandspeed, Bandspeed's antitrust evidence is as follows: (i) Bandspeed sued several Defendants on the patent infringement claims in August 2009; (ii) beginning in December 2009 certain Defendants discussed with Bluetooth whether the BPLA required Bandspeed to grant Defendants a royalty-free patent license; (iii) certain Defendants then asserted the BPLA license provisions as a defense to the patent litigation. *See* Part II.C, *supra*. Based on this evidence, Bandspeed asserts its antitrust claims against Bluetooth and the patent infringement Defendants on the grounds that Defendants "conspired" to assert the BPLA license as a defense.

The timing of the alleged conduct, among other defects, is fatal to Bandspeed's antitrust claims. None of the alleged conduct occurred until <u>months after</u> Bandspeed filed its patent lawsuit in August 2009. Moreover, <u>all of the alleged conduct</u> was undertaken as a result of Bandspeed's patent lawsuit. Indeed, most of the evidence identified by Bandspeed—filing affirmative defenses, filing a joint status report, filing a motion to transfer—demonstrates activity directly involving the Court itself.[15] To the extent Bandspeed has identified a small number of communications between certain Defendants regarding the meaning and interpretation

---

[15] If Bandspeed's antitrust theory were correct, co-defendants in a patent case could not work together to prepare a defense—or even file "joint" motions—without violating the antitrust laws. Such a result would be absurd and is entirely without precedent.

of the BPLA, <u>all</u> such communications relate to determining whether the terms of the BPLA provide a defense to Bandspeed's patent claims.

Just as in *Feminist Women's Health Clinic*, even if Bandspeed were correct (which it is not) that all Defendants coordinated or agreed on the BPLA defense, the patent infringement Defendants and Bluetooth had the right to "band together for purposes of supporting" the defense to Bandspeed's patent claims by discussing their respective views of the contractual rights and obligations under the BPLA and in asserting similar defenses to Bandspeed's patent claims under the terms of the BPLA. Accordingly, and pursuant to the *Noerr-Pennington* doctrine and related case law, Bluetooth has complete immunity from Bandspeed's antitrust claims and Bluetooth is entitled to summary judgment as to Bandspeed's antitrust claims.

ii. <u>Bandspeed's authority in opposition to *Noerr-Pennington* immunity is entirely distinguishable</u>

In prior briefing, Bandspeed has repeatedly relied on *Sony Electronics, Inc. v. Soundview Technologies, Inc.*, 157 F. Supp. 2d 180 (D. Conn. 2001), for the proposition that *Noerr-Pennington* immunity should not apply in this case.[16]  *Sony Electronics*, however, is entirely distinguishable. Bandspeed describes the antitrust allegations in *Sony Electronics* as "based on Sony's agreement with other competitors (through a standard setting organization) to set a uniform price for a license to Soundview's patents." *Id.*  Yet, Bandspeed's description omits critical facts:  the defendants in *Sony Electronics* were alleged to have held a meeting, "agreed upon a uniform price for a license under the Soundview patent," and informed Soundview of this agreement <u>before</u> Soundview initiated any infringement litigation. 157 F. Supp. 2d at 182. The defendants in *Sony Electronics* were not petitioning the court in litigation—they were alleged to

---

[16] *See e.g.*, Bandspeed, Inc.'s Resp. to Def. TomTom Int'l B.V.'s Mot., dkt. no. 1243, at p 27; Pl.'s Resp. to Def. Bluetooth SIG, Inc.'s Mot. to Dismiss, dkt. no. 826 at pp. 13-14.

have held a meeting, agreed on a uniform price, and communicated that price to Soundview, all prior to any litigation. *Id.* None of the *Sony Electronics* defendants was advocating a patent infringement defense in litigation. Not surprisingly, the *Sony Electronics* court ruled that "Soundview's counterclaim contains <u>substantially more than mere litigation or joint action to challenge a patent</u>, in that it alleges a conspiracy to pay a maximum price and a group boycott not to accept a license from Soundview." *Id.* at 189 (emphasis added). Additionally, it is significant that the *Sony Electronics* decision was based on a motion to dismiss pursuant to which all of Soundview's allegations were taken as true.[17]

The facts in this case are in stark contrast to *Sony Electronics*. Here, all of the alleged "anticompetive" conduct occurred <u>after and in response to Bandspeed's patent lawsuit</u>. Defendants in this case have merely asserted the BPLA as a defense to Bandspeed's patent infringement claims. Defendants did not meet in a non-litigation context and agree to set a ceiling on the price at which they would license patents from Bandspeed, as was the allegation in *Sony Electronics*. Thus, *Sony Electronics* is distinguishable and provides no guidance as to the *Noerr-Pennington* immunity at issue in this case.[18]

---

[17] Soundview's antitrust claims were later dismissed upon the defendants' motion for summary judgment. *See Sony Elec., Inc. v. Soundveiw Tech., Inc.*, 281 F. Supp. 399 (D. Conn. 2003) (determination that defendants were not infringing on Soundview's patents precluded Soundview from having standing to assert antitrust claims).

