# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | | |
|---|---|---|---|
| BANDSPEED, INC., | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| GARMIN INTERNATIONAL, INC. *et al.*; | ) | Case No. | 1:11-CV-00771 |
| | ) | | |
| Defendants, | ) | | |
| _____ | ) | | |

## TOSHIBA CORPORATION, TOSHIBA AMERICA, INC., AND TOSHIBA AMERICA INFORMATION SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT ON PATENT INFRINGEMENT CLAIMS (COUNTS I AND II)

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................ 1

II.  UNDISPUTED STATEMENT OF FACTS ..................................................... 1

III.  LEGAL STANDARD ..................................................................................... 7

IV.  ARGUMENT .................................................................................................. 9

    A.  Toshiba Has An Express License To The '418 and '614 Patents ................. 9

    B.  Bandspeed made Contributions to the Bluetooth Specification ................. 10

    C.  Bandspeed's contributions were included in the Bluetooth Specification ................. 11

    D.  The Agreement Refutes Bandspeed's Arguments Against a Royalty Free License .... 12

        1.  The first license grant in section 4(b) is not limited to copyright licenses ............... 12

        2.  Bandspeed's purported withdrawal from the Bluetooth SIG does not extinguish the Toshiba license ................................................................................... 15

    E.  There is no "retroactive interpretation" of the Agreement ........................... 19

V.  CONCLUSION ............................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

**CASES**

*833 Northern Corp. v. Tashlik & Assoc., P.C.*, 256 A.D.2d 535 (N.Y.A.D. 1998) ....................... 8

*ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85 (2nd Cir. 2007) ........................................................................................................................... 17

*Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275 (N.Y.A.D. 1990) ................................ 8

*Aramony v. United Way of America*, 254 F.3d 403, 413  (2d Cir. 2001) ..................................... 16

*Crane Co. v. Coltec Industries, Inc.*, 171 F.3d 733 (2d Cir. 1999) ................................................. 8

*Elsky v. Hearst Corp.*, 232 A.D.2d 310 (N.Y.A.D. 1996)................................................................ 8

*In re Lehman Bros., Inc.*, 478 B.R. 570 (S.D.N.Y. 2012) ............................................................... 8

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76 (2d Cir. 2002)....................... 8

*Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374 (5th Cir. 2010) ...................................... 7

*Lockheed Martin Corp.v. Retail Holdings, N.V.*, 639 F.3d 63 (2d Cir. 2011) ................................ 8

*Madison Murray Assoc. v. Perlbinder*, 215 A.D.2d 204 (N.Y.A.D. 1995) .................................... 8

*Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003) .......................................................... 8, 15

*Maxine Co., Inc. v. Brink's Global Services USA, Inc.*, 94 A.D. 3d 53 (N.Y.A.D. 2012) .............. 8

*Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42 (N.Y.A.D. 1956)................................................ 17

*Power Lift, Inc. v. Weatherford Nipple–Up Systems, Inc.*, 871 F.2d 1082 (Fed. Cir. 1989)........................................................................................................................................ 7

*South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272 (N.Y. 2005) .......................................................... 8

*Tougher Heating & Plumbing Co. v. State of New York*, 73 A.D.2d 732 (N.Y.A.D. 1979)........................................................................................................................................ 8

Defendants Toshiba Corporation, Toshiba America, Inc., and Toshiba America Information Systems, Inc. (jointly "Toshiba") move for Summary Judgment on plaintiff Bandspeed's claims of infringement of U.S. Patent Nos. 7,027,418 (the "'418 patent") and 7,570,614 (the "'614 patent") (collectively "Patents-in-Suit").

## I.   <u>INTRODUCTION</u>

In this case, the plaintiff Bandspeed asserts claims for infringement of patented technology that Bandspeed contributed, on a royalty free basis, to an industry-wide standards setting group, the Bluetooth Special Interest Group ("Bluetooth SIG"). The existence and nature of those contributions are not in dispute, nor is the language of the applicable agreement, the Bluetooth Patent/Copyright License Agreement (attached as **Ex. 1**[1]), that governs this dispute.  The consequence of Bandspeed's contributions is that Toshiba, as an original Promoter member of the Bluetooth SIG, has a license to the Bandspeed patents and cannot be liable for infringement of the Patents-in-Suit.  And because the facts are not in dispute, this issue is ripe for determination by summary judgment

## II.   <u>UNDISPUTED STATEMENT OF FACTS</u>

1.      Bluetooth technology is a wireless communications system intended to replace cables and wires between electronic devices.   **Ex. 2**, *Fast Facts, Bluetooth Technology Website.*

2.      The Bluetooth SIG is a global technology standards organization.  **Ex. 3***, Introduction to Membership*, *Bluetooth Technology Special Interest Group.*  Formed in 1998, the Bluetooth SIG has overseen the development of Bluetooth Specifications and the

---

[1] Exhibit citations ("Ex.") refer to the exhibits attached to the declaration of Jonathan Falkler in support of this motion, submitted concurrently herewith.

promotion and protection of the Bluetooth brand.  Backed by industry leading companies, the Bluetooth SIG empowers more than 20,000 member companies to collaborate, innovate and guide Bluetooth wireless technology.  *Id.*

