IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BANDSPEED, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO. 1:11-CV-00771 |
| v. | § | |
| | § | |
| GARMIN INTERNATIONAL, INC.; | § | |
| GARMIN USA, INC.; LG | § | |
| ELECTRONICS, INC.; LG | § | |
| ELECTRONICS U.S.A., INC.; LG | § | |
| ELECTRONICS MOBILECOMM | § | |
| U.S.A., INC.; MOTOROLA | § | |
| SOLUTIONS INC. FNA MOTOROLA, | § | |
| INC.; MOTOROLA MOBILITY INC.; | § | |
| BLACKBERRY LIMITED; | § | |
| BLACKBERRY CORPORATION; | § | |
| TOSHIBA CORPORATION; TOSHIBA | § | |
| AMERICA INFORMATION SYSTEMS, | § | |
| INC.; TOSHIBA AMERICA, INC., | § | |
| | § | |
| Defendants | § | |
| | § | |

**PLAINTIFF BANDSPEED, INC.'S
MOTION FOR SUMMARY JUDGMENT ON
<u>DEFENDANTS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS</u>**

**NON-CONFIDENTIAL VERSION**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES.................................................................................................... iii

SUMMARY JUDGMENT STANDARD.................................................................................2

STATEMENT OF UNDISPUTED FACTS ............................................................................2

ARGUMENT..........................................................................................................................10

I. Bandspeed Did Not Expressly License the Patents-in-Suit to Defendants Under the Plain Terms of the BPLA.................................................................10

    A. The BPLA Should Be Interpreted Under New York Law. ................................11

    B. Bandspeed Did Not Grant a Patent License to Defendants Under Section 5 of the BPLA.....................................................................................................12

    C. The Copyright License in Section 4 of the BPLA Does Not Grant a Patent License. ..............................................................................................................13

        1. The Unambiguous Language of Section 4 of the BPLA Grants a Copyright License, Not a Patent License........................................................ 13

        2. The Term "Contribution" in Section 4 of the BPLA Does Not Contemplate the Licensing of Patents. ................................................................................ 14

        3. Even if Section 4 Were Ambiguous, Extrinsic Evidence of the Parties' Intent Demonstrates that Section 4 of the BPLA Was Not Intended to Grant a Patent License.................................................................................... 15

    D. Even if Section 4(b) Were Interpreted to Grant a Patent License, it Would Not Grant a License to a Contribution of a Member That Withdrew Before Adoption of the Specification in Which the Contribution Was Included.............................................................................................................16

    E. Even if Section 4(b) Were Interpreted to Grant a Patent License, it Would Only Grant a License to "Necessary Claims." ....................................................17

II. Defendants' Waiver Defense Fails As A Matter Of Law Because Bandspeed Did Not Have A Duty To Disclose Its Patent Applications To Bluetooth Sig Or Ieee. .....................................................................................................................18

III. Defendants' Equitable-Estoppel Defense Fails As A Matter Of Law Because Defendants Do Not Allege Any Misconduct By Bandspeed After The Patents-In-Suit Issued. ..........................................................................................19

IV.     Defendants' Promissory-Estoppel Defense Fails As A Matter Of Law
        Because Bandspeed Did Not Make A Promise To Defendants. ..........................21

V.      Defendants' Unclean-Hands Defense Fails As A Matter Of Law Because
        Bandspeed Did Not Make An Affirmative Misrepresentation To The Pto
        Or Engage In Other Misconduct. ...............................................................................22

VI.     Defendants' Laches Defense Fails As A Matter Of Law Because
        Bandspeed Did Not Delay Enforcing The Patents-In-Suit. ...................................22

VII.    Defendants' Patent-Misuse Defense Fails As A Matter Of Law Because
        Bandspeed Did Not Engage In Anticompetitive Conduct....................................23

VIII.   Defendants' Marking Defense Fails Because There Is No Evidence That
        Bandspeed Or Its Licensees Sold Any Unmarked Products That
        Performed The Patented Claims. .............................................................................24

CONCLUSION .........................................................................................................................25

## **TABLE OF AUTHORITIES**

**CASES**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.,*
 960 F.2d 1020 (Fed Cir. 1992) .................................................................................... 27

*Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.,*
 2012 WL 3890128 (S.D.N.Y. Sept. 7, 2012) ............................................................. 16

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
 166 F.3d 772 (5th Cir. 1999) ...................................................................................... 27

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.,*
 2002 WL 1751381 (N.D. Tex. Apr. 4, 2002). ............................................................ 26

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.,*
 69 A.D.3d 212,  889 N.Y.S.2d 793 (2009) ................................................................ 19

*FDIC v. Giammettei,*
 34 F.3d 51 (2d Cir. 1994) ............................................................................................. 6

*Fontenot v. Upjohn Co.,*
 780 F.2d 1190 (5th Cir. 1986) ...................................................................................... 6

*Halliburton Servs. v. Smith Int'l Inc.,*
 317 F. Supp.2d 719 (E.D. Tex. 2004) ........................................................................ 29

*Hartford Fire Ins. Co. v. City of Mont Belvieu,*
 611 F.3d 289 (5th Cir. 2010). .................................................................................... 26

*Helena Chem. Co. v. Texell Fed. Credit Union,*
 2006 WL 5266765 (W.D. Tex. June 14, 2006) ........................................................... 6

*Howard v. Howard,*
 292 A.D.2d 345, 740 N.Y.S.2d 71 (2002) ................................................................ 16

*Hynix Semiconductor, Inc. v. Rambus, Inc.,*
 645 F.3d 1336 (Fed. Cir. 2011). ................................................................................ 22

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.,*
 309 F.3d 76 (2d Cir. 2002) ........................................................................................ 16

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.,*
 595 F.3d 458 (2d Cir. 2010) ...................................................................................... 15

*Maxwell v. Baker, Inc.,*
 86 F.3d 1098 (Fed. Cir. 1996) ................................................................................... 29

*Mazzeferro v. RLI Ins. Co.,*
   50 F.3d 137 (2d Cir. 1995) ........................................................................ 16

*Meyers v. Asics Corp.,*
   974 F.2d 1304 (Fed. Cir. 1992) ........................................................... 24, 27

*Myers v. Brooks Shoe, Inc.,*
   912 F.2d 1459 (Fed. Cir. 1990 ................................................................ 27

*Radio Systems Corp. v. Lalor,*
   709 F.3d 1124 (Fed. Cir. 2013) .............................................................. 23

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
   157 F.3d 1340 (Fed. Cir. 1998) .............................................................. 28

*STMicroelectronics, Inc. v. Sandisk Corp.,*
   2006 WL 1624534 (E.D. Tex. June 12, 2006) ....................................... 28

*Symbol Tech., Inc. v. Proxim, Inc.,*
   2004 WL 1770290 (D. Del. July 28, 2004) ............................................ 23

*Texas Digital Sys., Inc. v. Telegenix, Inc.,*
   308 F.3d 1193 (Fed. Cir. 2002) .............................................................. 29

*Thompson v. Gjivoje,*
   896 F.2d 716 (2d Cir. 1990) .................................................................... 16

*Trinity Industries, Inc. v. Road Sys., Inc.,*
   235 F. Supp. 2d 536 (E.D. Tex. 2002) ................................................... 28

*U.S. Philips Corp. v. ITC,*
   424 F.3d 1179 (Fed. Cir. 2005) . ............................................................ 28

