# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| BANDSPEED, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GARMIN INTERNATIONAL, INC. *et al.*; | ) | Case No.   1:11-CV-00771 |
| | ) | |
| Defendants, | ) | |
| | ) | |

## TOSHIBA AND LG'S REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PATENT INFRINGEMENT CLAIMS

## I. Defendants Have An Express License To The Patents In-Suit Based On The Plain Language Of The BPLA

There are two royalty-free patent licenses under the Bluetooth Patent/Copyright License Agreement: one under section 4(b), and a separate one under section 5(b). Bandspeed argues that section 4(b) is either a copyright license, or in the alternative is a patent license that permitted it to withdraw from the Bluetooth SIG and take its patents rights with it based on the language in section 7. Bandspeed is wrong on both counts.

The section 4(b) patent license concerns those members who make contributions to a specification, and it is irrevocable whether or not the contributor withdraws from the Bluetooth SIG. This makes sense for a standards body that has set up a standard to be royalty-free because it would not want to be "held up" by a contributor with patents after the working group had gone through all the effort to create a new feature of the standard, only to have a contributor back out later on. The license grant under section 4(b) is defined, or "specified", in section 5(b), but the license under 5(b) is a separate license. The grant under 5(b) is a patent license, which Bandspeed does not dispute. A contributor grants the patent license under section 4(b) "even if such … Member has withdrawn or been terminated as a member of the Bluetooth SIG." Ex. 1 at p. 4.[1]

The section 5(b) license applies instead to all members of the Bluetooth SIG, not just to contributors. This section requires each member to license to all other members all of its patents that cover any part of a Bluetooth specification (regardless of contributions). Section 7 permits a member to withdraw up to three weeks after the adoption of a Bluetooth specification and not grant a license to its patents. This makes sense. There are thousands of members of the Bluetooth SIG, most of whom do not participate in the standards body or in a working group.

---

[1] "Ex." refers to Opening Brief exhibits; "Opp. Ex." refers to Opposition Exhibits; "Reply Ex." Refers to Reply exhibits; "Br." refers to Opening Brief; "Opp. Br." refers to Opposition Brief.

Section 7 gives such members a three-week window of time to examine the standard after its adoption, and if that member sees that the standard has now gone in a direction that falls under its own patents, it can decide to withdraw, and if so, the effective date of that withdrawal is just prior to the adoption of the specification. This is fair to a member who had not contributed its technology to the standard and would not have known that its patents now cover a new version of a Bluetooth specification and would now be licensed to all other Bluetooth SIG members royalty-free if it remained a member. This is in contrast to the irrevocable license in section 4(b) in which a contributing member actively participated in creating any Bluetooth Specification or Draft Bluetooth Specification, and contributed its technology to the specification, and therefore was fully aware that if it had patents that covered its contributions, those patents would be licensed royalty-free regardless of whether it withdrew from the Bluetooth SIG.

Bandspeed incorrectly interprets section 7(b)(iii) of the BPLA as a way for a contributing member to withhold the license it has granted under section 4(b). Opp. Br. at 10. The proper reading of this section permits a contributor that withdrew, prior to the adoption of a Bluetooth Specification to which it contributed, to obtain a license under section 5(b) to patents owned by all of the other members of the Bluetooth SIG that would have been licensed to the contributor had the contributor not withdrawn. If the withdrawing contributor grants a license to its patents that would otherwise have been licensed under section 5(b) had it not withdrawn (that is, grants a license to the patents that cover aspects of Bluetooth technology that the withdrawing contributor did not contribute), it will get in return "a license from all Licensees regarding all such Bluetooth Specifications (i.e. all those which include such Member's Contributions)." Ex. 1, § 7. In other words, in return for the contributing member granting a license to its patents covered under section 5(b), the withdrawing contributor gets a license back from other members, enabling it to practice that particular version of the Bluetooth specification to which it contributed without

threat of suit from any other member, yet do so without maintaining its membership.[2]  This additional benefit is only available for those members who withdraw and are also contributors to a Bluetooth specification, but it is not automatic – the withdrawing member must grant a corresponding license to its patents that are covered by section 5(b).

Section 7(b)(iv) makes it clear that licenses under section 5 survive the withdrawal of a member if the withdrawal is after the effective date of the adoption of the specification.  This section says nothing about section 4(b) because section 4(b) licenses survive the withdrawal of a member regardless of the timing of that withdrawal.