[18] Other decisions cited by Bandspeed are similarly distinguishable. *See Jones Knitting Corp. v. Morgan*, 361 F.2d 451, 459 (3d Cir. 1966) (with no discussion of the *Noerr-Pennington* doctrine the court addressed a group formed pre-litigation for the purposes of (i) refusing to negotiate with patent holder and (ii) bringing suit for non-infringement); *Mondis Tech., Ltd. v. LG Elec., Inc.*, 2009 WL 901480, at *4 (E.D. Tex. Mar. 31, 2009) (motion to dismiss based on *Noerr-Pennington* denied because counter claim defendant was "not pleading an unfair competition violation premised on [the patent plaintiff's] actions in bringing the lawsuit," but rather on the plaintiff's failure to honor encumbrances on the patents); *In re Morrison*, 2009 WL 1856064, at *3 (Bankr. S.D. Tex. June 26, 2009) (motion to dismiss based on *Noerr-Pennington* denied where plaintiffs alleged that they were harmed because defendant had previously created and

### 3.   Bandspeed cannot meet its very high burden of showing that the "sham" litigation exception to the *Noerr-Pennington* doctrine applies

Although its position has been vague, Bandspeed previously indicated that it may attempt to rely on the "sham" litigation exception to the *Noerr-Pennington* doctrine.[19]   Bandspeed failed to plead the "sham" exception in the SAC, which precludes Bandspeed from relying on that exception at this stage of the case.   *See Destec Energy, Inc. v. Southern Calif. Gas Co.*, 5 F. Supp. 2d 433, 463 (S.D. Tex. 1997) ("In order to plead a sham exception, 'a complaint must include allegations of the specific activities not protected by *Noerr* . . . .'" (citation omitted)). Yet, even if Bandspeed had sufficiently pled the existence of "sham" litigation, it would be wrong to assert that exception here.   Under the controlling legal standard, Bandspeed cannot meet its burden to establish that Defendants' BPLA license defense is a sham.

The Supreme Court has established a two-part test to determine whether litigation-related activity is a "sham" and, therefore, not subject to *Noerr-Pennington* immunity.   *See Prof'l Real Estate Inv., Inc.,* 508 U.S. at 60-61.   First, the litigation-related activity "must be **objectively** baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60 (emphasis added).   Second, "[o]nly if the challenged litigation is objectively meritless may a court examine the litigant's **subjective** motivation."   *Id.* (emphasis added).   In other

---

implemented a fraudulent arbitration scheme; fraud allegations were not based on actions related to petitioning the government).

[19] In the past, Bandspeed has repeatedly cited to *Barton's Disposal Service, Inc. v. Tiger Corp.,* 886 F.2d 1430, 1436-37 (5th Cir. 1989) for the proposition that "direct interference in the business of a competitor is not shielded even though a governmental body is incidentally connected to the activity."   *See*, *e.g.,* Bandspeed's Resp. to TomTom Mot. For Summ J., dkt. no. 1243, at 26-27.   Bandspeed's quotation from *Barton's Disposal* is taken from that court's discussion of the "sham" litigation exception.   In the seminal *Professional Real Estate Investors, Inc.,* decided four years after *Barton's Disposal* and discussed below, the Supreme Court re-defined the definition of "sham" litigation.   508 U.S. at 60-61.   *Barton's Disposal* is not controlling as to the "sham" litigation standard.

words, an antirust plaintiff must show as a threshold matter that a legal claim or defense is objectively baseless. Only then may a court "focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationship of competitor' . . . through the 'use of governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Id.* at 60-61 (emphasis in original) (quoting *Noerr*, 365 U.S. at 144 and *Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991)).

The party asserting that litigation is a "sham" bears the burden of proof to establish both the objective and subjective elements of the test. *Id.* at 61 ("This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability." Underline added; italics in original). As a matter of law, Bandspeed cannot meet this burden.

> i. Bandspeed cannot show that Defendants' alleged interpretation of the BPLA and assertion of a royalty-free license in response to Bandspeed's patent litigation is "objectively" baseless

Courts have frequently rejected "sham litigation" arguments where parties differ in interpreting agreement terms. *See*, *e.g.*, *IGEN Int'l, Inc. v. Roche Diagnostics GMBH,* 335 F.3d 303, 312 (4th Cir. 2003) (holding that a defendant to patent lawsuit could not establish the sham litigation exception to *Noerr-Pennington* where the plaintiff had "advanced at least an arguably convincing defensive interpretation" of an agreement regarding the grant of a license); *Lamar Cnty Elec. Coop. Ass'n v. Rayburn Cnty. Elec. Coop., Inc.*, 330 F. Supp. 2d 763, 765-66 (E.D. La. 2002 (granting motion to dismiss under *Noerr-Pennington* and rejecting sham litigation exception that was based on "efforts to interpret and enforce" the terms of a settlement agreement in litigation); *In re Terazosin Hydrochloride Antitrust Litig.*, 335 F. Supp. 2d 1336, 1356, 1359-60 (S.D. Fla. 2004) (ruling that a losing argument in litigation regarding the interpretation of treaty agreement was "hypertechnical" and "a stretch," but it passed the

"'straight face'" test and was therefore not objectively baseless), *aff'd Kaiser Found. Health Plan, Inc. v. Abbot Labs., Inc.*, 552 F.3d 1033, 1046-47 (9th Cir. 2009).