3.      Any company that uses Bluetooth wireless technology in its products must become a member of the Bluetooth SIG in order to use the Bluetooth SIG's intellectual property and the Bluetooth brand.  *Id.*

4.      The Bluetooth SIG offers multiple levels of membership, which afford the member different rights.  *Id.*

5.      At the highest membership level, there are seven "Promoter Members," each of which engaged in the development of Bluetooth technology and has a seat on the Bluetooth SIG Board of Directors and Qualification Review Board.  *Id.*  Toshiba is one of five founding Promoter Members of the Bluetooth SIG.  *Id.*

6.      A company can join the Bluetooth SIG as an "Associate Member" which grants them, among other things, the ability to participate in working groups and influence the direction of the Bluetooth Specifications.  *Id.*

7.      Finally, a company may join the Bluetooth SIG as an "Adopter Member" for free, and in return gains the following rights including the right to build and use Bluetooth products royalty free.  *Id.*  Garmin joined the Bluetooth SIG as an Adopter Member on November 11, 1999.  **Ex. 4**, *Bluetooth Adopters Agreement Form.*

8.      Bandspeed joined the Bluetooth SIG as an Adopter Member on September 5, 2001; on September 12, 2001, Bandspeed applied for Associate Membership.  **Ex. 5,** *Beale Dep.* 76:17-79:17; **Ex. 6,** *Facsimile Transmittal* at BSPD0492161.  In doing so, Bandspeed agreed to the terms and conditions in the Bluetooth Patent/Copyright License Agreement.

Bandspeed chose to pay for the higher membership, Associate Member, and thereby also chose and paid to be in a position to "influence the direction of the technology."

9.      A copy of the signed Acceptance of Associate Membership is attached as Exhibit 6.  It is undisputed that Bandspeed executed this agreement, and that the terms and conditions of Bluetooth Associate Membership detailed in the referenced Membership Agreement Commitment (**Ex. 7**) include an agreement to be bound by the Bluetooth Patent/Copyright License Agreement (**Ex. 1**, hereinafter, "the Agreement").

10.      Section 4(b) of the Agreement states that "contributions" by Bluetooth SIG members that become part of any Bluetooth Specification "shall be licensed" to all other Bluetooth SIG members, even if the contributing member withdraws:

> (b)  All ***Contributions*** by a contributing Associate or Adopter Member that have been submitted for inclusion in a Bluetooth Specification or Draft Bluetooth Specification ***shall be licensed*** by the contributing Associate or Adopter Member to all Licensees (as defined in Section 5(b) hereof) under the grant specified in Section 5(b) hereof for all Bluetooth Specifications in which the Contributions become included, ***even if such Associate or Adopter Member has withdrawn*** or been terminated as a Member of Bluetooth SIG.

**Ex. 1** at section 4(b) (emphasis added).  "Contribution" is defined by the Agreement as "any written or electronic document submitted to a Working Group for inclusion into a Bluetooth Specification by a Bluetooth SIG Member or agreed upon in writing or electronically by a Bluetooth SIG Member that such document is a contribution of such Bluetooth SIG Member." **Ex. 1** at section 1(h).

11.      The license "grant specified in Section 5(b)," which applies to all Contributions to the standard made by Bluetooth SIG Member, is a "nonexclusive, ***royalty free***, perpetual, ***irrevocable***, nontransferable, nonsublicenseable, worldwide license," under the grant specified in section 5(b):

5.  License Grant.
. . . .

(b)    By Associate or Adopter Member.  Effective upon the adoption by Bluetooth SIG of each Bluetooth Specification, each Associate and Adopter Member and their Affiliates hereby grant to each Promoter Member and Associate and Adopter Member and all of their respective Affiliates (also Collectively, "Licensee") a nonexclusive, royalty free, perpetual, irrevocable, nontransferable, nonsublicenseable, worldwide license under its Necessary Claims solely to make, have made, use, import, offer to sell, sell and otherwise distribute and dispose of Compliant Portions; provided that such license need not extend to any part of function of a product in which a Compliant Portion is incorporated that is not itself part of the Compliant Portion.  . . .

**Ex. 1** at section 5(b).

12.    The Agreement is governed under the laws of the State of New York.  **Ex. 1** at section 8(c).

13.    Bandspeed understood that it would be granting a royalty free license to other members of the Bluetooth SIG for technology contributed to the Bluetooth Specification, and Bandspeed's management – including Rick Beale, Stan Skafidas, and Michael Luther discussed this licensing obligation.  **Ex. 5,** *Beale Dep.* 85:3-11.

14.    About eight months before joining the Bluetooth SIG, on January 25, 2001, Bandspeed filed two provisional patent applications whose application numbers are 60/264,594 and 60/264,345.  On September 6, 2001, after applying for Adopter Membership and days before becoming an Associate Member of the Bluetooth SIG, Bandspeed filed two patent applications claiming priority to these provisional patent applications that resulted in U.S. Patent Nos. 7,027,418 (D.I. 731, Ex. B) and 7,570,614 (D.I. 731, Ex. C).  Bandspeed refers to the technology claimed in the '418 and '614 patents as "Adaptive Frequency Hopping" ("AFH").  *Id.*  The specifications of both patents state that Bluetooth technology, which was developed by the Bluetooth SIG, is an example of frequency hopping.  D.I. 731, Ex. B at 2:3-13; D.I. 731, Ex. C at 2:20-29.