## STATUTES

35 U.S.C. § 287(a) ............................................................................................ 28

## RULES

Fed. R. Civ. P. 56(a) ........................................................................................... 6

Defendants assert numerous affirmative defenses—license,[1] waiver,[2] equitable estoppel,[3] promissory estoppel,[4] laches,[5] unclean hands,[6] patent misuse,[7] and marking[8]—for which there is no support in the record. Defendants also assert counterclaims seeking a declaratory judgment that the patents-in-suit are unenforceable.[9] The Court should grant summary judgment on these defenses and counterclaims on the following grounds:

- The affirmative defenses of license, and the counterclaims seeking a declaratory judgment of unenforceability, rely on Defendants' claim that Bandspeed expressly licensed the patents-in-suit to Defendants under the Bluetooth SIG Patent/Copyright License Agreement ("BPLA"). But according to the plain language of the BPLA, Bandspeed did not grant a patent license;

- The affirmative defenses of waiver, equitable estoppel, and promissory estoppel, and the counterclaims seeking a declaratory judgment of unenforceability, rely on Defendants' claim that the patents-in-suit are unenforceable in equity because of Bandspeed's purported misconduct in Bluetooth SIG and IEEE. This claim fails because (1) there is no evidence that Bandspeed engaged in misconduct in Bluetooth SIG or IEEE, and (2) Defendants' purported reliance on Bandspeed's alleged misconduct would not have been reasonable in light of the policies of those organizations;

- Defendants' affirmative defense of laches fails because there is no evidence that Bandspeed delayed enforcing the patents-in-suit;

- Defendants' unclean-hands defense fails because there is no evidence that Bandspeed made an affirmative misrepresentation to the Patent and Trademark Office ("PTO");

---

[1] Doc. 1056 ¶ 160 (LG Defendants); Doc. 757, 758, 760 ¶ 163 (Toshiba Defendants).

[2] Doc. 1056 ¶ 163 (LG Defendants); Doc. 757, 758, 760 ¶ 162 (Toshiba Defendants).

[3] Doc. 1056 ¶ 161 (LG Defendants); Doc. 757, 758, 760 ¶ 160 (Toshiba Defendants).

[4] Doc. 1056 ¶ 161 (LG Defendants); Doc. 757, 758, 760 ¶ 160 (Toshiba Defendants).

[5] Doc. 1056 ¶ 161 (LG Defendants); Doc. 757, 758, 760 ¶ 160 (Toshiba Defendants).

[6] Doc. 1056 ¶ 162 (LG Defendants); Doc. 757, 758, 760 ¶ 176 (Toshiba Defendants).

[7] Doc. 757, 758, 760 ¶ 161 (Toshiba Defendants).

[8] Doc. 757, 758, 760 ¶ 159 (Toshiba Defendants).

[9] Doc. 1056 Prayer for Relief ¶¶ (e), (f) (LG Defendants); Doc. 757, 758, 760, Countercl. ¶¶ 32-38 (Toshiba Defendants).

- Defendants' patent-misuse defense fails because Bandspeed did not engage in anticompetitive conduct; and

- Defendants' marking defense fails because there is no evidence that Bandspeed or its licensees sold unmarked products practicing the patents-in-suit.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A plaintiff moving for summary judgment on a defendant's affirmative defense may satisfy its burden by (1) submitting evidence that negates an essential element of the defendant's defense, or (2) showing that the defendant's evidence is insufficient to establish an essential element of its defense. *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). *See also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). While whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." *Helena Chem. Co. v. Texell Fed. Credit Union*, 2006 WL 5266765, at *2 (W.D. Tex. June 14, 2006).

## STATEMENT OF UNDISPUTED FACTS

1.      Bandspeed holds U.S. Patent Nos. 7,027,418 and 7,570,614 (collectively, "patents-in-suit"). Ex. 1, U.S. Patent No. 7,027,418, Dep. Ex. 177; Ex. 2, U.S. Patent No. 7,570,614, Dep. Ex. 178.

2.      The patents-in-suit cover a coexistence technology called adaptive frequency hopping ("AFH"), which reduces interference in wireless communications such as Bluetooth by selecting and managing communications channels based on the

performance of the channels. Ex. 1, U.S. Patent No. 7,027,418, Dep. Ex. 177; Ex. 2, U.S. Patent No. 7,570,614, Dep. Ex. 178.

3.    The IEEE 802.15.2 Coexistence Task Group (TG2) was established in January 2000 "to facilitate coexistence of IEEE 802.15 WPAN devices with selected other wireless devices operating in unlicensed frequency bands." Ex. 3, Email from J. Carlo to J. Haasz dated Nov. 29, 1999, Dep. Ex. 400 (IEEE 802.15.2 PAR Approval Date Jan. 30, 2000).

4.    Bandspeed began research into coexistence technology in late 1999 or early 2000. Ex. 4, Issues on Bandspeed's Adaptive Frequency Hopping Mechanism, BSPD0094747 at BSPD00949750 (began research in mid-2000); Ex. 5, Skafidas Tr. at 20:5-9 (began research in about 1999); Ex. 6, Treister Tr. at 68:15-69:4 (joined BSPD in February 2000 to perform Bluetooth research).

5.    Bandspeed employees Hongbing Gan and Bijan Treister submitted a proposal on AFH to IEEE 802.15.2 TG2 in November 2000. Ex. 7, Adaptive Frequency Hopping Implementation Proposals for IEEE 802.15.1/2 WPAN by H. Gan and B. Triester dated Nov. 2000, Dep. Ex. 233; Ex. 5, Skafidas Tr. at 78:22-79:5.

6.    The submission included a disclaimer that Bandspeed's AFH proposal was "proprietary." Ex. 7, Adaptive Frequency Hopping Implementation Proposals for IEEE 802.15.1/2 WPAN by H. Gan and B. Triester dated Nov. 2000, Dep. Ex. 233 at BSPD0138395.

7.    In late 2000 or early 2001, Bandspeed began developing a prototype Bluetooth product. Ex. 8, Wireless Project Review 2000 dated Dec. 22, 2000, BSPD0000122; Ex. 9, Bandspeed and Open Interface North America Press Release dated Nov. 27, 2001, BSPD0088502; Ex. 6, Treister Tr. at 68:15-18 (not yet working on a Bluetooth product in February 2000); 80:10-13 (building prototypes in early 2001).

8.     Bandspeed filed provisional applications for the patents-in-suit on January 25, 2001. Ex. 1, U.S. Patent No. 7,027,418, Dep. Ex. 177; Ex. 2, U.S. Patent No. 7,570,614, Dep. Ex. 178.

9.     Bandspeed filed applications for the patents-in-suit on September 6, 2001. Ex. 1, U.S. Patent No. 7,027,418, Dep. Ex. 177; Ex. 2, U.S. Patent No. 7,570,614, Dep. Ex. 178.

10.     Bandspeed joined Bluetooth SIG in September 2001. Ex. 10, Email from R. Beale (Bandspeed) to Bluetooth Admin dated Sept. 4, 2001, Foley Ex. 5; Ex. 11, Facsimile from R. Beale (Bandspeed) to Bluetooth SIG dated Sept. 12, 2001, Foley Ex. 6.