Section 7(b)(vi) is merely a catch-all provision that has no effect on the explicit language of the last clause of section 4(b), which specifically states that the license under this section survives the contributor's withdrawal from the Bluetooth SIG.  Permitting a contributor to withdraw from the Bluetooth SIG and not license its patents royalty-free under section 4(b) would completely read out the language of the last clause of section 4(b), making that language superfluous, an impermissible contract interpretation.

Indeed, Bandspeed's interpretation of the BPLA completely reads out all of section 4(b) – first, by arguing that it is a copyright license, which would make section 4(b) redundant with respect to section 4(a), and second, by arguing that even if it were a patent license, contributors can still withdraw within three weeks after a Specification's adoption and keep their patent

---

[2] Bandspeed mistakenly argues that section 7(b)(iii) involves the "right to license (or not to license) [a] Contribution."  Opp. Br. at 11.  This is inconsistent with plain language of 7(b)(iii) which "grants a license under the terms of Section 5(b)" – not section 4(b) which is the Contribution license.  As an example of how section 7(b)(iii) works: here, Bandspeed contributed its AFH technology to the Bluetooth SIG standard.  Assuming that (i) Bandspeed later withdrew from the Bluetooth SIG, (ii) had patents that related to other technology included in the Bluetooth SIG standard, e.g., patents relating to Bluetooth power management (not relating to AFH), and (iii) decided it did want to manufacture a Bluetooth product--Bandspeed, under section 7(b)(iii) could agree to license its power management technology in exchange for a reciprocal license from all Bluetooth SIG members. Under section 4(b) Bandspeed's AFH technology is licensed "even if [Bandspeed] has withdrawn."

rights, making it redundant with respect to section 5(b). Opp. Br. at 5 and 9.  Neither of these interpretations make sense nor are they supported by the plain language of the agreement.

The plain language of BPLA section 4(b) grants an irrevocable patent license to contributions from contributors like Bandspeed, especially when read in the context of the other relevant sections of the BPLA.  Bandspeed's interpretation of the BPLA requires all sorts of contortions, making it into a puzzle where the pieces do not fit together and throwing out entire pieces that it doesn't like.

**II.     The Extrinsic Evidence Does Not Support A Contributor's Withdrawal From The Bluetooth SIG Followed By Patent Holdup**

There is no doubt that Bandspeed fully understood that the offer of its technology would result in "automatic" licensing to all Bluetooth SIG members, Ex. 12, Bluetooth IP Strategy, at BSPD0074873, and Bandspeed's former CFO, John Curtin, acknowledged that BPLA section 4(b) granted a patent license.  Br. at 14; Ex. 40, Curtin Dep. at 215:2-7.  Moreover, Bandspeed employees Rick Beale, Stan Skafidas and Michael Luther discussed and were aware of the licensing obligations for "technology contributed to the specification" under BPLA section 4. Ex. 5, Beale Dep. 85:3-11.  Finally, the Bluetooth SIG itself interprets the license under section 4(b) as a royalty-free patent license upon adoption into the standard even if the member has withdrawn from the Bluetooth SIG. Ex. 41, Powell Dep. at 115:17-117:16; Ex. 34, Foley Dep. at 169:4-10.  Furthermore, Bandspeed accepted the terms of the BPLA with full knowledge of the licensing requirements on its patent portfolio when a contribution was made and adopted.  Ex. 40, Curtin Dep. At 215:2-7; Ex. 5, Beale Dep. 85:3-11; Ex. 43, Burke Dep, at 94:15-23 ("it was a bad move for Bandspeed to join the Bluetooth SIG in the first place . . . [b]ecause the Bluetooth SIG required members to give up rights to licensing revenue from their IP.").

Bandspeed's extrinsic evidence on which it relies fails for several reasons.  First, none of

the evidence submitted by Bandspeed provides support for a *contributing* member to withdraw and then later assert patents covering its contributions. Contributing members are treated differently under the terms of the BPLA, and for good reason. Once a submission has been made by a contributing member in an effort to shape an upcoming specification, it would be a great injustice to allow that member to obtain licensing fees from fellow members for intellectual property rights contained in the submission. This scenario is explicitly addressed in BPLA section 4(b), wherein a license is granted regardless of withdrawal, thus prohibiting the very actions taken by Bandspeed in this case.