Defendants' interpretation of the BPLA—even if it might be found incorrect by a court or jury—is not objectively baseless.  Bandspeed participated in the Bluetooth SIG standard setting process for 15 months, during which it contributed to the Bluetooth SIG working group.  SAC ¶¶ 89-01.[20]  Section 4(b) of the BPLA provides that "[a]ll contributions . . . that have been submitted for inclusion in any Bluetooth Specification . . . **shall be licensed** . . . under the grant specified in Section 5(b) . . . **even if such Associate or Adopter Member has withdrawn**."  Powell Decl., Ex. 1 (emphasis added).  The reference to BPLA Section 5(b) makes clear that the license granted by Bandspeed relates to patents, is effective "upon the adoption by Bluetooth SIG of each Bluetooth Specification," and is "non-exclusive, royalty-free, perpetual, irrevocable, nontransferable, nonsublicensable, [and] worldwide."  *Id.*  According to Bandspeed's own patent infringement allegations, the Bluetooth SIG Specification Version 1.2 (adopted less than a year after Bandspeed withdrew) referenced the technology allegedly covered by Bandspeed's patents.  SAC ¶ 93.

A reasonable litigant could realistically expect that Bluetooth's interpretation of the BPLA—premised on the actual language of the agreement—could be successful on the merits.  *Prof'l Real Estate Investors, Inc.,* 508 U.S. at 60-61.  It is Bandspeed's burden to prove otherwise.  *Id.*  Bandspeed cannot do so given the plain language of the BPLA.  Therefore, the "sham" litigation exception to *Noerr-Pennington* does not apply.

---

[20] As described above, footnote 7 *supra,* Bandspeed's stated strategy during this time period evolved and Bandspeed ultimately sought to convince Bluetooth to adopt its AFH technology into the Bluetooth standard immediately before Bandspeed was to withdraw from Bluetooth, only later to assert that it was owed licensing royalties from Bluetooth product manufacturers.

> ### ii. Bandspeed has no evidence that Defendants' assertion of a royalty-free license in response to Bandspeed's patent litigation was "subjectively" intended to interfere with Bandspeed's business

Even assuming *arguendo* that Bandspeed could make such a showing that Defendants' interpretation was objectively baseless, Bandspeed would also need to present evidence from which a jury could find that Defendants' conduct was <u>subjectively</u> a concealed attempt to use the litigation process to directly harm Bandspeed's business. *Id.* Bandspeed has no such evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (moving party on summary judgment need only show that non-moving party lacks evidence). To the contrary, the undisputed evidence is that <u>Bandspeed initiated the patent infringement lawsuit</u> well before any Defendants ever even discussed the BPLA interpretation as applied to Bandspeed's patents or the BPLA as a defense. Each Defendant's assertion of a BPLA affirmative defense was merely an appropriate reaction to Bandspeed's lawsuit. There is simply no evidence of any intent by Bluetooth to interfere with Bandspeed's business through objectively-baseless litigation. The "sham" litigation exception to *Noerr-Pennington* fails for this reason as well.

### 4. The *Noerr Pennington* Doctrine applies to all of Bandspeed's antitrust-related claims.

Bandspeed's state law, antitrust-related claims fail under *Noerr-Pennington* as well. Bandspeed's claim under the Texas antitrust statute is "comparable to, and indeed taken from the Sherman Act." *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990). For the same reasons Bluetooth is immune to Bandspeed's Sherman Act claims under federal, it is also immune to Bandspeed's state law antitrust claims. Similarly, Bandspeed's civil conspiracy claim fails as it is not an independent claim and is merely derivative of separate underlying claims (*i.e.*, the antitrust claims). *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). All of Bandspeed's antitrust-related claims are subject to summary judgment under *Noerr-Pennington*.

**B.  Bandspeed's Antitrust Claims Fail for Lack of Evidence as to the Existence of an Illegal Agreement**

Even if Bandspeed's antirust-related claims were not barred by *Noerr-Pennington* immunity, they should independently be dismissed on summary judgment for the reason that Bandspeed cannot identify any anticompetitive agreement or "conspiracy," the alleged predicate conduct for all such clams.  Antitrust claims are subject to a specific analysis on summary judgment:

> To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of [Sherman Act] § 1 must present evidence 'that tends to exclude the possibility" that the alleged conspirators acted independently.  [Plaintiff] must show that the inference of a conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 270-71 (5th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)).  Thus, a district court should grant summary judgment unless the plaintiff can present "evidence strong enough to reasonably exclude the possibilities of [i] independent action and [ii] conduct consistent with permissible competition." *Id*. at 271.

It is not sufficient for Bandspeed to simply presume that an unlawful agreement existed between Defendants.  Rather, "[t]o establish concerted action, the plaintiff must present 'evidence that reasonably tends to prove that the [defendants] had a <u>conscious commitment to a common scheme designed to achieve an unlawful objective</u>.'" *Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) (emphasis added) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)) (alteration in original).  The plaintiff must establish the concerted action by either direct or circumstantial evidence.  *Id.*  The plaintiff cannot "simply propose conceivable motives for conspiratorial conduct," it must produce actual evidence.  *Golden Bridge*, 547 F.3d at 273; *Tunica*, 496 F.3d at 409 ("[C]onduct

as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.").

Bandspeed has neither direct evidence of concerted action nor circumstantial evidence that excludes the possibility that defendants acted independently or in a manner consistent with lawful competition. The absence of such evidence requires summary judgment dismissal of Bandspeed's antitrust claims.