15.     Bandspeed applied to join a working group of the Bluetooth SIG, the Coexistence Working Group, and was admitted by October 16, 2001.  **Ex. 8,** *Oct. 16, 2001 Email*.  The Coexistence Working Group's purpose was to determine what methods and technologies best solved the interference problems that existed between Bluetooth devices and wireless devices operating on the 802.15 frequency.  The AFH proposal in the coexistence working group was the same as Bandspeed's prior proposal to the IEEE, and Bandspeed suggested to the group that it could contribute additional information.  *Id.* (quotation highlighted in exhibit).  Bandspeed understood that the Bluetooth SIG would only consider Bandspeed's technology if Bandspeed was a member of the Bluetooth SIG.  **Ex. 9,** *Issues on Bandspeed's Adaptive Frequency Hopping Mechanism* at BSPD0094766 (quotation highlighted in exhibit).

16.     On October 22, 2001, Bandspeed received confirmation from the Coexistence Working Group that Bandspeed's AFH technology was chosen for incorporation into the Bluetooth Specification.  **Ex. 10,** *Oct. 22, 2001 Email* (quotation highlighted in exhibit); **Ex. 11,** *Longterm Strategy* at BSPD0462963.

17.     On or about March 25, 2002, Bandspeed prepared internal strategy documents outlining a plan to push the precise Adaptive Frequency Hopping ("AFH") technology covered by its intellectual property ("IP") into the Bluetooth Specification through its membership in the Coexistence Working Group.  *See* **Ex. 5,** *Beale Dep.* At at 172:13-174:12; **Ex. 12,** *Bluetooth IP Strategy* at BSPD0074873-78; **Ex. 13,** *Bandspeed Standards Strategy* at BSPD0485326-28.

18.     As testified to by Bandspeed's former Vice President of Sales, Mr. Rick Beale, a Bandspeed strategy document entitled "The Bluetooth IP Sales Situation Strategy Recommendation" outlines the following plan:

- Complete sales cycle on the outstanding companies.
- Likely conclusion is: IP is worthless until SIG adopts AFH in next standard version and we resign from SIG.
- Keep a small core of Bandspeed people in Bluetooth to continue to contribute to SIG and IEEE so we win the IP in the Bluetooth standard.
- Resign from Bluetooth SIG when notified that our AFH IP is to be incorporated (or shortly before) so we keep IP rights and they don't go to SIG members for free.
- Then re-surface with AFH & APC IP Licensing-for-Fee.

**Ex. 5,** *Beale Dep.* at 172:13-174:12; *see* **Ex. 12,** *Bluetooth IP Strategy* at BSPD0074878.

19.     Bandspeed proceeded to make numerous contributions to the Bluetooth SIG Coexistence Working Group in its efforts to "win the IP in the Bluetooth standard." *See* **Ex. 14,** *Bandspeed Expertise in Adaptive Frequency Hopping (AFH)* (listing contributions) at BSPD0485840; **Ex. 15,** *Bandspeed's proposal for Bluetooth solution*; **Ex. 16,** *Instant Channel Replacement (ICR) approach for AFH*; **Ex. 17,** *Why bad channels should not be used in the hopping sequence?*; **Ex. 18,** *Pseudocode of Instant Channel Replacement*; **Ex. 19,** *Oct. 19, 2001 Email*; **Ex. 20,** *Oct. 19, 2001 Email*; **Ex. 21,** *Nov. 6, 2001 Email*; **Ex. 22,** *AFH Specification 0.1* (excerpt); **Ex. 23,** *AFH Specification 0.3* (excerpt); **Ex. 24,** *AFH Specification 0.5* (excerpt); **Ex. 25,** *AFH Specification 0.7* (excerpt); **Ex. 26,** *Hopset switching discussion document*; **Ex. 27,** *Instant Channel Replacement (ICR) versus partition sequence to intelligently use bad channels*.

20.     Bandspeed also contributed information about AFH technology to an IEEE 802.15.2 coexistence working group, which incorporated AFH into its IEEE 802.15.2 standard. **Ex. 13,** *Bandspeed Standards Strategy* at BSPD0485326-27 (quotation highlighted in exhibit); **Ex. 28,** *August 2, 2001 Email* (describing Bandspeed contributions). Bandspeed's

**TOSHIBA'S MOTION FOR SUMMARY JUDGMENT**                                              6

proposed IEEE 802.15.2 AFH standard was also then presented to the Bluetooth SIG for inclusion in the Bluetooth standard. **Ex. 29,** *Marketing Strategy* at BSPD0463158 (quotation highlighted in exhibit); **Ex. 13**, *Bandspeed Standards Strategy* at BSPD0485326-27 (quotation highlighted in exhibit); **Ex. 30,** *August 10, 2001 Email* (quotation highlighted in exhibit).