11.     In January – March 2002, Bandspeed employees offered information for inclusion in discussion documents intended to aid the work of the Coexistence Working Group of Bluetooth SIG using a template provided by Bluetooth SIG that contained the following statements: "No license, express or implied, by estoppel or otherwise, to any intellectual property rights are granted herein" and "Readers should not design products based on this document." *E.g.*, Ex. 12, Hopset Switching Discussion Document, Jan. 8, 2002, Dep. Ex. 362; Ex. 13, Powell Tr. at 148:13-149:11.

12.     Bandspeed's last participation in IEEE 802.15 TG2 occurred in January 2002. Ex. 14, IEEE P802.15 January 2002 TG2 Minutes dated Jan. 25, 2002, Dep. Ex. 496; Ex. 5, Skafidas Tr. at 177:14-179:17 (Bandspeed's Bluetooth division was shut down and Bandspeed stopped participating in IEEE 802.15 and Bluetooth SIG in early 2002); Ex. 15, Gan Tr. at 7:7-14 (left Bandspeed in April 2002); 12:17-18 (did not participate in IEEE after leaving Bandspeed); Ex. 16, Sapozhnykov Tr. at 12:30-13:1 (left Bandspeed at the same time as Hongbing Gan in 2002); 28:3-7 (did not participate in IEEE 802.15.2 after leaving Bandspeed); Ex. 17, Siep Tr. at 219:18-220:1 (not aware of any BSPD participation in IEEE 802.15 after January 24, 2002).

13.     In late February 2002, Bandspeed ceased development of a Bluetooth product and decided to get out of the Bluetooth space entirely. Ex. 18, Bandspeed, Inc. Minutes of a Regular Meeting of the Board of Directors dated Feb. 27, 2002, BSPD0350989 at BSPD0350990; Ex. 19, Luther Tr. at 109:17-110:10.

14.     Bandspeed never sold a Bluetooth product commercially. Ex. 5, Skafidas Tr. at 86:24-87:10; Ex. 20, Eversole Tr. (9/11/12) at 190:1-5.

15.     Bandspeed's last participation in Bluetooth SIG occurred in March 2002. Ex. 21, Bluetooth SIG Coexistence Working Group AFH Specification, Dep. Ex. 369; Ex. 22, Eversole Tr. (11/14/13) at 275:16-276:3; 336:11-14; Ex. 15, Gan Tr. at 7:7-14 (left Bandspeed in April 2002); 12:19-20 (did not participate in Bluetooth SIG after leaving Bandspeed); 35:15-22 (attended only one Bluetooth SIG meeting, which took place in early 2002); Ex. 5, Skafidas Tr. at 177:14-179:17 (Bandspeed's Bluetooth division was shut down and Bandspeed stopped participating in IEEE 802.15 and Bluetooth SIG in early 2002).

16.     Bandspeed's application for the '614 patent was published on July 25, 2002. Ex. 2, U.S. Patent No. 7,570,614, Dep. Ex. 178.

17.     Bandspeed's application for the '418 patent was published on September 26, 2002. Ex. 1, U.S. Patent No. 7,027,418, Dep. Ex. 177.

18.     By October 2002, members of the Coexistence Working Group of Bluetooth SIG were aware that Bandspeed was no longer participating in the Coexistence Working Group. Ex. 23, Email from J. Linsky (Silicon Wave) to BT SIG Coexistence Group dated Oct. 24, 2002, Dep. Ex. 354; Ex. 13, Powell Tr. at 54:15-55:7.

19.     Bandspeed withdrew from Bluetooth SIG effective December 2002. Ex. 24, Letter from M. Luther (CEO, Bandspeed) to M. McCamon (Executive Director, Bluetooth SIG) dated Dec. 12, 2002, Dep. Ex. 651; Ex. 25, Foley Tr. at 75:18-77:12

(Bluetooth SIG member may withdraw by sending a letter to Mike McCamon, Executive Director of Bluetooth SIG, notifying the Bluetooth SIG of the member's withdrawal from Bluetooth SIG); Ex. 26, Scott Tr. at 71:12-21 (same); 84:1-98:21 (testimony on receipt of Bandspeed's withdrawal letter and U.S. Postal Service Return Receipt dated Dec. 16, 2002 and signed by Christine Scott).

20.     In January 2003, approximately one month after Bandspeed sent its notice of withdrawal from Bluetooth SIG, Bluetooth SIG's General Manager informed "contributing" members of the Bluetooth SIG Coexistence Working Group that members may withdraw prior to adoption of the Specification without granting a license. Ex. 27, Email from Tom Siep (Bluetooth SIG) to J. Linsky (Silicon Wave) dated Jan. 17, 2003, Dep. Ex. 360 ("The review is for the purposes of each member company having the opportunity to withdraw from the SIG prior to the Adoption of the profile (or core in this case). * * * "This allows the member company the ability to preserve its own IPR in the new work and keep it from being included in the IPR pool of the SIG. They would preserve it by withdrawing from the SIG, thereby losing all rights to using the SIG\'s [*sic*] IPR."); Ex. 13, Powell Tr. at 52:20-53:16; 126:7-20.

21.     Bluetooth SIG adopted Specification v. 1.2 on November 5, 2003. Ex. 28, Specification of the Bluetooth System v. 1.2, Dep. Ex. 343 at BTSIG-000039; Ex. 25, Foley Tr. at 103:16-21; Ex. 13, Powell Tr. at 90:1-5.

22.     Specification v. 1.2 was the first Bluetooth Specification to include AFH. Ex. 25, Foley Tr. at 103:22-104:5; 161:25-162:10.

23.     IEEE Standard 802.15.1-2005 was approved by the IEEE-SA Standards Board on February 14, 2005. Ex. 29, 802.15.1 IEEE Standard for Information Technology, Dep. Ex. 174 at 2; Ex. 17, Siep Tr. at 222:21-223:3.

24.    IEEE Standard 802.15.1-2005 was the first IEEE Standard to address AFH. Ex. 29, 802.15.1 IEEE Standard for Information Technology, Dep. Ex. 174 at 17 ("New Features" include "Adaptive Frequency Hopping").

25.    The '418 patent issued on April 11, 2006. Ex. 1, U.S. Patent No. 7,027,418, Dep. Ex. 177.

26.    The '614 patent issued on August 4, 2009. Ex. 2, U.S. Patent No. 7,570,614, Dep. Ex. 178.

27.    Bandspeed filed suit against Sony Electronics, Inc., Nintendo of America, Inc., and Apple, Inc. in the Western District of Texas alleging infringement of the patents-in-suit on August 7, 2009. 09-cv-00593-LY (W.D. Tex), Doc. 1.

28.    Bandspeed filed an Amended Complaint against Sony Electronics, Inc., Sony Computer Entertainment America, Inc.; Nintendo of America, Inc.; and Apple, Inc. on August 13, 2009. 09-cv-00593-LY (W.D. Tex), Doc. 13.

29.    Bandspeed filed a Second Amended Complaint against Sony Electronics, Inc., Sony Computer Entertainment America, Inc.; Nintendo of America, Inc.; Apple, Inc.; Lego Systems, Inc.; Parrot, Inc.; and Scosche Industries, Inc. on October 9, 2009. 09-cv-00593-LY (W.D. Tex), Doc 53.

30.    Bandspeed entered a settlement agreement with Scosche Industries, Inc. ("Scosche Agreement") on May 28, 2010. Ex. 30, Settlement and Nonexclusive Patent License Agreement by Bandspeed, Inc. and Scosche Industries, Inc. dated May 28, 2010, BSPD0435881.