For example, Bandspeed relies on an email from Tom Seip, Bluetooth SIG's General Manager from 2001 to 2002, for support for its position that contributing members can withdraw from the Bluetooth SIG and take their patent rights with them to assert against other members. Opp. Br. at 7; Opp. Ex. 2. Yet nowhere in Mr. Seip's email is withdrawal under section 4(b) of the BPLA addressed. Rather, this email could only have been referencing section 5(b) of the agreement, where timely withdrawal by a non-contributing member can avoid licensing obligations.

Indeed, the extrinsic evidence demonstrates that Bandspeed was fully aware before it became a member that the Bluetooth SIG would not incorporate any technology into a Bluetooth specification because of the Bluetooth SIG's royalty-free licensing requirement. In a May 2001 email to Bijan Treister, one of the inventors of the patents-in-suit, Steve Shellhammer (head of the coexistence working group at the IEEE) told Bandspeed:

> I was on the Bluetooth SIG Coexistence Working Group conference call this morning and I reported how in IEEE 802.15.2 [the IEEE coexistence working group] we agreed on an Adaptive Frequency Hopping proposal. Tod Sizer [head of the Bluetooth SIG Coexistence Working Group] was very interested in what the IEEE is doing in AFH and asked me to send the final proposal … to the Bluetooth SIG Coexistence Working Group email reflector, which I did.

5

> The Bluetooth SIG wants to develop an AFH technique and incorporate it into the Bluetooth specification.  <u>Tod Sizer is concerned about any Intellectual Property issues, since the Bluetooth SIG requires Royalty Free licensing</u>.
>
> As far as he was able to determine by looking at the Bluetooth SIG web site, neither IPC nor Bandspeed are members of the Bluetooth SIG.
>
> \*   \*   \*
>
> <u>Tod Sizer will be hesitant to consider adopting an IEEE proposal if one or more of the companies that submitted the proposal are not Bluetooth members</u>.  I would like to get the Bluetooth SIG to work with us and adopt our technique so I am interested in knowing if your companies plan to join the Bluetooth SIG.

Opp. Ex 28, May 25, 2001 email, Shellhammer to Treister (emphasis added).

The fact that the Bluetooth SIG does not track member contributions is irrelevant to this case because there is substantial evidence of Bandspeed's contributions;[3] at most, the lack of contribution tracking shows that the Bluetooth SIG expected its members to act in good faith. Moreover, the Bluetooth SIG does track contributors, and identifies Bandspeed as a "contributor" in Specifications and Draft Specifications.  *See* Exs. 23-25, 33 at BSPD0401701. The Defendants have pointed to an abundance of evidence laying out what Bandspeed contributed to the Bluetooth standard.  *See* Br. SOF 19-22; Exs. 13-30.  Bandspeed also does not dispute that it submitted information pertaining to AFH to the Bluetooth SIG with the very hopes of getting it adopted.  *See e.g.* Ex. 5 (7/17/2012 Beale deposition, Tr. 172-74); Ex. 12 at BSPD0074878.

Finally, Bandspeed's reliance on the boilerplate language on the "discussion documents" containing its submissions to the Bluetooth SIG is irrelevant to the BPLA and misplaced.  Opp. Br. at 8; Opp. Ex. 8.  First, the disclaimers in this document are Bluetooth SIG disclaimers, not disclaimers made by contributors.  Reply Ex. 45 (6/27/2013 Powell deposition, Tr. 150-53).  The plain language of these disclaimers warns readers that the proposed provisions therein had not

---

[3]

6

yet been adopted ("Readers should not design products based on these documents").  Opp. Ex. 8.  Because this is a "discussion document", members should not yet implement those proposed changes or design products based on the submissions made or rely on anything in discussion documents like Opp. Ex. 8.  Bandspeed also points to the boilerplate language "[n]o license, express or implied, by estoppel or otherwise, to any intellectual property rights are granted herein" in the discussion documents as evidence that the contributor did not give a license to any intellectual property rights.  But as Mr. Powell testified, this language was a Bluetooth SIG disclaimer and not a disclaimer of any contributors.  Regardless of this language, because this was a "discussion document", the licenses in sections 4(b) and 5(b) would not yet apply because those licenses only take effect when the technology in the discussion documents is later included in a Bluetooth specification.  The purpose of these boilerplate statements was not to relieve a party who submitted a proposal for inclusion in a Bluetooth specification from its licensing obligations expressly provided for in the BPLA.