### 1. Bandspeed has no direct evidence of an agreement

Bandspeed has no direct evidence of the alleged agreement between Defendants to boycott or engage in price fixing as to Bandspeed's licenses. "Direct evidence <u>explicitly refers</u> to an understanding between the alleged conspirators . . . ." *Golden Bridge,* 547 F.3d at 271 (emphasis added). *See also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted"). Direct evidence demonstrates the existence of an actual agreement with no inference necessary. *Compare Tunica Web Adver.*, 496 F.3d at 410 (statements in emails that defendants had "entered into a 'gentlemen's agreement" to not deal with [plaintiff]" and that a defendant "had to terminate its relationship with [plaintiff] as a result of [defendants'] agreement" constituted direct evidence) *with Golden Bridge,* 547 F.3d at 272 (none of the emails or evidence presented by the plaintiff "show an explicit understanding between the [defendants] to collude and unlawfully eliminate [plaintiff's technology] from the standard").

In its prior briefing, Bandspeed argued that it had direct evidence of concerted action between the antitrust Defendants. *See* Bandspeed, Inc.'s Resp. to Def. TomTom Int'l B.V.'s Mot., dkt. no. 1243, at pp. 12-20. Bandspeed is wrong. None of the evidence presented by Bandspeed "explicitly refers" to an agreement by any Defendants to boycott or price fix a license

from Bandspeed.  *See* Part II.C, *supra*.  Nor does any of the evidence even demonstrate that Defendants explicitly agreed on the so-called "retroactive reinterpretation" of the BPLA that Bandspeed alleges was a pretext for a group boycott or price fix.  *Id.*  Bandspeed's briefing repeatedly and consistently mischaracterizes this evidence as demonstrating that Defendants "agreed" or "jointly agreed" to various conduct.  The Court should reject this unsupported, conclusory argument.  There is no direct evidence of <u>any anticompetitive agreement</u> between or among any Defendants in either documents or testimony.

If taken at face value, the evidence submitted by Bandspeed arguably supports only the following: (i) some Defendants exchanged information regarding their respective legal defenses based on the BPLA in 2009 and 2010, after being sued by Bandspeed for patent infringement, (ii) Defendants in the patent infringement action asserted as affirmative defenses or arguments in briefing to the Court that the BPLA requires Bandspeed to grant them a royalty-free license; and (iii) Bluetooth's corporate representative answered Bandspeed's deposition questions regarding the BPLA by explaining his belief that the BPLA requires Bandspeed to grant a royalty-free license.  This is not direct evidence of concerted action.  *See Golden Bridge,* 547 F.3d at 272 (affirming summary judgment against plaintiff where no evidence showed "an explicit understanding between the [members of the trade association] to collude and unlawfully eliminate [the plaintiff's patented technology] from the standard").

## 2. Bandspeed's purported "circumstantial" evidence is insufficient to survive summary judgment

Bandspeed's alleged circumstantial evidence is perfectly consistent with independent action on the part of each Defendant and a determination that Defendants acted in a manner consistent with lawful competition.  For cases based on circumstantial evidence, the evidence "must be strong in order to survive summary judgment" on a claim alleging a conspiracy in

restraint of trade.  *Tunica*, 496 F.3d at 409.  This high standard is required because "'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.'"  *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).[21]  Where the evidence equally supports permissible competition as it does illegal conspiracy, the plaintiff must present "evidence [that] tend[s] to exclude the possibility that the [defendants] acted independently."  *Golden Bridge*, 547 F.3d at 272 (stating that plaintiff failed to present any evidence that the defendants had non-illegal reasons for their actions); *Tunica*, 496 F.3d at 409 ("In sum, a plaintiff can survive summary judgment only if it 'show[s] that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed' the plaintiff."  (quoting *Matsushita*, 475 U.S. at 588) (alteration in original)).

Even if a plaintiff actually presents evidence of behavior that is inconsistent with lawful conduct, the defendant "can rebut [the] allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999).  *See also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 49 (7th Cir. 1992).  "The burden then shifts back to the plaintiff to provide underline specific evidence tending to show that the defendant was not engaging in permissible competitive behavior."  *Citric Acid Litig.*, 191 F.3d at 1094 (emphasis added).

The Fifth Circuit's decision in *Golden Bridge* is particularly instructive as to the standard for evaluating purported circumstantial evidence.  547 F.3d at 272.  In *Golden Bridge*, the

---

[21] The same principles that govern whether a conspiracy to restrain trade exists govern whether a conspiracy to monopolize exists.  *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 526 (5th Cir. 1999) (applying *Matsushita* to a § [Sherman Act] 2 claim); *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010); *Nova Designs v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000).

members of an SSO held several meetings in which they discussed and ultimately decided to exclude Golden Bridge's technological feature from the standard for compatibility of cellular devices. *Id.* at 269-70. Golden Bridge asserted antitrust claims, alleging that the SSO members unlawfully conspired to exclude its technology from the market. *Id.* The district court granted summary judgment to the defendants, and the Fifth Circuit affirmed on the grounds that Golden Bridge could not demonstrate the existence of an agreement in restraint of trade. *Id.* at 270, 273. Important to this case, the Fifth Circuit rejected Golden Bridge's argument that evidence amounting to "an exchange of information, followed by parallel conduct" could refute the likelihood of independent action by the defendants. *Id.* at 272.