21.     In August, 2002, Bandspeed employees discussed the need to withdraw from the Bluetooth SIG, which was including their patented technology in the Standard. **Ex. 31,** *August 8, 2002 Email* (quotation highlighted in exhibit).   Bandspeed alleges to have withdrawn from the SIG on December 12, 2002. **Ex. 32.**

22.     Bluetooth SIG adopted version 1.2 of the Bluetooth Specification on November 5, 2003. **Ex. 33** (excerpts).  This version of the Bluetooth Specification listed Bandspeed Employee Hongbing Gan as a contributor (**Ex. 33** at BSPD0401701), and incorporated Bandspeed's AFH technology. **Ex. 33** at, *e.g.,* BSPD0402010-12**, Ex. 34,** *Foley Dep. at 103:16-20*; *see also* **Ex. 35,** *Feb. 11, 2002 Email* at BSPD0454346 (quotation highlighted in exhibit); **Ex. 36,** *Goodman Dec.* at ¶¶ 3-6.

## III.     <u>LEGAL STANDARD</u>

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the evidence as a whole shows that no genuine issues as to any material fact exist to be resolved by a jury and that the moving party is entitled to judgment as a matter of law. *Jackson v. Cal–Western Packaging Corp.,* 602 F.3d 374, 377 (5th Cir. 2010).

Toshiba's license defense is governed by basic contract law.  *Power Lift, Inc. v. Weatherford Nipple–Up Systems, Inc.,* 871 F.2d 1082, 1085 (Fed. Cir. 1989).  The Bluetooth Copyright/Patent License Agreement is governed by New York law under Provision 8(d). SOF ¶ 12.  Under New York law, a contract must be interpreted according to the parties'

intent. *Crane Co. v. Coltec Industries, Inc.,* 171 F.3d 733, 737 (2d Cir. 1999) (quoting *Am. Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275 (N.Y.A.D 1990)). That intent is derived "from the plain meaning of the language employed in the agreements when the agreements are read as a whole." *In re Lehman Bros., Inc.,* 478 B.R. 570, 586 (S.D.N.Y. 2012).

Courts must avoid "interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.,* 337 F.3d 237, 250 (2d Cir. 2003). A contract should not be interpreted to produce a result that is absurd (*see Tougher Heating & Plumbing Co. v. State of New York*, 73 A.D.2d 732 (N.Y.A.D. 1979)), commercially unreasonable (*see Elsky v. Hearst Corp*., 232 A.D.2d 310, 311 (N.Y.A.D. 1996)) *Madison Murray Assoc. v. Perlbinder*, 215 A.D.2d 204 (N.Y.A.D. 1995) or contrary to the reasonable expectations of the parties (*see 833 Northern Corp. v. Tashlik & Assoc., P.C*., 256 A.D.2d 535 (N.Y.A.D. 1998).

When the parties' intent is clear—*i.e.,* unambiguous—the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp.v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011) (*citing South Rd. Assocs., LLC v. IBM,* 4 N.Y.3d 272 (N.Y. 2005)). Further, interpretation of an unambiguous contract is a matter of law for the court. *Maxine Co., Inc. v. Brink's Global Services USA, Inc.*, 94 A.D. 3d 53, 56 (N.Y.A.D. 2012).

Finally, the rule in New York is that a title or caption of a provision does not alter ordinary rules of contract interpretation.  *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 86-87 (2d Cir. 2002) (*citing* 2 Couch on Insurance § 18:18 (3d ed. 1997) ("While the caption or designation of the type of policy . . . does not broaden the coverage expressed in the body of the policy, the policy must be considered as a whole and the caption read in connection with the remainder of the contents.")).

## IV.   ARGUMENT

### A.   Toshiba Has An Express License To The '418 and '614 Patents

The starting point in this analysis is the plain language of section 4(b) of the Agreement, which states:

> "All Contributions by a contributing Associate . . . Member that have been submitted for inclusion in an Bluetooth Specification . . . shall be licensed by the contributing Associate . . . Member to all Licensees . . . for all Bluetooth Specifications in which the Contributions become included, even if such Associate . . . Member . . . has withdrawn or been terminated as a Member of Bluetooth SIG."

SOF ¶ 10.   All of the elements for a 4(b) license to Toshiba are satisfied here: (1) Bandspeed was an Associate Member; (2) Bandspeed made Contributions, as defined by the Agreement,[2] to the Bluetooth Specification; (3) the Specification as finally adopted included Bandspeed Contributions (which Bandspeed has described as the IP in the Patents-in-Suit); and (4) Toshiba is a Licensee as defined by the Agreement.

Two of these elements are readily demonstrated and undisputed: first, it is undisputed that Bandspeed signed the Membership Agreement on September 12, 2001 and was an Associate Member at least until its purported withdrawal from the Bluetooth SIG on December 12, 2002 (SOF ¶¶ 10, 21); and second, section 5(b) of the Agreement defines the term Licensee as including all Promoter Members, Adopter Members and Associate Members, thus making Toshiba a Licensee since Toshiba has been a Promoter Member of the Bluetooth SIG since its inception (SOF ¶ 11).

The evidence of record shows that the remaining two elements are also satisfied.