███  ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

33.     Bandspeed filed suit against Acer, Inc., Acer America Corporation; Belkin International, Inc., Belkin, Inc., Casio Computer Co., Ltd., Casio Hitachi Mobile Communications Co., Ltd., Casio America, Inc.; Dell, Inc.; Garmin International, Inc., Garmin USA, Inc.; GN Netcom A/S, GN U.S., Inc. a/k/a/ GN Netcom, Inc.; Hewlett-Packard Company, Hewlett-Packard Development Company, L.P.; HTC Corporation, HTC America, Inc.; Huawei Technologies Company, Ltd.; Kyocera Communications, Inc.; Lenovo, Inc.; LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics MobileComm U.S.A., Inc.; Motorola, Inc.; Nokia Corporation, Nokia, Inc.; Pantech Wireless, Inc.; Plantronics, Inc.; Research in Motion Limited, Research in Motion Corporation; Samsung Telecommunications America, LLC; TomTom International B.V., TomTom, Inc.; and Toshiba Corporation, Toshiba America Information Systems, Inc., Toshiba America, Inc. in the Eastern District of Texas alleging infringment of the patents-in-suit on June 30, 2010. 10-cv-00215 Doc. 1.

34.     <u>Bluetooth SIG Policies</u>

a.     Bluetooth SIG members must agree to the terms of the Bluetooth Patent/Copyright License Agreement ("BPLA"). Ex. 13, Powell Tr. at 38:23-39:2.

b.     Under Section 8(d), the BPLA "shall be construed and controlled by the laws of the State of New York." Ex. 33, BPLA, Foley Ex. 13.

c.     Neither the bylaws of Bluetooth SIG nor the BPLA in effect in 2001-2002 required a Member of Bluetooth SIG to disclose to Bluetooth SIG the existence of

patents or patent applications. Ex. 25, Foley Tr. at 172:9-12; Ex. 34, Bluetooth SIG Bylaws, Foley Ex. 7.

d. A June 2001 presentation by Per Hoffman, the Bluetooth SIG Head of Legal Matters, states that a royalty-free *copyright* license is granted for Contributions, but omits any such discussion regarding patent licenses. Ex. 35, "Access to Bluetooth IP" Presentation by Per Hoffman (Bluetooth SIG Head of Legal Matters) dated June 6, 2001, Dep. Ex. 359 at 16 ("Copyright in draft Bluetooth Specifications"), 17 ("Copyright in final Bluetooth Specifications") and 18 ("Patent cross license").

e. A June 2012 publication by Bluetooth SIG to its members entitled "Bluetooth.org – IP Protections" states that a royalty-free *copyright* license is granted for Contributions under Section 4 of the BPLA, but omits any such discussion regarding patent licenses. Ex. 36, Bluetooth.org "IP Protections," Dep. Ex. 361 at 2.

f. Bluetooth SIG does not track who makes Contributions. Ex. 37, Letter from C. Kelhoffer (Bluetooth SIG counsel) to R. Wang (Huawei counsel) dated Oct. 21, 2010, Dep. Ex. 372; Ex. 25, Foley Tr. at 159:14-24 ("We really don't have records of that, and we don't track individual contributions made on any particular specification.").

35. <u>IEEE Policies</u>

g. The IEEE-SA Standards Board Bylaws in effect from 2000-2002, did not require disclosure of the existence of patent applications. Ex. 38, IEEE-SA Standards Board Bylaws 2000 § 6, Dep. Ex. 212; Ex. 39, IEEE-SA Standards Board Bylaws 2001 § 6, Dep. Ex. 215; Ex. 40, IEEE-SA Standards Board Operations Manual 2000 § 6.3, Dep. Ex. 219; Ex. 41, IEEE-SA Standards Board Operations Manual 2002 § 6.3, Dep. Ex. 209; Ex. 42, Letter from B. Johnson (IEEE) to D. Clark (FTC) dated April 17, 2002, Dep. Ex. 188 at 3 ("The situation will become unworkable if . . . participants were expected to disclose to the standards committee the existence of confidential unpublished patent

applications or an intent to file patent applications."); Ex. 43, Ringle Tr. at 44:18-21; 51:11-18; 56:10-16.

h.      Under the IEEE-SA Standards Board Bylaws in effect from 2000-2002, the IEEE could make a request to a "patent holder" for assurance that it would license its patent under reasonable terms and conditions. Ex. 38, IEEE-SA Standards Board Bylaws 2000 § 6, Dep. Ex. 212; Ex. 39, IEEE-SA Standards Board Bylaws 2001 § 6, Dep. Ex. 215.

i.      IEEE made no request to BSPD or its employees for an assurance regarding its patents or patent applications. Ex. 43, Ringle Tr. at 201:5-16; Ex. 15, Gan Tr. at 20:22-27.

j.      Under the IEEE-SA Standards Board Bylaws in effect from 2000-2002, if a request was made to a patent holder, the assurance had to be provided "without coercion." Ex. 38, IEEE-SA Standards Board Bylaws 2000 § 6, Dep. Ex. 212; Ex. 39, IEEE-SA Standards Board Bylaws 2001 § 6, Dep. Ex. 215; Ex. 43, Ringle Tr. at 51:5-18.

k.      Under the IEEE-SA Standards Board Bylaws in effect from 2000-2002, if a patent holder was asked for an assurance, the patent holder had a choice between (1) disclaiming that the patent holder would enforce its patents required to implement a standard, or (2) agreeing to grant a license to all applications without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. Ex. 38, IEEE-SA Standards Board Bylaws 2000 § 6, Dep. Ex. 212; Ex. 39, IEEE-SA Standards Board Bylaws 2001 § 6, Dep. Ex. 215.

**ARGUMENT**

**I.      Bandspeed Did Not Expressly License the Patents-in-Suit to Defendants Under the Plain Terms of the BPLA.**

Section 5(b) of the BPLA exclusively governs the grant of patent licenses under the BPLA. As shown below,

- Bandspeed did not grant a patent license to Defendants under Section 5(b) of the BPLA because it withdrew from Bluetooth SIG before adoption of Bluetooth Specification v. 1.2;

- Contrary to Defendants' argument, Section 4(b) unambiguously grants only a copyright license, not a patent license. Even if Section 4(b) were ambiguous, the extrinsic evidence is conclusive that the parties never intended Section 4(b) to grant a patent license;

- Even if Section 4(b) were interpreted to grant a patent license, Bandspeed did not grant a patent license to Defendants under Section 4(b) because it withdrew from Bluetooth SIG before adoption of the Bluetooth Specification in which its Contribution was included; and

- Even if Section 4(b) were interpreted to grant a patent license despite Bandspeed's timely withdrawal from Bluetooth SIG, Bandspeed did not grant a patent license to all of Asserted Claims because they are not "Necessary Claims" under the BPLA.

**A.    The BPLA Should Be Interpreted Under New York Law.**

There is no dispute that the BPLA should be interpreted under New York law. Statement of Undisputed Facts ("Fact") 34(a). The interpretation of an unambiguous contract, such as the BPLA, is a question of law to be resolved by the Court. *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465-66 (2d Cir. 2010). "It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations." *Howard v. Howard*, 292 A.D.2d 345, 345, 740 N.Y.S.2d 71 (2002). "A court should accord [contractual] language its plain meaning giving due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish." *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l*

*Ins. Co.*, 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012). "[C]aptions are relevant to contract interpretation." *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002). Indeed, "a contract . . . must be read as a whole, ***including any introductory clause or heading***, to determine the intent of the parties." *Mazzeferro v. RLI Ins. Co.*, 50 F.3d 137, 140 (2d Cir. 1995) (emphasis added).