### III.   Bandspeed's Submissions to the Bluetooth SIG were "Contributions" Included in Bluetooth Specification Version 1.2

Bandspeed's own internal documents acknowledge that it not only contributed to version 0.7 of the AFH Draft Specification, but that the Bluetooth SIG adopted Bandspeed's proposal in version 0.7.  Specifically, at page 3 of Exhibit 13 to Defendants' Opening Brief, in the section regarding the Bluetooth SIG status, Bandspeed acknowledged:

- That it is a contributor to the Bluetooth SIG coexistence solution.
- That AFH had already been adopted, and that the adopted AFH technology is the same as what Bandspeed had proposed to the IEEE.
- That it had contributed to version 0.7 and that it was "still in the loop".

Ex. 13 at BSPD0485327.  Therefore, Bandspeed's own documents demonstrate that its position before this litigation was that it contributed its technology to the Bluetooth SIG, and that its technology was indeed adopted by the Bluetooth SIG.  It further admits that it was "in the loop"

7

all along the way to version 0.7. It is only since this litigation began that Bandspeed has changed its tune because of the licensing obligations of contributors.

The evidence of Bandspeed's contributions to the Bluetooth SIG regarding adaptive frequency hopping is substantial. *See* Br. SOF 19-22; Exs. 13-30. The evidence of the adoption of these contributions into Bluetooth Specification v.1.2 is likewise abundant. *See* Exs. 10, 31, 33-36. In fact, Bandspeed does not dispute that its contributions, at least with respect to the claims it admits are necessary, were adopted in Bluetooth Specification v. 1.2.

Bandspeed argues that it is possible to avoid practicing any of the asserted claims and still be compliant with Bluetooth Specification v.1.2. Opp. Br. 16. However, if a Bluetooth SIG member wants to build a Bluetooth product that uses adaptive frequency hopping, that member must design that product according to the requirements of the Bluetooth specification for implementing adaptive frequency hopping in order to be considered compliant with the specification. Bandspeed's argument that members simply "turn off" AFH completely defeats the purpose of standards, which generally seek widespread adoption. Ex. 39 at ¶ 3.

With respect to the claims Bandspeed says are not necessary to practice Bluetooth v.1.2, that is, claims 2, 22, 41, 70 and 109 of the `418 patent, and claims 37, 89 and 94 of the `614 patent (Opp. Br. 15-16), Dr. Goodman stated in his declaration that he compared each of the claims with portions of documents showing Bandspeed's contributions to the Bluetooth SIG. Ex. 36 at ¶ 5. Furthermore, Mr. Skafidas, one of the inventors of the patents-in-suit, testified that in order to practice the AFH portions of the Bluetooth specification v.1.2 and higher, it is necessary to practice the claims of the `418 and `614 patents. Reply Ex. 46 (10/17/2013 Skafidas deposition, Tr. 232-233).

Bandspeed also asserts that Dr. Goodman somehow interpreted the BPLA. However, Dr. Goodman merely compared the Adaptive Frequency Hopping technique presented by Bandspeed

8

to the Bluetooth SIG, the AFH techniques adopted into Bluetooth Specification v.1.2, and the AFH technique disclosed in Bandspeed's Patents. Ex. 36 ¶¶ 3-6. This task is purely technical, and involves no interpretation of the BPLA contract terms or conditions.

Finally, Bandspeed attempts to argue that its contributions fall outside the scope of those defined in the BPLA because AFH "improves" Bluetooth interoperability," but is not "needed" for Bluetooth interoperability. If this narrow reading of the BPLA was indeed correct, any contributing member whose submission wasn't absolutely essential to Bluetooth communication would be permitted to sue every user of Bluetooth for patent infringement in the United States. Clearly, this interpretation flies in the face of the abundant evidence in the record that the BPLA was explicitly designed to provide for a royalty-free standard prohibiting such actions, a policy of which Bandspeed was fully aware. *See e.g.* Opp. Ex. 28, Steve Shellhammer email, referenced above.