As in *Golden Bridge*, Bandspeed has no evidence that Defendants did not independently decide to assert the BPLA license as a defense to Bandspeed's patent infringement claims. This distinction is the crux of the issue. To establish an unlawful agreement using circumstantial evidence, Bandspeed must show that there was an express or implicit agreement among Defendants to assert the BPLA license as a pre-textual defense <u>and</u> that the Defendants would not have otherwise done so absent such an agreement. *Id*. It is not enough for Bandspeed to simply point to a couple of instances in which certain Defendants queried Bluetooth about the BPLA, followed by parallel conduct in asserting the BPLA defense. *Id.* at 272-73; *Shapiro v. Gen. Motors Corp.*, 472 F. Supp. 636, 645 (D. Maryland 1979) (rejecting plaintiff's antitrust theory based on parallel conduct and stating that "Plaintiffs are not being destroyed by defendants' refusal to pay them royalties. . . . The patent laws protect their inventions, and they remain free to charge what they can get for their ideas."). Bandspeed's evidence fails because, as described above, there is an objectively valid basis for the Defendants to assert the BPLA as a defense. *See* Part II.B.2 and III.A.3.ii, *supra*. The BPLA defense is therefore not a pretext for a

24

boycott or price fix.  It is also unquestionably in each Defendant's economic interest to assert the existence of a BPLA license because that defense, if successful, gives the Defendants a license to use Bandspeed's technology and precludes either patent infringement or antitrust damages. Defendants therefore had independent, economically-logical reasons for taking the action on which Bandspeed bases its antitrust claims.

Bandspeed's circumstantial evidence is also insufficient because Defendants had lawful reasons for discussing the BPLA's licensing provision and asserting the license as a defense.  It was Bandspeed that chose to file the patent infringement suit.  That suit placed the patent-infringement Defendants in a position where they and their counsel had a lawful right to form a joint defense group and to investigate potential legal defenses to Bandspeed's suit amongst themselves and with any third parties (i.e., Bluetooth) that had evidence or information relevant to Bandspeed's suit.  Thus, even if there was evidence that Defendants had agreed amongst themselves to assert the BPLA defense, which there is not, such an agreement would have been entirely lawful.  Bandspeed's circumstantial evidence fails for this reason as well.

In Bandspeed's prior briefing, it argued that it could establish "plus factors" in support of its circumstantial evidence in order to avoid summary judgment.  *See* Bandspeed, Inc.'s Resp. to Def. TomTom Int'l B.V.'s Mot., dkt. no. 1243, at pp. 21-25.  Bandspeed misreads the law and misapplies the facts.  The so-called "plus factors" are simply another means to examine the underlying question regarding circumstantial evidence where the plaintiff's case is based on a theory of "conscious parallelism": does the plaintiff have evidence that tends to exclude the possibility of independent/unilateral action by the defendants?  *See Royal Drug Co., Inc. v. Group Life and Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984) (affirming grant of summary judgment on theory of parallelism and plus factors); *Southway Theatres, Inc. v.*

*Georgia Theatre Co.*, 672 F.2d 485 (5th Cir. 1982) (noting that the "conscious parallelism" theory is largely insufficient to prove an agreement where a group boycott is alleged).  There are no "plus factors" that apply here.  Each Defendant had a reasonable and independent economic self-interest in asserting the BPLA license agreement as a defense.  That defense is an objectively reasonable basis for the alleged conduct, and therefore it was not a pretext.[22]  There were limited communications between Defendants, none which invite or suggest an "agreement," and there are many pro-competitive reasons for cross-licensing agreements in an SSO (discussed below at Part III.C, *infra*).

Bandspeed simply does not have either the direct or the "strong" circumstantial evidence necessary to survive summary judgment as to the issue of whether Defendants undertook concerted action in restraint of trade.  Bandspeed's antitrust claims are subject to summary judgment for this reason as well.

### C.  The Governing Legal Standard Requires Summary Judgment as to Bandspeed's Antitrust Claims

Bandspeed has no evidence from which it can establish the existence of a conspiracy.  Yet, even if such evidence existed, that is not the end of the inquiry.   "Once a plaintiff establishes that a conspiracy occurred, whether it violates [Sherman Act] § 1 is determined by the application of either the *per se* rule or the rule of reason."  *Golden Bridge*, 547 F.3d at 571.  Bandspeed has incorrectly alleged that the *per se* rule applies to Defendants' conduct in this case.  *See*, *e.g.*, SAC ¶ 118.  As an alternative to the reasons for summary judgment discussed above, Bluetooth separately seeks an order on summary judgment that (i) the rule of reason applies to all of Bandspeed's antitrust claims because the BPLA license defense is related to and necessary for

---

[22]  *See* Part III.A.3.i, *supra*, discussing the objective reasonableness of Defendants' BPLA interpretation and Part III.C2, *infra*, discussing the reasons why cross-licensing agreements are integral to the existence and functionality of a standard setting organization.

the existence of the SSO (Bluetooth) and standard setting process, and (ii) to the extent Bandspeed fails to allege a price fixing claim under the rule of reason, such claim must be dismissed on summary judgment.[23]

### 1.  The rule of reason governs Sherman Act § 1 antitrust claims against an SSO

The Supreme Court has adopted two separate tests to determine whether conduct constitutes an unreasonable restraint on trade under the Sherman Act:  the *per se* test and the rule of reason test.  Only conduct that "'would always or almost always tend to restrict competition and decrease output'" is reviewed under the *per se* test.  *Id.* (quoting *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007)); *see also F.T.C. v. Actavis, Inc.*, 133 S.Ct. 2223, 2237 (2013) (cautioning against deeming conduct presumptively unlawful).