---

[2] "Contribution" is defined by the Agreement as "any written or electronic document submitted to a Working Group for inclusion into a Bluetooth Specification by a Bluetooth SIG Member or agreed upon in writing or electronically by a Bluetooth SIG Member that such document is a contribution of such Bluetooth SIG Member."  **Ex. 1** at section 1(h).

### B.      Bandspeed Made Contributions to the Bluetooth Specification

Bandspeed was instrumental in developing AFH within the Bluetooth SIG.  **Ex. 35,** *Feb. 11, 2002 Email* at BSPD0454346 (quotation highlighted in exhibit).  In fact, even before the Bluetooth SIG working group was formed, Bandspeed was the first to propose a solution of AFH to the IEEE 802.15.2 standards committee.  **Ex. 13**, *Bandspeed Standards Strategy* at BSPD0485326-27.  The AFH kernel eventually considered by the Bluetooth SIG was the same one that Bandspeed proposed to the IEEE.  *Id.* Indeed, Bandspeed's contributions to the Bluetooth SIG were an integral part of its plan to "keep a small core of Bandspeed people in BT to continue to contribute to the SIG and IEEE so [they] win the IP in BT standard."  **Ex. 5,** *Beale Dep.* at 173:12-16; **Ex. 12,** *Bluetooth IP Strategy* at BSPD0074878.  Bandspeed was determined to continue to participate in IEEE 802.15 & the BT SIG until they were ready to adopt AFH.  **Ex. 37,** *April 9, 2002 Email* (quotation in exhibit).

Bandspeed is, by its own admission, one of the editors of the coexistence solution in the Bluetooth SIG.  **Ex. 13**, *Bandspeed Standards Strategy* at BSPD0485327.  Its written contributions are reflected in numerous submitted documents identified above.  SOF ¶¶ 19-20. Among other things,[3] Bandspeed presented the group with documents describing its AFH technology in their "Proposal for Bluetooth Solution" document (**Ex. 15**) and other written proposals addressing implementation details (**Exs. 14-18, 26-27**) including numerous emails (e.g., **Exs. 19-21**).  Bandspeed employees contributed draft specifications, including the AFH Specification versions .1, .3, .5 and .7.  **Exs. 22-25**.

Bandspeed also made contributions to the IEEE coexistence working group (formed earlier than the Bluetooth SIG working group), and those contributions were used to create the IEEE specification that was eventually incorporated into the Bluetooth Specification.  SOF

---

[3] Bandspeed's response to Interrogatory No. 29 lists its contributions.  **Ex. 38**.

**TOSHIBA'S MOTION FOR SUMMARY JUDGMENT**                                           10

¶ 20-22; **Ex. 28** (quotation highlighted in exhibit).  The AFH kernel eventually adopted by the Bluetooth SIG was the same one Bandspeed proposed to the IEEE.  **Ex. 13**, *Bandspeed Standards Strategy* at BSPD0485326-27 (quotation highlighted in exhibit).

Bandspeed made these contributions as part of a concerted effort *to have its exact AFH implementation* adopted in both the IEEE and Bluetooth SIG.  Bandspeed employees spent a substantial amount of their time on these activities.  **Ex. 37,** *April 9, 2002 Email* (quotation highlighted in exhibit).  Bandspeed made this effort because it believed, based on its flawed and self-serving interpretation of the Agreement, that it could withdraw just before the adoption of the Specification and then later resurface to collect royalties after Bluetooth products were built according to the standard.  *Id.*

### C.  Bandspeed's Contributions Were Included in the Bluetooth Specification

Just as Bandspeed planned, the Bluetooth SIG included the Bandspeed Contributions in the Bluetooth Specification.  The AFH Specification .7, which lists Bandspeed Employee Hongbing Gan as a contributor, was incorporated into the Bluetooth Specification version 1.2 adopted in November 2003.  *See* SOF ¶ 22.  The adopted Bluetooth Specification included the features Bandspeed had pushed for, as confirmed by Bandspeed's own commentary.  When AFH was first chosen as the method for inclusion in the Bluetooth Specification, Bandspeed confirmed this method was the same as their prior IEEE recommendation, and their patents.  **Ex. 10,** *Oct. 22, 2001 Email* (quotation highlighted in exhibit); **Ex. 31,** *August 8, 2002 Email* (quotation highlighted in exhibit).  Bandspeed employee Hongbing Gan is listed as a contributor to the Bluetooth Specification version 1.2.  **Ex. 33**.

Lest there be any doubt, Defendants' expert, Mr. Goodman, compared the disclosure of Bandspeed's contributions to the IEEE and Bluetooth SIG to each feature of the Bluetooth Specification version 1.2 that Bandspeed has alleged to be relevant to this case (*i.e.,* the

**TOSHIBA'S MOTION FOR SUMMARY JUDGMENT**                                                  11

Bluetooth Specification version 1.2 features allegedly infringing their patents).   **Ex. 36,** *Goodman Dec*. at ¶¶ 3-6.   Mr. Goodman found that each of the features in Bluetooth Specification 1.2 could be identified in Bandspeed's contributions.  *Id*.  In other words, every relevant feature of the Bluetooth Specification came from a Bandspeed contribution. Accordingly, any intellectual property held by Bandspeed that covers these features is licensed to Toshiba under the Agreement.