### B.   Bandspeed Did Not Grant a Patent License to Defendants Under Section 5 of the BPLA.

Section 5(b) exclusively governs the grant of patent licenses under the BPLA. *See* Ex. 33. Under Section 5(b), a Bluetooth SIG Member does not grant a license until a Bluetooth Specification is adopted that includes that Member's technology. *Id. See also* Ex. 36 (describing Section 5 of the "PC Agreement").

Section 7 addresses licensing obligations under the BPLA upon a Member's withdrawal from Bluetooth SIG. *See E*x. 33. By its terms, Section 7 applies to all licenses granted under the BPLA. Id. The timing of a Member's withdrawal "determine[s] the effect on such . . . Member's licensing obligations as specified in Section 7(b)." Id. Under Section 7(b)(vi), all licenses terminate with respect to a withdrawing Member, "including those set forth in Section 5, except as set out in Section 7(b)(3), (4) and (5)." Id. Under Section 7(b)(3), (4) and (5), the ***only*** license that survives the withdrawal of a Member is the license granted under Section 5 with respect to all Bluetooth Specifications "adopted prior to the effective date of withdrawal." Id. Under Section 4.7 of the Bluetooth SIG Bylaws, "a Member may withdraw from [Bluetooth SIG] at any time by providing written notice to the Executive Director." Ex. 34; Fact ¶ 19. The Member's withdrawal becomes effective upon receipt by the Executive Director. Ex. 34; Fact ¶ 19.

Bandspeed withdrew from Bluetooth SIG in December 2002 by submitting a letter of withdrawal to Mike McCamon, Executive Director of Bluetooth SIG at that time. Fact ¶ 19. Mr. McCamon received the letter on or around December 16, 2002, as evidenced by a U.S. Postal Service Return Receipt signed by Christine Scott, the Operations Assistant of Bluetooth SIG. Id. Christine Scott testified that she has no reason to believe that the signature on the U.S. Postal Service Return Receipt is not hers and that, assuming she signed for the letter, it would have been delivered to Mr. McCamon in December 2002. Id.

Bluetooth Specification v. 1.2 was the first Specification to include AFH technology. Fact ¶ 22. Bluetooth Specification v. 1.2 was adopted on November 5, 2003—well after Bandspeed's withdrawal from Bluetooth SIG became effective on or around December 16, 2002. Fact ¶ 21. As a result, under the plain terms of the BPLA, Bandspeed did not grant a license under Section 5(b) for its AFH technology.

C.     **The <u>Copyright License</u> in Section 4 of the BPLA Does Not Grant a Patent License.**

1.     <u>The Unambiguous Language of Section 4 of the BPLA Grants a Copyright License, Not a Patent License.</u>

Defendants contend that Bandspeed granted a license to its AFH patents under Section 4(b) of the BPLA. In doing so, Defendants ignore both the caption of Section 4—"Copyright License"—and the unambiguous language of that section. Simply stated, Section 4 of the BPLA does not grant a patent license, only a copyright license.

The caption of Section 4 of the BPLA—"Copyright License"—shows a clear intent of the drafting parties that Section 4 apply only to copyrights, not to patents. *See Int'l Multifoods Corp.*, 309 F.3d at 85 (holding that captions "are relevant to contract interpretation" under New York law). Indeed, introductory captions are vital in determining the intent of the parties. *See Mazzeferro*, 50 F.3d at 140. Had the drafting

parties intended Section 4 to apply to patents, they could have simply captioned the section "Copyright and Patent" License. They chose not to do so. To ignore the caption of Section 4 would be to ignore key evidence of the parties' intent as reflected in the plain meaning of the language the parties chose to employ. *See Acumen Re Mgmt. Corp.*, 2012 WL 3890128, at *5.

Nowhere in Section 4 does the term "patent" appear. *See* Ex. 33. If the parties had intended Section 4 to apply to patent licenses, as well as copyright licenses, they could have simply included language about patents in that section. Moreover, reading Sections 4(a) and 4(b) together, it is clear that both sections apply to copyright licenses. Section 4(a) addresses the grant of a copyright license for Contributions used in developing any "Draft Bluetooth Specifications." Id. Section 4(b) addresses the grant of a copyright license for Contributions that "become included" in a final Bluetooth Specification. Id. Taken as a whole, Section 4 addresses the grant of a copyright license for Contributions in *draft* and *final* Bluetooth Specifications.

2. The Term "Contribution" in Section 4 of the BPLA Does Not Contemplate the Licensing of Patents.

Section 4(b) of the BPLA refers to the licensing of "Contributions." Id. "Contribution" is defined under Section 1(h) of the BPLA as "any written or electronic document submitted to a Working Group for inclusion into a Bluetooth Specification by a Bluetooth SIG Member." Id. By definition, the right to reproduce written or electronic material in a document is granted under a copyright license. If the drafters of the BPLA had intended to grant a patent license under Section 4(b), they would have included language regarding the licensing of *patented technology described in* Contributions to the Bluetooth SIG. As it exists, the license in Section 4(b) grants only the right to reproduce written or electronic material in Contributions to the Bluetooth SIG.

3.     Even if Section 4 Were Ambiguous, Extrinsic Evidence of the Parties' Intent Demonstrates that Section 4 of the BPLA Was Not Intended to Grant a Patent License.

As set forth above, the unambiguous language of the BPLA demonstrates that Section 4(b) grants only a copyright license, not a patent license. However, if the Court were to find the BPLA ambiguous on this point, the extrinsic evidence of the parties' intent shows that Section 4(b) does not grant a patent license.

"In the event a contract is ambiguous, its interpretation is still a matter [of law] for the court unless determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 69 A.D.3d 212, 218, 889 N.Y.S.2d 793 (2009). The only extrinsic evidence of the parties' intent that pre-dates this litigation demonstrates that the parties, including the drafter of the BPLA, Bluetooth SIG, intended Section 4(b) to grant only a copyright license. For example:

- January 2003 emails from Bluetooth SIG's General Manager to "contributing" members of the Bluetooth SIG Coexistence Working Group state that members may withdraw prior to adoption of the Specification without granting a patent license. Fact ¶ 20.
- A June 2001 presentation by Per Hoffman, the Bluetooth SIG Head of Legal Matters, states that a royalty-free *copyright* license is granted for Contributions, but omits any such discussion regarding patent licenses. Fact ¶ 34(d).
- A June 2012 publication by Bluetooth SIG to its members entitled "Bluetooth.org – IP Protections" states that a royalty-free *copyright* license is granted for Contributions under Section 4 of the BPLA, but omits any such discussion regarding patent licenses. Fact ¶ 34(e).
- If every contribution to Bluetooth SIG constituted a license agreement, Bluetooth SIG would necessarily track member contributions. Bluetooth SIG admits, however, that it does <u>not</u> track contributions at all. Fact ¶ 35(f).
- Every submission that Bandspeed made to the Bluetooth SIG, on the form provided by Bluetooth SIG, contained the following statements: "No license, express or implied, by estoppel or otherwise, to any intellectual property rights are granted herein" and "Readers should not design products based on this document." Fact ¶ 11.