## IV. BANDSPEED'S OBJECTIONS TO EVIDENCE

Bandspeed objects to AFH Specifications v. 0.3, 0.5 and 0.7 (Exs. 23-25) as inadmissible hearsay. These documents are admissible at least because they fall under the business records exception to hearsay under Federal Rule of Evidence 803(6) Records of a Regularly Conducted Activity. These records were made at a time by someone with knowledge, were made and kept in the course of regularly conducted business of the Bluetooth SIG, and are trustworthy. As described by Michael Foley, Executive Director of the Bluetooth SIG, in his deposition dated July 24, 2010, these documents are draft Bluetooth specifications, as defined by the Bluetooth SIG bylaws. Reply Ex. 47, Tr. 151-52. There are strict procedures in place for the preparation and distribution of these draft specifications to the Bluetooth SIG members, as well as for the process by which the draft specifications are voted on and possibly adopted by the SIG. Reply Ex. 47, Tr. 152-58, 202-05. Moreover, Bandspeed's own attorney introduced AFH

Specifications v.0.1, 0.3, and 0.5 during the deposition of Michael Crowley, dated July 24, 2013. Reply Ex. 48, Tr. 140, 155; Reply Ex. 49.

Bandspeed also objects to the declaration of Peter Schwechhimer (Ex. 39), arguing that it should be struck because he "opines regarding the interpretation of the BPLA as a 'RAND-Z' licensing policy," and that there are no facts in his declaration establishing him as qualified under Rule 702 to render a legal opinion regarding the BPLA.  However, Mr. Schwechheimer does not interpret the BPLA or opine as to whether the royalty-free provisions of the BPLA apply to Bandspeed.  Instead, Mr. Schwechheimer's declaration provides an explanation as to why it is economically efficient for a standards organization to adopt a royalty-free licensing policy, and his declaration is only relied on by Defendants for that proposition.  Br. at 18; Ex. 39.  Mr. Schwechheimer only rendered an expert opinion relating to the economics of a royalty-free agreement, an opinion for which he is eminently qualified as an economist and Vice President at Charles River Associates where he "specializes in economic financial analysis pertaining to intellectual property and antitrust-related litigation," which Bandspeed does not dispute.  Ex. 39, ¶ 1.  He did not render a legal opinion.

## V. CONCLUSION

Bandspeed knew the consequences of making contributions to the Bluetooth SIG, a royalty-free standards organization.  Yet, Bandspeed believed it could beat the system and squeeze some value out of its admittedly "worthless" patents by taking advantage of fellow Bluetooth contributors and adopters. But the intent of the parties was clear – all technology in an adopted standard is royalty-free.  Now, Bandspeed should finally be held to the terms of the contract into which it freely entered, rather than be allowed to continue this blatant shakedown.

For all the foregoing reasons, and those expressed in Defendants' Opening Brief (Dkt. 1478), Defendants ask the Court to grant their motion for summary judgment against Bandspeed.

Date:  January 21, 2014 By:  */s/ Gerard A. Haddad*

David P. Whittlesey
dwhittlesey@andrewskurth.com
State Bar No. 00791920
J. Roger Williams, Jr.
rwilliams@andrewskurth.com
ANDREWS KURTH LLP
State Bar No. 21555650
111 Congress Avenue, Suite 1700
Austin, Texas, 78701
Telephone: (512) 320-9200
Facsimile: (512) 320-9292

Jeffrey K. Sherwood
SherwoodJ@dicksteinshapiro.com
State Bar No. 24009354
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, D.C.  20006
(202) 420-2200 (office)
(202) 420-2201 (fax)

Gerard A. Haddad (*pro hac vice*)
HaddadG@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York  10019
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Attorneys for Defendants Toshiba Corporation, Toshiba America Information Systems, Inc. and Toshiba America, Inc.*

11

By:  */s/ Michael Rueckheim by permission*

David J. Healey (09327980)
Wasif Qureshi (24048155)
Brian G. Strand (24041166)
Michael R. Rueckheim (24081129)
Jackob Ben-Ezra (24073907)
FISH & RICHARDSON PC
1221 McKinney Street, Ste. 2800
Houston, TX 77010
Tel: (713) 654-5300
Fax: (713) 652-0109
healey@fr.com
qureshi@fr.com
strand@fr.com
rueckheim@fr.com

Michael J. McKeon
FISH & RICHARDSON PC
1425 K Street N.W., 11th Floor
Washington, D.C. 20005
Tel: (202) 783-5070
Fax: (202) 283-7331
mckeon@fr.com
William Thomas Jacks (10452000)
FISH & RICHARDSON PC
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
Tel: (512) 472-5070
Fax: (512) 320-8935
jacks@fr.com

***Counsel for Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc***.