In almost all instances, courts evaluate an SSO's allegedly-anticompetitive conduct under the rule of reason.  *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335-36 (Fed. Cir. 2010)  ("Congress  has  recognized  [the]  procompetitive  features  [of  standard  setting organizations] and has directed that the activities of a 'standards development organization while engaged in a standards development activity' is subject to the rule of reason." (quoting Standards Development Organization Act of 2004, Pub. L. No. 108-237 § 104, 118 Stat. 661, 663)); s*ee also Texaco, Inc. v. Dagher*, 547 U.S. 1, 5-5 (2006) (rule of reason applied to joint venture even where joint venture adopted same price for the two separate product brands sold by entities that formed the joint venture); *Golden Bridge*, 547 F.3d at 273 n.2 ("[O]ur opinion should not be construed to endorse [the district court's] conclusion that if [plaintiff] had shown an agreement in restraint of trade, the Appellees' conduct would be considered *per se* illegal."); *Addamax Corp.*

---

[23] Although it is beyond the scope of this motion, Bluetooth anticipates seeking a further ruling on summary judgment, if appropriate, that Bandspeed's remaining claims, if any, fail as a matter of law under the rule of reason test.

*v. Open Software Found.*, 152 F.3d 48, 52 (1st Cir. 1998) ("Joint venture enterprises . . . unless

they amount to complete shams . . . are rarely susceptible to *per se* treatment.").[24]

Other antitrust authorities have similarly concluded that cross-licensing arrangements

should be tested under the rule of reason.  *See*, *e.g.* U.S. Dept. of Justice, ANTITRUST GUIDELINES

FOR THE LICENSING OF INTELLECTUAL PROPERTY § 3.4 ("In the vast majority of cases, restraints

in intellectual property licensing arrangements are evaluated under the rule of reason."); U.S.

Dept. of Justice and Fed. Trade Comm'n, "ANTITRUST ENFORCEMENT AND INTELLECTUAL

PROPERTY RIGHTS: PROMOTING INNOVATION AND COMPETITION," Ch. 3, Sec. II.c, April 2007

("The Agencies continue to recognize that most of the nonexclusive cross-licensing agreements .

. . generally do not raise competition concerns. When the licensing of intellectual property allows

firms to combine complementary factors of production, such licensing can be procompetitive.

Accordingly, cross-licensing (and pooling) arrangements typically are analyzed pursuant to the

rule of reason.").

## 2.  Bandspeed cannot meet its burden of establishing that the presumptive rule of reason test does not apply

Because activities by an SSO such as Bluetooth are presumptively subject to the rule of

reason, Bandspeed bears the burden of establishing that the *per se* test should apply.  "A plaintiff

seeking application of the *per se* rule must present a threshold case that the challenged activity

falls into a category likely to have predominantly anticompetitive effects. The mere allegation of

a concerted refusal to deal does not suffice because not all concerted refusals to deal are

---

[24] Indeed, the rule of reason is applicable whenever "'restraints on competition are essential if the product is to be available at all.'"  *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2216 (2010) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 101 (1984) and citing *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful . . . where the agreement . . . is necessary to market the product at all.")).

predominantly anticompetitive." *NW Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 298, (1985); *see also Texaco, Inc. v. Dagher*, 547 U.S. 1, 5-5 (2006) (holding with respect to activities by joint venture that Supreme Court "presumptively applies rule of reason analysis" and has "expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious" (quotations omitted)). Bandspeed cannot meet its burden of establishing that the *per se* rule applies.

The allegedly anticompetitive conduct in this case is based on purported communications regarding the BPLA license and the assertion of the BPLA as an affirmative defense to Bandspeed's patent infringement lawsuit. On its face, Defendants' conduct is not anticompetitive. Bandspeed's claims are therefore governed by the rule of reason, not the *per se* test. Yet, Bandspeed argues without explanation or evidence that this case is governed by the *per se* test because it involves "concerted refusals to deal and price fixing." *See* Bandspeed, Inc.'s Resp. to Def. TomTom Int'l B.V.'s Mot., dkt. no. 1243, at p. 8; SAC ¶ 118. While those types of antitrust claims have been held subject to the *per se* test in certain limited circumstances, the Supreme Court has warned that courts must look beyond the plaintiff's characterization of its own claim and determine what conduct is actually at issue before applying the appropriate test. *See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7-10 (1979) (holding that a blanket intellectual property license as to numerous musical artists' intellectual property was not "price fixing" and noting that "easy labels do not always supply ready answers" when addressing the *per se* versus rule of reason test).

Bandspeed's argument for an application of the *per se* test also mischaracterizes its own allegations and the facts of this case, which arise out of the purported "retroactive reinterpretation" of an SSO's own agreement (the BPLA cross-licensing requirement). As

discussed above, Bandspeed has no evidence from which a court or jury could find that there was an actual "agreement" among Defendants to fix a price or refuse to deal with Bandspeed. Instead, Bandspeed repeatedly points to Defendants' parallel assertion of the BPLA as an affirmative defense as evidence of an antitrust violation.