###### D.   The Agreement Refutes Bandspeed's Arguments Against a Royalty Free License

Bandspeed has made several arguments as to why the Bluetooth SIG members do not have a royalty free license.  None of these arguments has merit.

####### 1.   The license grant in section 4(b) is not limited to copyright licenses

Bandspeed contends that the scope of the license grant in section 4(b) is limited to copyright licenses.  Bandspeed makes this argument because section 4, of which 4(b) is a part, is titled "Copyright License."  Relying solely on this title and ignoring the text of section 4, Bandspeed contends that the scope of section 4 must be limited to copyright licenses. Bandspeed is wrong.

The title does accurately describe section 4(a), which extends copyright licenses to members of a Working Group who are involved in the development of a Specification.  The scope of the 4(a) language, unlike the 4(b) language, is limited to licensing "copyrights in [the] Contributions," and only for "Promoter and Associate Members "who participate in a Working Group . . . for the purpose of developing any Draft Bluetooth Specification."  **Ex. 1** at section 4(a).  In other words, section 4(a) eliminates the risk that any member could be subjected to a copyright claim for its role in preparing draft specifications that might otherwise infringe upon another Working Group member's copyright.  Such a narrow scope is

appropriate because, while the Specification is being developed, only those involved in developing the Specification and sharing drafts need copyright protection.

Section 4(b) is not so limited because it applies to Contributions "submitted . . . for inclusion in any Bluetooth Specification or Draft Bluetooth Specification . . . for all Bluetooth Specifications in which the Contributions become included," which can then be practiced by all Members' wireless devices that communicate with each other.  **Ex. 1** at 4(b).  Upon adoption of a Specification, a broader scope is needed to protect Bluetooth SIG Members from infringement claims.   And, this is evident from section 4(b)'s statement that all "Contributions" shall be licensed, without the limiting reference to copyrights that appears in section 4(a). "Contribution" is a defined term that encompasses "any submitted written or electronic document submitted to a Working Group for inclusion into a Bluetooth Specification . . . ."  **Ex. 1** at 1(h).   Given that the Specification creates an operating standard for wireless communication between devices, it is inescapable that a Contribution must include the technology needed to accomplish such wireless communication.   Such Contributions obviously and necessarily encompass technology that will be used to perform the Specification and to allow wireless devices to communicate with each other.   That technology will be reflected not only in copyrights, but in patents as well.  As a result, section 4(b) is necessarily broader in scope than section 4(a) and applies to all licensable subject matter.  In this way, section 4(b) ensures that if a Member's Contribution becomes included in the final Specification, then the Member must grant both copyright and patent licenses, so that all members subsequently making Bluetooth products pursuant to that Specification are protected.

As further proof of its scope, section 4(b) explicitly states that the license is "as defined in Section 5(b) hereof," which definition includes an irrevocable patent license.[4] And, Bandspeed's former CFO, Mr. John Curtin testified that (i) he was the person responsible for originally reviewing the BPLA on behalf of Bandspeed and (ii) Bandspeed itself interpreted section 4(b) as granting a patent license. *See* **Ex. 40**, *Curtin Dep.* at 215:2-7, 219:13-19. The Bluetooth SIG testified that it had the same interpretation. *See* **Ex. 41,** *Powell Dep.* at 115:17-117:16; *see also* **Ex**. **34,** *Foley Dep.* at 169:4-10 ("Q. So is it fair to say that regardless of when a member withdraws from the SIG, so long as his or -- so long as that member's contribution is adopted, that contribution is licensed to the other members? . . . THE WITNESS: Yes, and that was always the intent.").

Finally, as already explained, Bandspeed made numerous Contributions in the form of AFH technology. Bandspeed itself describes that technology as "IP," which it patented, further reinforcing that section 4(b) Contributions extend to patents, copyrights and any other protectable subject matter. **Ex. 5,** *Beale Dep.* at 173:12-21; *See* **Ex. 31,** *August 8, 2002 Email* (quotation highlighted in exhibit). The title "Copyright License" therefore does not limit the scope of section 4(b).

In fact, interpreting section 4(b) as applying only to copyright would render it superfluous. Sections 4(a) and 3 fully address the issue of copyright licenses/ownership for Toshiba and establish the circumstances in which Toshiba would receive any such licenses or

---

[4] The 5(b) grant includes a worldwide license "under its Necessary Claims solely to make, have made, use, import, offer to sell, sell and otherwise distribute and dispose of [Bluetooth-compliant devices]." **Ex. 1** at section 5(b). "Necessary Claims" includes all "claims of a patent or patent application that (a) are owned or controlled by a party [now or in the future] . . . and (b) are necessarily infringed by implementing those portions of a Bluetooth Specification within the bounds of [protocols and data formats needed for Bluetooth interoperability.]" **Ex. 1** at section 1(l).

ownership rights. If Toshiba participates in a Working Group, it receives a copyright license under 4(a) for development of Draft Specifications. But, once the Specification is final, Toshiba, as a Promoter Member, also acquires ownership of all copyrights. *See* **Ex. 1** at section 3 ("Copyrights in Final Specifications"). By Bandspeed's logic, upon final adoption of the Specification, section 4(b) would give Toshiba a license to copyrights that it *acquired at the same time* by operation of section 3. Bandspeed's narrow interpretation of section 4(b) as only affording Toshiba a copyright license is not only wrong as a matter of straightforward contract interpretation, but it renders that provision superfluous, which is an impermissible contract interpretation under New York law. *See Manley v. AmBase Corp.,* 337 F.3d 237, 250 (2d Cir. 2003) (courts must avoid "interpretations that render contract provisions meaningless or superfluous").