This evidence confirms that the parties never intended Section 4(b) of the BPLA to grant a patent license to so-called "Contributions."

**D.    Even if Section 4(b) Were Interpreted to Grant a Patent License, it Would Not Grant a License to a Contribution of a Member That Withdrew Before Adoption of the Specification in Which the Contribution Was Included.**

As set forth above, Section 4(b) of the BPLA does not grant a patent license. But, even if Section 4(b) were interpreted to grant a patent license, it would not grant a patent license to the Contribution of a Member such as Bandspeed that withdrew before adoption of the Specification in which the Contribution allegedly was included.

Section 4(b) refers to Section 5(b). *See* Ex. 33.  Section 5(b) states: "[e]ffective upon the adoption by Bluetooth SIG of each Bluetooth Specification," a Member provides a license to patent claims necessarily infringed by implementation of the Bluetooth Specification. Id. As a result, any purported license to a Member's "Contribution" under section 4(b) is not granted until adoption of the Contribution into a Bluetooth Specification. Consequently, if an entity is not a Member at the time its Contribution is adopted into a Bluetooth Specification, no license to the Contribution is granted.

This rule applies notwithstanding the language in Section 4(b), which states that the license described in Section 4(b) applies "even if such [Member] has withdrawn or been terminated as a Member of Bluetooth SIG." Id. When Sections 4(b) and 5(b) are read together, this language in Section 4(b) is properly interpreted as applying only to entities that withdraw from Bluetooth SIG after adoption of a Bluetooth Specification incorporating the Member's Contribution.

Finally, as explained above, under Section 7(b)(vi), all licenses terminate with respect to a withdrawing Member, "including those set forth in Section 5, except as set out in Section 7(b)(3), (4) and (5)." Id. Under Section 7(b)(3), (4) and (5), the ***only*** license

that survives the withdrawal of a Member is the license granted under Section 5 with respect to all Bluetooth Specifications "adopted prior to the effective date of withdrawal." Id. Thus, any license granted under Section 4(b) would be expunged upon withdrawal.

### E.   Even if Section 4(b) Were Interpreted to Grant a Patent License, it Would Only Grant a License to "Necessary Claims."

Even if Section 4(b) were interpreted to grant a patent license, Defendants still would not have a license to practice Bandspeed's Asserted Claims. It cannot be disputed that, read together, Section 4(b) and Section 5(b) grant a license only to "Necessary Claims" as that term is defined by the BPLA. "Necessary Claims" are those claims of the patents that:

> (b) are necessarily infringed by implementing those portions of a Bluetooth Specification and/or Foundation Specification within the bounds of the Scope, wherein a claim is ***necessarily infringed*** only when it is not possible to avoid infringing it because there is no technically reasonable non-infringing alternative for implementing such portions of the Bluetooth Specification and/or Foundation Specification within the bounds of the ***Scope***.

Id. (emphasis added). The BPLA defines "Scope" as:

> the protocols and data formats ***needed for Bluetooth interoperability***, and the electrical signaling characteristics solely to the extent disclosed with particularity in a Bluetooth Specification and/or Foundation Specification where the sole purpose of such disclosure is to enable products to interoperate, interconnect or communicate as defined within such Bluetooth Specification and/or Foundation Specification.

Id. (emphasis added). Accordingly, under Section 4(b), Defendants could only have a license to practice those claims of the patents-in-suit that are necessarily infringed by practice of portions of the Bluetooth Specification needed for Bluetooth interoperability. But Bandspeed's Asserted Claims are not necessarily infringed by practicing portions of the Specification needed for Bluetooth interoperability: At least one limitation of each and every Asserted Claim is practiced by a portion of the Specification v.1.2 (and above)

that is not required for Bluetooth interoperability. Ex. 44, Decl. of Jose Melendez. *See also* Ex. 13, Powell Tr. at 169:13-16. Accordingly, Defendants would not have a license to practice these claims, even if Section 4(b) were interpreted to grant a patent license.

## II. Defendants' Waiver Defense Fails as a Matter of Law Because Bandspeed Did Not Have a Duty to Disclose its Patent Applications to Bluetooth SIG or IEEE.

To prevail on the affirmative defense of waiver, Defendants must show that Bandspeed's conduct was so inconsistent with an intent to enforce its rights with respect to the patents-in-suit as to induce a reasonable belief that such rights had been relinquished. *See Hynix Semiconductor, Inc. v. Rambus, Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011). To do this, Defendants must prove that (1) Bandspeed had a duty to disclose its patent applications to Bluetooth SIG or IEEE; and (2) Bandspeed breached that duty. *Id.*

Defendants' waiver defense fails because Bandspeed had no duty to disclose its patent applications to Bluetooth SIG or IEEE. The Bluetooth SIG policies in effect when Bandspeed employees were participating in those organizations did not require the disclosure of patent applications. Fact ¶ 34(c); Ex. 25, Foley Tr. at 172:9-12 (Q: Do the bylaws or the patent license agreement that was in effect in 2001-2002 require that members disclose any intellectual property – A: No). Likewise, the relevant IEEE policies did not require disclosure of patent applications. Fact ¶ 35(a); Ex. 43, Ringle Tr. at 56:10-16 (Q: Are you aware of the IEEE policy at any time from 1999 to the present requiring the disclosure of a particular patent, patent claim, or patent application? A: No.). *See also Symbol Tech., Inc. v. Proxim, Inc.*, 2004 WL 1770290, *8 (D. Del. July 28, 2004) (holding that defendants failed to provide any evidence to support its claim that IEEE Standards Board members bore a duty to disclose their patent rights). Because Defendants cannot point to a single policy of either organization that Bandspeed

violated when its employees were participating in those organizations, Defendants' defense of waiver fails as a matter of law.

### III.    Defendants' Equitable-Estoppel Defense Fails as a Matter of Law Because Defendants Do Not Allege Any Misconduct by Bandspeed After the Patents-in-Suit Issued.

To succeed on the affirmative defense of equitable estoppel, Defendants must show that (1) Bandspeed, through misleading conduct, led Defendants to reasonably infer that Bandspeed did not intend to enforce the patents-in-suit against Defendants; (2) Defendants relied on that conduct; and (3) Due to their reliance, Defendants will be materially prejudiced if Bandspeed is allowed to proceed with its claim. *Radio Systems Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013). Typically, the affirmative defense of equitable estoppel is raised when a patent holder "threaten[s] immediate and vigorous enforcement" of its patents and then does nothing to enforce its patents for an unreasonably long time. *See Meyers v. Asics Corp.*, 974 F.2d 1034, 1039 (Fed. Cir. 1992). There can be no misleading conduct for equitable-estoppel purposes until the patent-in-suit has issued. *Radio Systems*, 709 F.3d at 1130.

Defendants' equitable-estoppel defense fails because it is based solely on purported "misleading conduct" that took place *before* the patents-in-suit issued. Defendants contend that Bandspeed "fail[ed] to comply with various policies of Bluetooth SIG and IEEE. Doc. 1056 at ¶ 173 (LG Defendants). *See also* Doc. 757, 758, 760 at Countercl. Count 3 (Toshiba Defendants). But Bandspeed's last participation in Bluetooth SIG and IEEE occurred in March 2002 and January 2002, respectively, Fact ¶¶ 15, 12, and the patents-in-suit did not issue until April 2006 and August 2009, Fact ¶¶ 25, 26. As a matter of law, Bandspeed cannot be barred from enforcing the patents-in-suit by conduct that occurred before the patents issued.