Cross-licensing mechanisms are integral to SSOs such as Bluetooth, which develop advanced technology.[25] Here, the BPLA cross-licensing requirement is central to the successful implementation of Bluetooth's purpose. *See Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 310-13 (3d Cir. 2007) (explaining the existential risk of a "patent hold-up" where a contributing member's technology is implemented in a standard without a license and noting that "[t]o guard against anticompetitive patent hold up, most [standard setting organizations] require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies").[26] Absent mandatory cross-licensing, companies that contribute technology for the purpose of achieving a uniform technological standard could not use that standard without facing patent infringement claims from every other contributor. *Id.* The absence of cross-licensing would eliminate the many pro-competitive benefits from an SSO, including the many benefits that flow to consumers. *See id.* at 308-09 (providing extensive discussion of ways in

---

[25] Bluetooth is an SSO with over 19,000 members and, among others, its purposes are to (i) create and publish specifications for Bluetooth device interoperability, (ii) qualify products as Bluetooth compliant, and (iii) promote Bluetooth wireless technology. Powell Decl. ¶ 2. Bluetooth's seeks to create the most economically feasible and easy-to-use short range wireless technology possible. The technological standard Bluetooth developed has been incorporated into excess of a billion products. Such products include cars, mobile phones, medical devices, computers and many other types of devices. The Bluetooth standard allows these devices to operate with one another in numerous ways, many of which they otherwise could not achieve without the existence of a Bluetooth or comparable standard. *Id.*

[26] The Defendants' interpretation of the BPLA is that its provisions were designed to, and do in fact, avoid this type of patent "hold up" by requiring parties who contribute to the Bluetooth specification to provide a license, even if those parties later withdraw from the Bluetooth SIG.

which an SSO promotes competition and lowers costs to consumers, including ensuring interoperability of products, permitting the spreading of research and development costs, lowering costs to consumers, and enhancing competition in upstream markets); *Rambus, Inc. v. Infineon Techs. AG*, 330 F. Supp. 2d 679, 696 (E.D. Va. 2004) ("Product uniformity through standardization, especially in technological markets, facilitates the comparison of competing products, which benefits consumers in the short run and provides incentives for engineers to develop the next generation of compatible products, thereby providing longer-term consumer benefits.").

Stated differently, without the BPLA, the Bluetooth standard and its many pro-competitive benefits would very likely not exist. *See Am. Needle*, 130 S. Ct. 2201, 2216 (rule of reason applies where "restraints on competition are essential if the product is to be available at all."). Thus, Bandspeed cannot meet its burden of showing that Defendants' effort to defend the BPLA licensing requirements is a naked "concerted refusal to deal" or a "price fix." The BPLA license is instead an essential aspect of the standard setting regime that allows the Bluetooth standards and Bluetooth product interoperability to exist. Courts have long held that such activities are tested under the rule of reason. Bluetooth therefore requests that the Court enter an order establishing that the rule of reason applies to Bandspeed's antitrust claims.

### 3. Bandspeed's Sherman Act § 1 "price fixing" claim must be dismissed on summary judgment because it alleges only a *per se* violation

Bandspeed has asserted two Sherman Act § 1 claims in this case. *See* SAC ¶¶ 114-125 (Third and Fourth Claims for "price fixing" and "concerted refusal to deal/group boycott," respectively). Bandspeed's "price fixing" claim alleges <u>only</u> a *per se* violation. *Id.* ¶ 118. In contrast, Bandspeed's "concerted refusal to deal/group boycott" claim alleges a *per se* violation or, in the alternative, a violation under the rule of reason. *Id.* ¶ 124.

"While pleading exclusively *per se* violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy.  If the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the <u>plaintiff's claims will be dismissed</u>."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) (emphasis added).  For example, in *Texaco, Inc. v. Dagher,* the Supreme Court refused to conduct a rule of reason analysis where the plaintiff failed to assert a violation under the rule of reason.  547 U.S. at 7 n.2.  The same standard applies here.  Bandspeed failed to plead a violation under the rule of reason as to its price fixing claim.  Because the rule of reason applies to all of Bandspeed's antitrust allegations, but Bandspeed has only alleged a *per se* price-fixing claim, the price fixing claim is subject to summary judgment.

## IV.    CONCLUSION

Plaintiffs' allegations in this case are merely an attempt to seek the triumph of labels over substance. Now is the appropriate time to dismiss these wholly meritless claims and narrow the remainder of this case.  For the reasons set forth above, Bluetooth therefore respectfully requests that the Court grant Bluetooth's motion for summary judgment and dismiss Bandspeed's antitrust-related claims or, in the alternative, conclude that the rule of reason applies to Bandspeed's antitrust claims for purposes of further summary judgment motions and/or trial.

//

//

//

//

Dated: September 13, 2013                    Respectfully submitted,

**K&L GATES LLP**

By: _/s/ Ramona M. Emerson_
HUGH F. BANGASSER, *Pro Hac Vice*
RAMONA M. EMERSON, *Pro Hac Vice*
CHRISTOPHER M. WYANT, *Pro Hac Vice*
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Telephone:  (206) 623-7580
Facsimile:  (206) 623-7022
hugh.bangasser@klgates.com
ramona.emerson@klgates.com
chris.wyant@klgates.com


GREGORY P. SAPIRE
State Bar No. 00791601
K&L GATES LLP
111 Congress Avenue, Suite 900
Austin, Texas 78701
Telephone:  (512) 482-6800
Facsimile:  (512) 482-6859
greg.sapire@klgates.com

**ATTORNEYS FOR BLUETOOTH SIG, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 13, 2013 the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the parties listed below.