### 2. Bandspeed's purported withdrawal from the Bluetooth SIG does not extinguish the Toshiba license

Bandspeed also argues erroneously that its purported withdrawal from the Bluetooth SIG nullified the royalty free license to Toshiba. In making this argument, Bandspeed relies upon the provisions of section 7 which provide, in effect, that if a member withdraws within 3 weeks of notice of adoption of a Specification, then the withdrawal is effective immediately prior to the adoption of the Specification. The timing is important because a license granted under section 5(b) can be avoided if the member withdraws prior to adoption of the specification. *See* **Ex. 1** at section 7(b)(iv) (Section 5 licenses continue in effect for specifications adopted *prior* to withdrawal/termination of the member).

The Bandspeed argument mistakenly contends that the Toshiba license to the Bandspeed patents arises under section 5(b) where timely withdrawal can avoid the license. But, the Toshiba license arose under section 4(b), not 5(b), and withdrawal does not avoid a

**TOSHIBA'S MOTION FOR SUMMARY JUDGMENT**                    15

4(b) license no matter when that withdrawal is attempted or achieved.  The language on this point in the Agreement could not be more explicit: it states that the Contribution "shall be licensed . . . <u>even if such Associate or Adopter Member has withdrawn or been terminated as a Member of Bluetooth SIG</u>."  **Ex. 1** at section 4(b) (emphasis added).  Unlike section 5(b), section 4(b) creates a license that is intended to survive withdrawal.  This makes sense, as section 4(b) applies to Contributions actively made by members of working groups.  If a member actively contributes information into these working groups, it cannot later complain about a royalty free, irrevocable patent license when its proposals are included in a final, adopted specification.

Bandspeed, by its argument, yet again asks the Court to read language out of the Agreement.  The 4(b) provision that prohibits termination of the license protects a very important expectation of participants in the Bluetooth SIG standards/specification setting process – that affirmative Member contributions that are included in the specification will be available royalty free to all members of the Bluetooth SIG without risk of revocation by the contributing Member.  Otherwise, a Member in the specification setting process could join a working group of the Bluetooth SIG, offer its technology without disclosing the patenting status of that technology, advocate for inclusion of such technology in the final standard, and then withdraw before final adoption so that it could seek royalties from all Bluetooth SIG members, despite the fact that Bluetooth is a royalty free technology.  Section 4(b) protects against this result.[5]

---

[5] To the extent Bandspeed argues that section 7's language relating to "all licenses" revokes the 4(b) irrevocable license, this argument is unavailing because the general provisions of section 7 cannot override the specific provisions of section 4(b), which describe the exact circumstances of this case and the consequences of Bandspeed actions.  *See Aramony v. United Way of America,* 254 F.3d 403, 413 (2d Cir. 2001) (it is a fundamental rule of contract

As shown by its own documents, Bandspeed understood all of these points. First, Bandspeed knew that the affirmative offer of its technology would result in an "automatic" license to all Bluetooth SIG members. **Ex. 12,** *Bluetooth IP Strategy* at BSPD0074873 (quotation highlighted in exhibit). Second, it is uncontroverted that Bandspeed sought membership in the SIG's Coexistence Working Group and then used its membership in the Working Group to push the Bluetooth SIG to adopt its "AFH IP" into Bluetooth Specification Version 1.2. SOF ¶¶ 17-20. Third, the Bluetooth SIG adopted the Bandspeed AFH approach as its chosen method for addressing coexistence; using Bandspeed's words, it "won" the AFH IP for the Bluetooth Specification. SOF ¶ 19-22. And fourth, Bandspeed understood that Bluetooth SIG licenses are royalty free. SOF ¶ 13.

In hatching its ill-conceived plan, Bandspeed recognized that it was contravening the expectations of Bluetooth SIG members. The record repeatedly reflects the importance of the members' royalty free expectations and Bandspeed's awareness of that expectation. *See* **Ex. 42**, *Bandspeed Meeting Notes* at BSPD0452461 (quotation highlighted in exhibit); **Ex. 9**, *Issues on Bandspeed's Adaptive Frequency Hopping Mechanism* at BSPD0094766 (quotation highlighted in exhibit). Mr. Robert Burke, a former technology director at Bandspeed, recalled that he "thought it was a bad move for Bandspeed to join the Bluetooth SIG in the first place . . . [b]ecause the Bluetooth SIG required members to give up rights to licensing revenue from their IP." **Ex. 43**, *Burke Dep.* at 94:15-23. Bandspeed founder and CTO, Mr.