Even if Defendants could rely on conduct that took place before the patents-in-suit issued, Defendants' equitable-estoppel defense would still fail because, as shown above, Bandspeed had no duty to disclose its patent applications to either BT SIG or IEEE. Accordingly, Defendants cannot show that Bandspeed engaged in any "misleading conduct" that would prevent it from enforcing the patents-in-suit. *See Hynix Semiconductor*, 645 F.3d at 1348 (holding in the standard-setting-organization context that, to show misleading conduct, defendant must prove that (1) patent holder had duty of disclosure, and (2) patent holder breached that duty).

Further, Defendants' equitable-estoppel defense fails because any inference of Defendants that Bandspeed did not intend to enforce the patents-in-suit based solely on Bandspeed's participation in Bluetooth SIG would have been unreasonable. Although Bluetooth members must agree to the terms of the BPLA, Fact ¶ 34(a), under the plain terms of that agreement, a member can avoid granting a patent license by withdrawing from Bluetooth SIG before adoption of a Bluetooth Specification including the member's technology, *see, supra,* Part I(B). Thus, participation in Bluetooth SIG is not inconsistent with an intent to enforce Bluetooth-related patents, and it would have been unreasonable for Defendants to make that inference.

Any inference of Defendants that Bandspeed did not intend to enforce the patents-in-suit based solely on Bandspeed's participation in IEEE 802.15 TG2 would have been similarly unreasonable. IEEE participants do not automatically relinquish their rights to enforce IEEE-standards-related patents. Fact ¶ 35(a)-(e). Nor does IEEE require the disclosure of specific patents or patent applications. Fact ¶ 35(a). Thus, participation in IEEE is not inconsistent with an intent to enforce IEEE-standard-related patents. The only reasonable inference Defendants could have made regarding Bandspeed's participation in IEEE 802.15 TG2 is that Bandspeed intended to enforce

any patents (or patent applications) it held related to the IEEE 802.15 standard. Furthermore, IEEE participants who are asked to provide a voluntary letter of assurance to IEEE may choose between (1) disclaiming their patent rights, and (2) enforcing their patent rights by agreeing to grant a RAND license to all applicants practicing the IEEE standard. Fact ¶ 35(e). Thus, even if Bandspeed had disclosed its patent applications through a letter of assurance to IEEE 802.15 TG2, Bandspeed could still seek a RAND license for the patents-in-suit—exactly what Bandspeed is seeking now. Accordingly, Defendants' could not reasonably infer that Bandspeed did not intend to enforce the patents-in-suit.

IV.   **Defendants' Promissory-Estoppel Defense Fails As a Matter of Law Because Bandspeed Did Not Make a Promise to Defendants.**

To prevail on the affirmative defense of promissory estoppel, Defendants must show (1) that Bandspeed made a promise, (2) that Bandspeed should have expected would lead Defendants to some definite and substantial injury, (3) that such an injury occurred, and (4) that injustice may be remedied only by enforcing the promise. *Hartford Fire Ins. Co. v. City of Mont Belvieu*, 611 F.3d 289, 295 (5th Cir. 2010). Defendants' promissory-estoppel defense fails as a matter of law because there is no evidence that Bandspeed ever made a promise to Defendants that it would not enforce the patents-in-suit. Bandspeed's participation in Bluetooth SIG did not constitute such a promise because Bluetooth SIG members can avoid granting a patent license by withdrawing from Bluetooth SIG. *See supra,* Part I(B). Bandspeed's participation in IEEE 802.15 TG2 did not constitute such a promise because Bandspeed did not voluntarily provide a letter of assurance disclaiming its patent rights. *See supra,* Part III.

Further, Bandspeed could not have expected Defendants to infer that Bandspeed did not intend to enforce the patents-in-suit simply because it participated in Bluetooth

SIG and IEEE. As explained above, any inference made by Defendants that Bandspeed did not intend to enforce the patents-in-suit based solely on Bandspeed's participation in Bluetooth SIG and IEEE would have been unreasonable.

## V.   Defendants' Unclean-Hands Defense Fails as a Matter of Law Because Bandspeed Did Not Make an Affirmative Misrepresentation to the PTO or Engage in Other Misconduct.

To succeed on the affirmative defense of unclean hands, Defendants must show that Bandspeed made an affirmative misrepresentation of material fact with an intent to deceive the PTO. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1549 (Fed. Cir. 1997). Because Defendants have adduced no evidence of such a misrepresentation, their unclean-hands defense fails as a matter of law. *See Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 2002 WL 1751381, *26 (N.D. Tex. Apr. 4, 2002).

To the extent Defendants' unclean-hands defense is based on the same purported misconduct of Bandspeed at the time its employees were participating in Bluetooth SIG and IEEE, as shown above, Defendants have adduced no evidence that Bandspeed engaged in any misconduct in those organizations. *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796-97 (5th Cir. 1999). Accordingly, Defendants' affirmative defense of unclean hands fails as a matter of law.

## VI.   Defendants' Laches Defense Fails as a Matter of Law Because Bandspeed Did Not Delay Enforcing the Patents-in-Suit.

To succeed on the affirmative defense of laches, Defendants must show that (1) Bandspeed delayed filing suit for an unreasonable and inexcusable length of time from the time Bandspeed knew or reasonably should have known of its claims against Defendants; and (2) the delay operated to the prejudice or injury of Defendants. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed Cir. 1992) (en banc). "The laches period begins to run when the patent owner 'knew or reasonably should

have known of the defendant's alleged infringing activities,' but the period does not begin to run until the patent issues." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1307 (Fed. Cir. 1992). A delay of less than six years is not presumptively unreasonable. *See Aukerman Co.*, 960 F.2d at 1037.

Defendants' laches defense fails because Defendants cannot show any delay at all in Bandspeed's enforcement of the patents-in-suit. The '614 patent issued on August 4, 2009, and Bandspeed filed suit on August 9, 2009—five days later. Fact ¶¶ 26, 27. Although the '418 issued in 2006, Fact ¶ 25, Bandspeed filed suit in just over three years, and the Federal Circuit finds it reasonable for a patent holder to wait until a second, related, patent is issued before filing suit on both patents together. *Meyers*, 974 F.2d at 1307 (*citing Myers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1461 (Fed. Cir. 1990)). Because Defendants cannot show any unreasonable or inexcusable delay in Bandspeed's enforcement of its patent rights, Defendants' laches defense fails as a matter of law.

## VII.   Defendants' Patent-Misuse Defense Fails as a Matter of Law Because Bandspeed Did Not Engage in Anticompetitive Conduct.

It is not patent misuse for a patent owner to seek to enforce its patents against alleged infringers. *STMicroelectronics, Inc. v. Sandisk Corp.*, 2006 WL 1624534, at *2 (E.D. Tex. June 12, 2006). The purpose of the patent-misuse defense is "to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." *U.S. Philips Corp. v. ITC*, 424 F.3d 1179, 1184 (Fed. Cir. 2005). To succeed on its affirmative defense of patent misuse, Defendants must prove that Bandspeed "has impermissibly broadened the scope of the [patents-in-suit] causing an anticompetitive effect." *Trinity Industries, Inc. v. Road Sys., Inc.*, 235 F. Supp. 2d 536, 541-42 (E.D. Tex. 2002). Patent misuse cases typically involve illegal tying, enforcing

package licensing, pricing restraints, and extending royalty terms past a patent's expiration. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998).