<u>/s/ Ramona M. Emerson</u>
Ramona Emerson

Mikal C. Watts
State Bar. No. 20981820
Christopher V. Goodpastor
State Bar No. 00791991
Linda K. Leibfarth (*pro hac vice*)
WATTS GUERRA LLP
811 Barton Springs Road, Suite 725
Austin, TX 78704
Tel:  (512) 479-0500
Fax:  (512) 479-0502
mcwatts@wattsguerra.com
cgoodpastor@wattsguerra.com
lleibfarth@wattsguerra.com

Edward W. Allred
State Bar No. 50511764
Francisco Guerra, IV
State Bar No. 00797784
Mark Fassold
State Bar No. 24012609
Shalimar S. Wallis
State Bar No. 24033191
WATTS GUERRA LLP
300 Convent Street, Suite 100
San Antonio, TX 78205
Tel:  (210) 527-0500
Fax:  (210) 527-0501
eallred@wattsguerra.com
fguerra@wattsguerra.com
mfassold@wattsguerra.com
swallis@wattsguerra.com

Andrew G. DiNovo
State Bar No. 00790594
Adam G. Price
State Bar No. 24027750
DINOVO PRICE ELLWANGER & HARDY LLP
7000 N. MoPac Expressway, Suite 350
Austin, TX 78731
Tel:  (512) 539-2626
Fax:  (512) 539-2627
adinovo@dpelaw.com
aprice@dpelaw.com

**Attorneys for Plaintiff Bandspeed, Inc.**

Ajeet P. Pai
David B. Weaver
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746
Tel:  512-542-8798
Fax:  512-236-3317
apai@velaw.com
dweaver@velaw.com

Steven R. Borgman
William L. LaFuze
VINSON & ELKINS LLP
1001 Fannin St., Suite 2500
Houston, TX 77002
Tel:  713-758-2002
Fax:  713-615-5758
sborgman@velaw.com
wlafuze@velaw.com

Dylan J. Raife
Bita Rahebi
Vincent J. Belusko
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
Tel:  213-892-5200
Fax:  213-892-5454
draife@mofo.com
brahebi@mofo.com
vbelusko@mofo.com

Bradley S. Lui
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW, Suite 6000
Washington, DC 20006
Tel:  202-887-1500
Fax:  202-887-0763
blui@mofo.com

Francis C. Ho
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel:  415-268-7000
Fax:  415-268-7522
fho@mofo.com

**Attorneys for Defendants Research In Motion Limited and Research In Motion Corporation**

Stephen E. McConnico
Steven J. Wingard
Paige Arnette Amstutz
SCOTT, DOUGLASS & MCCONNICO
One American Center
600 Congress Avenue, 15th Floor
Austin, TX 78701
Tel:  512-495-6300
Fax:  512-474-0731
smcconnico@scottdoug.com
swingard@scottdoug.com
pamstutz@scottdoug.com

Adam P. Seitz
Michelle L. Marriott
Caroline A. Bader
ERISE IP, P.A.
6201 College Blvd., Suite 300
Overland Park, KS 66211
Tel:  913-777-5600
Fax:  913-777-5601
adam.seitz@eriseip.com
michelle.marriott@eriseip.com
carrie.bader@eriseip.com

**Attorneys for Defendants Garmin International, Inc. and Garmin USA, Inc.**

David J. Healey
Wasif H. Qureshi
Brian G. Strand
FISH & RICHARDSON PC
1221 McKinney Street, Ste 2800
Houston, TX 77010
Tel:  713-654-5300
Fax:  713-652-0109
healey@fr.com
qureshi@fr.com
strand@fr.com

Michael J. McKeon
FISH & RICHARDSON PC
1425 K Street N.W., 11th Floor
Washington, DC  20005
Tel:  202-783-5070
Fax:  202-283-7331
mckeon@fr.com

**Attorneys for Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc.**

William H. Boice
Michael J. Turton
Bonnie M. Grant
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309-4530
Tel:  404-815-6500
Fax:  404-815-6555
bboice@kilpatricktownsend.com
mturton@kilpatricktownsend.com
bgrant@kilpatricktownsend.com

Steven D. Moore
Caroline K. Wray
Matias Ferrario
James L. Howard
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Tel:  336-607-7300
Fax:  336-607-7500
smoore@kilpatricktownsend.com
cwray@kilpatricktownsend.com
mferrario@kilpatricktownsend.com
jlhoward@kilpatricktownsend.com

Mark A. Mayfield
Mark T. Mitchell
GARDERE WYNNE SEWELL LLP
One America Center
600 Congress Avenue, Suite 3000
Austin, TX 78701
Tel:  512-542-7000
Fax:  512-542-7315
mmayfield@gardere.com
mmitchell@gardere.com

**Attorneys for Defendants Motorola Mobility Inc. and Motorola Solutions, Inc.**

Jeffrey K. Sherwood
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, D.C. 20006-5403
Tel:  202-420-1307
Fax:  202-420-2201
sherwoodj@dicksteinshapiro.com

David Philip Whittlesey
J. Roger Williams, Jr.
ANDREWS KURTH LLP
111 Congress Avenue, Suite 1700
Austin, TX 78701
Tel:  512-320-9200
Fax:  512-320-9292
dwhittlesey@akllp.com
rwilliams@andrewskurth.com

**Attorneys for Defendants Toshiba Corporation, Toshiba America Information Systems, Inc. and Toshiba America, Inc.**