---

construction that "specific terms and exact terms are given greater weight than general language.") (quoting Restatement (Second) of Contracts Sec. 203(c) (1981); *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc*., 485 F.3d 85, 102 (2nd Cir. 2007) (where there is "an inconsistency between a specific provision and a general provision of a contract ..., the specific provision controls) (*quoting Muzak Corp. v. Hotel Taft Corp*., 1 N.Y.2d 42, 46 (N.Y.A.D 1956)). Here, 4(b) describes the precise circumstances at issue; it must therefore control.

Efstratius Skafidas, testified that he understood that if AFH became part of the standard and Bandspeed was part of the Bluetooth SIG, there "would be some implications," including that Bluetooth SIG members "would cross-license whatever was put into the standard and agreed to by the standard." **Ex. 44,** *Skafidas Dep.* at 127-128.  Bandspeed was well aware its actions were inconsistent with the intent of the Agreement to collaboratively develop royalty free standards.

Peter Schwechheimer, Toshiba's damages expert, explains the importance of the royalty free agreement in the Bluetooth SIG as follows:

> In the present case, Bluetooth SIG has [a royalty free or] RAND-Z licensing policy. Its "Patent and Copyright Agreement" requires Members and Associate Members to grant royalty-free licenses for any patent claims that are necessary for implementing the standard. The economic logic for this is straightforward: companies essentially forego the opportunity (and challenge) of licensing out intellectual property necessary to implement the standard in return for, among other things, avoiding the costs, difficulties, and disputes that often arise if there is an obligation to license in such essential technology. Further, royalty free policies effectively avoid the so-called royalty stacking problem as well as the numerous difficulties and costs associated with bilateral licensing. All else equal, such policies produce technologies that cost relatively less to implement and therefore such technologies have a relatively greater likelihood of commercial success – which ultimately benefits all implementers of the standard.

**Ex. 39,** Schwechheimer Dec. at 6.  Mr. Schwechheimer further explains that: "In general, standards bodies with RAND-Z commitments incorporate technology into the standard only if it is available on a RAND-Z basis. . . . If a patent-holder does not agree to a RAND-Z commitment, that technology would, in general, be unlikely to be adopted by a standard with a RAND-Z policy."  *Id.* at 5.

Finally, the language of section 4(b) anticipates precisely the temporal sequence that occurred in this case – an Associate Member like Bandspeed first submits its technology for inclusion in the Specification, the technology/IP is adopted in reliance upon the royalty free

license and then the Member seeks to withdraw and "hold up" the remaining Members. Section 4(b)'s text requires that, in that event (which is precisely what happened here), if those Contributions "become included," then they are licensed "even if the Associate . . . Member has withdrawn."  **Ex. 1** at section 4(b).  Use of the mandatory "shall be licensed," juxtaposed with the phrase "become included," indicating a future or prospective event, and the phrase "even if the . . . Member has withdrawn" by their plain language mean that for all future versions of the Specification, such Member's Contributions are licensed, without regard to that Member's status within the Bluetooth SIG.  Because Bandspeed's AFH Contributions have been included in every succeeding version of the Specification, those Contributions are all licensed even if Bandspeed did succeed in withdrawing from the Bluetooth SIG.  Otherwise, Bluetooth SIG members could not use the Specification on a royalty free basis.  Bandspeed's efforts through this case to revoke that license and impose a royalty cannot stand.

> **E.**     **There is no "retroactive interpretation" of the Agreement**

In its interrogatory responses, Bandspeed contends that members of the Bluetooth SIG retroactively interpreted the Agreement to impose a royalty free license on Bandspeed.  This contention lacks merit for the simple reason that the contract language at issue here is the language in the Agreement that Bandspeed signed.  That language has never changed and it should be given its plain meaning and effect.  Furthermore, the evidence described above shows unequivocally that Bandspeed understood this plain meaning, understood there would be a legal dispute about it, and proceeded with its plan.

## V.     <u>CONCLUSION</u>

For all the foregoing reasons, Toshiba asks the Court to grant its motion for summary judgment against Bandspeed.

Dated: December 24, 2013

By:  /s/ Gerard A. Haddad

David P. Whittlesey
dwhittlesey@andrewskurth.com
State Bar No. 00791920
J. Roger Williams, Jr.
rwilliams@andrewskurth.com
ANDREWS KURTH LLP
State Bar No. 21555650
111 Congress Avenue, Suite 1700
Austin, Texas, 78701
Telephone: (512) 320-9200
Facsimile: (512) 320-9292

Jeffrey K. Sherwood
SherwoodJ@dicksteinshapiro.com
State Bar No. 24009354
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, D.C.  20006
(202) 420-2200 (office)
(202) 420-2201 (fax)

Gerard A. Haddad (pro hac vice)
HaddadG@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York  10019
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

**ATTORNEYS FOR DEFENDANTS
TOSHIBA CORPORATION, TOSHIBA
AMERICA, INC., AND TOSHIBA
AMERICA INFORMATION SYSTEMS,
INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic service, local rule CV-5(a)(3), on this 24th day of December, 2013.

<u>/s/ Gerard A. Haddad</u>
Gerrard A. Haddad