Bandspeed is simply seeking to enforce the patents-in-suit against Defendants. By definition, such conduct is not patent misuse. *STMicroelectronics,* 2006 WL 1624534, at *2. Defendants have no evidence that Bandspeed's conduct has caused an anticompetitive effect. Moreover, Defendants have no evidence of illegal tying, enforcing package licensing, pricing restraints, extending royalty terms past the expiration of the patents-in-suit, or any other anticompetitive activity. *See C.R. Bard, Inc.*, 157 F.3d at 1372. Accordingly, Defendants patent-misuse defense fails as a matter of law.

## VIII. Defendants' Marking Defense Fails Because There is No Evidence That Bandspeed or its Licensees Sold Any Unmarked Products That Performed the Patented Claims.

Patentees must comply with 35 U.S.C. § 287(a) (the "Marking Statute") in order to recover damages for infringement. *Halliburton Servs. v. Smith Int'l Inc.*, 317 F. Supp.2d 719, 723 (E.D. Tex. 2004). Under the Marking Statute, a party is entitled to damages from the time when:

- It began marking the products in compliance with section 287(a); or

- It actually notified the infringer of its infringement, whichever is earlier.

*Id.* Likewise, a patent holder that has licensed its patents may recover damages when its licensees mark products in compliance with the Marking Statute. *See Maxwell v. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996). However, "[t]he recovery of damages is not limited where there is no failure to mark, i.e., . . . where there are no products to mark." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002).

Defendants' affirmative defense of marking fails as a matter of law because there is no evidence that Bandspeed sold any products that performed the patented claims after the issuance of its '418 patent in April 2006 and before Bandspeed filed suit against Defendants on June 30, 2010. Fact ¶ 14. Moreover, the only licensing agreement that Bandspeed entered before June 30, 2010—the May 28, 2010 agreement with Scosche—

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

## CONCLUSION

Defendants have failed to meet their burden of proving each element of their license, waiver, equitable estoppel, promissory estoppel, laches, unclean hands, patent misuse, and marking defenses, as well as their counterclaims seeking a declaratory judgment that the patents-in-suit are unenforceable. Accordingly, Bandspeed respectfully requests this Court grant its Motion for Partial Summary Judgment, and further requests such other relief to which it may be justly entitled.

DATED this 10th day of January, 2014.

Respectfully submitted,

By:      /s/ Mikal C. Watts
          Mikal C. Watts
          State Bar. No. 20981820
          Christopher V. Goodpastor
          State Bar No. 00791991
          Linda K. Leibfarth (pro hac vice)
          WATTS GUERRA LLP
          811 Barton Springs Road, Suite 725
          Austin, Texas 78704
          Telephone: (512) 479-0500
          Facsimile: (512) 479-0502
          Email: mcwatts@wattsguerra.com
               cgoodpastor@wattsguerra.com
               lleibfarth@wattsguerra.com

Edward W. Allred
State Bar No. 50511764
Francisco Guerra, IV
State Bar No. 00797784
Mark Fassold
State Bar No. 24012609
Shalimar S. Wallis
State Bar No. 24033191
WATTS GUERRA LLP
300 Convent Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 527-0500
Facsimile: (210) 527-0501
Email: eallred@wattsguerra.com
        Fguerra@wattsguerra.com
        mfassold@wattsguerra.com
        swallis@wattsguerra.com

Andrew G. DiNovo
State Bar No. 00790594
Adam G. Price
State Bar No. 24027750
DINOVO PRICE ELLWANGER &
HARDY LLP
7000 N. MoPac Expressway, Suite 350
Telephone: (512) 539-2626
Facsimile: (512) 539-2627
Email: adinovo@dpelaw.com
        aprice@dpelaw.com

**ATTORNEYS FOR PLAINTIFF
BANDSPEED, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 10, 2014, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the parties listed below.

/s/ *Christopher V. Goodpastor*
Christopher V. Goodpastor

Stephen E. McConnico
Steven J. Wingard
Paige Arnette Amstutz
SCOTT, DOUGLASS & MCCONNICO
600 Congress Avenue, Suite 1500
Austin, TX 78701
Email: smcconnico@scottdoug.com
        Swingard@scottdoug.com
        pamstutz@scottdoug.com
*Via Email*

Adam P. Seitz
Michelle L. Marriott
Caroline A. Bader
Erise IP, P.A.
6201 College Blvd., Suite 300
Overland Park, KS 66211
Email: adam.seitz@eriseip.com
        Michelle.marriott@eriseip.com
        Carrie.bader@eriseip.com
*Via Email*

**ATTORNEYS FOR DEFENDANTS GARMIN INTERNATIONAL, INC. AND GARMIN USA, INC.**

David J. Healey
Wasif H. Qureshi
Brian G. Strand
Michael Rueckheim
FISH & RICHARDSON PC
1221 McKinney Street, Ste 2800
Houston, TX 77010
Email: healey@fr.com
        qureshi@fr.com
        strand@fr.com
        rueckheim@fr.com
*Via Email*

Michael J. McKeon
FISH & RICHARDSON PC
1425 K Street N.W., 11th Floor
Washington, D.C. 20005
Email: mckeon@fr.com
*Via Email*

**ATTORNEYS FOR DEFENDANTS LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS
MOBILECOMM U.S.A., INC.**

William H. Boice
Michael J. Turton
Bonnie M. Grant
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530
Email: bboice@kilpatricktownsend.com
        mturton@kilpatricktownsend.com
        bgrant@kilpatricktownsend.com
*Via Email*

Steven D. Moore
Caroline K. Wray
Matias Ferrario
James L. Howard
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Email: smoore@kilpatricktownsend.com
        cwray@kilpatricktownsend.com
        mferrario@kilpatricktownsend.com
        jihoward@kilpatricktownsend.com
*Via Email*

Mark A. Mayfield
Mark T. Mitchell
GARDERE WYNNE SEWELL LLP
One America Center
600 Congress Avenue, Suite 3000
Austin, TX 78701
Email: mmayfield@gardere.com
        mmitchell@gardere.com
*Via Email*

Christina E. Fahmy
Peter M. Boyle
KILPATRICK TOWNSEND & STOCKTON LLP
607 14th Street, NW, Suite 900
Washington, DC 2005
Email:  Cfahmy@kilpatricktownsend.com
            Pboyle@kilpatricktownsend.com
*Via Email*

**ATTORNEYS FOR DEFENDANTS MOTOROLA MOBILITY LLC
AND MOTOROLA SOLUTIONS, INC.**


Jeffrey K. Sherwood
Gerard Haddad
Jonathan Falkler
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, D.C. 20006-5403
Email: sherwoodj@dicksteinshapiro.com
            haddadg@dicksteinshapiro.com
            falklerj@dicksteinshapiro.com
*Via Email*

David Philip Whittlesey
J. Rogers Williams, Jr.
ANDREWS KURTH LLP
111 Congress Avenue
Suite 1700
Austin, TX 78701
Email: dwhittlesey@akllp.com
            Rwilliams@andrewskurth.com
*Via Email*

**ATTORNEYS FOR DEFENDANTS TOSHIBA CORPORATION,
TOSHIBA AMERICA INFORMATION SYSTEMS, INC. AND
TOSHIBA AMERICA, INC.**